IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF ILLINOIS

| | |
|---|---|
| **Subhadra Gunawardana and David Seely, pro se** | |
| **Plaintiffs,** | Case No.  *19-96 NJR-MAB* |
| | Jury demand |
| **vs.** | |
| **American Veterinary Medical Association (AVMA), Educational Commission for Foreign Veterinary Graduates (ECFVG) and Council on Education (COE)** | |
| **Defendant** | |

## Memorandum of Law in support of Complaint

Plaintiffs bring this action pursuant to 28 U.S. Code § 1331 against the AVMA and its branches the ECFVG and COE, for violations including equal rights, contractual and antitrust laws.

## I.    Parties, Jurisdiction and Service

1.   Dr. Subhadra Gunawardana, a resident of Florissant, MO, comes now to respectfully lay claims against the Defendants, American Veterinarian Medical Association [hereafter the AVMA], and its branches the Educational Commission for Foreign Veterinary Graduates [hereafter the ECFVG], and the Council on Education [hereafter the COE]. The defendants are headquartered in Schaumburg, IL, doing business nationwide. David Seely is Dr. Gunawardana's husband, witness and assistant throughout her career and the events in question.

1

2.    Jurisdiction is proper under 28 U.S.C. § 1331. Venue is proper under 28 U.S. Code § 1391(b) (3) & (d), as the defendants do business nationwide and the plaintiffs have resided in TN, IL and MO during the events in question to the present.

## II.    History/Background

3.    Subhadra Gunawardana was born in Sri Lanka and received her professional veterinary degree [BVSc] from the University of Peradeniya in 1991. In 1992 Dr. Gunawardana came to the USA as a graduate student. She completed a Masters in Pharmacology at Iowa State University College of Veterinary Medicine, a PhD in Pharmacology at Cornell University College of Veterinary Medicine, and postdoctoral research in Diabetes & Endocrinology at Vanderbilt University Medical School. She is currently employed as an Associate Professor at Washington University Medical School, St Louis, MO.

4.    AVMA is an organization representing veterinarians, and is recognized as the collective voice for the entire veterinary profession. AVMA collects dues from veterinarians in exchange for protecting, promoting, and advancing the veterinary profession. AVMA secures federal grant funding and loan repayment relief for veterinarians, and its political action committee provides financial support to selected candidates seeking election to the U.S. Congress. AVMA's stated commitment includes: "*Developing positions on key issues and advocates for veterinarians, advancing their ability to provide crucial veterinary services;     Providing educational accreditation and certification programs that protect and elevate the quality of veterinary care; Providing timely and relevant products and services to AVMA members that enhance their opportunities for success and service, and supports them in protecting the health*

2

*and welfare of animals in their care;  Educating the public on the important and varied types*
*of work that veterinarians do to advance both animal and human health.*"

5.    The COE and ECFVG are the branches of the AVMA that carry out the stated function of
providing educational accreditation and certification programs. Under the policies and
procedures set up by the AVMA, the ECFVG tests the professional skills of foreign veterinary
graduates seeking to practice in the USA, and provides the educational certification necessary
for that purpose. ECFVG certification is required before a foreign veterinary graduate can apply
for a license to practice in the United States. AVMA is the sole authority recognized by the
federal government for accreditation of veterinary education programs, and ECFVG
certification is an educational pre-requisite for foreign veterinary graduates as accepted by the
federal government and all state regulatory boards.

6.    ECFVG certification includes 4 steps: Credentials verification; English language testing;
written exam; and the Clinical Proficiency Exam (CPE) which includes seven sections of hands-
on practical skills testing.

7.    If a candidate receives an adverse decision at any point in the program, they have the
opportunity to appeal through the ECFVG/COE internal appeals process. The candidate can
first submit a petition for reconsideration through the ECFVG, and if not satisfied with that
decision, a subsequent petition for review which is conducted by the COE. Once these two
internal appeals are exhausted, candidates have no further recourse.

3

8.   In 2008 Dr. Gunawardana started the process of qualifying for license to practice Veterinary Medicine in the US, as part of her continuing education.  US licensing regulations required her to first obtain the ECFVG certification administered by the AVMA. From 2008 through 2013 she completed the first three steps of the ECFVG program, which include Credentials verification, English language testing, and Basic and Clinical Sciences Examination [written exam]. From 2015 through 2017 she went through the final step, the CPE [Clinical proficiency exam].

9.   During the CPE Dr. Gunawardana received an adverse decision, i.e. failing grade for the Anesthesia section, which was erroneous to the best of her knowledge. She appealed this decision through the ECFVG appeals procedure. The appeal was denied at both levels, leaving no further recourse. As described in detail in the next section, the appeal was handled improperly. The complaint is not only about this decision but the appeals procedure itself and ECFVG policies as a whole, which she believes violate the equal rights of its candidates. The denial of her appeal is a direct result of the problems with these policies.

### III.    Facts

10.  Dr. Gunawardana received a failing grade for the Anesthesia section during her ECFVG clinical proficiency exam, in November 2017. As reason for failure, the score report alleges a fatal flaw, i.e. *"Candidate failed to secure endotracheal tube and inflate the cuff appropriately within the time allotted after induction of anesthesia"*.  Plaintiff is certain such a flaw did not happen, and appealed the decision with detailed evidence [Ex.1: Appeal correspondence]. Even

4

though ECFVG failed to provide any independent impartial evidence to support the score report, both review panels upheld the original adverse decision, breaching the substantial evidence rule.

11.   Plaintiff disputes the examiner's position in the score report, and strongly believes that the videotape of this exam section would uphold her position and show that she performed the tasks correctly and in time [pages 1-2, ex.1]. ECFVG refused to release this videotape; failed to address many specific points raised in her petition, and denied the petition without providing a valid reason [page 4 of ex.1: Decision letter dated 02/07/2018].

12.   Subsequently she submitted a petition for review, pointing out the aforementioned facts and providing additional evidence demonstrating her ability to perform the tasks in question well within the time limit [pages 5-9 of ex.1: Petition for Review, submitted 03/01/2018]. While the COE review panel acknowledges the evidence presented, they affirm the original adverse decision based solely on the disputed score report with no independent verification, once again failing to address/rebut the key points plaintiff presented [pages 10-13 of ex.1: Memorandum dated 04/20/2018, Decision letter dated 05/18/2018].

13.   The actions of both review panels fail to meet the substantial evidence standard, falling short of the transparency and rules of evidence customary in arbitration procedures and the industry standards in equivalent certification programs such as USMLE/ECFMG [United States Medical Licensing Examination/ Educational Commission for Foreign Medical Graduates], not to mention ECFVG's own stated procedures of considering evidence presented by candidates.

14. Plaintiffs believe that the aforementioned decision is not an isolated incident, but rather a routine occurrence with all/most appeals from CPE candidates, as would be evident from ECFVG's records. This is due to the flaws in the appeals process and the policies overall, as specified in the Claims section below. In particular, the appeals process is designed in such a way that candidates cannot prevail.

15. On 09/05/2018 Dr. Gunawardana wrote to Dr. John de Jong, the president of the AVMA, describing the problems with the system, requesting correction of said problems and requesting specific relief for her situation [Ex. 2, pages 1-2]. Dr. de Jong replied stating that he would forward her email to the ECFVG and request that they review their policies and procedures in light of her comments and provide a response to him [Ex. 2, page 3]. Dr. de Jong further stated that as president of the AVMA he had no role in the reviewing or modifying decisions by the ECFVG, and these concerns should be addressed back to ECFVG staff.  Accordingly, Dr. Gunawardana wrote to ECFVG staff again, requesting to reverse the adverse decision in light of the problems with the appeals procedure specified in her letter to the president [Ex. 2, page 4]. ECFVG responded on 9/25/2018, refusing the request per their current policies, and failing to acknowledge the specific problems with the current policies pointed out by plaintiff [Ex. 2, page 5].

16. Subsequently Dr. Gunawardana submitted complaints to several federal regulatory agencies including the EEOC, USDE, USDoJ Education Opportunities Section and Disability Rights Section. Each agency declined to investigate, citing a lack of jurisdiction or that "another agency may be more suited for this complaint". Thus, it appears that the AVMA/ECFVG/COE

currently operate with no oversight or regulation, which in itself is a violation of the equal rights and protections of the candidates that they serve. Plaintiffs pray the court to correct this situation.

## IV.    Claims

17. The ECFVG policies and procedures, including the appeals procedure, breach a number of laws and guidelines such as the Sherman Antitrust Act; Contract laws; the Civil Rights Act of 1964; the Equal Protection Clause of the 14th Amendment; 42 U.S.C. § 1981; 42 U.S.C. § 1985(3); Americans with Disabilities Act and its amendments; and the Code of Professional Responsibilities in Educational Measurement. By imposing a greater burden on foreign veterinary graduates as opposed to US veterinary graduates, these policies violate their equal rights under the constitution.

ECFVG policies & Procedures [Exhibit 3]

Appeals procedure [pages 15-19, Ex.3]:

18.  The grounds for appeal are limited, and do not allow appeal in the event an examiner made an honest mistake or a biased decision; or in the event a stated procedure of ECFVG is incorrect.

19.  When a candidate disputes an examiner's assessment on a specific matter, the appeals procedure should have an independent and unbiased method to verify whose position is correct. ECFVG does not have such a process in place, in contrast to equivalent educational commissions such as the ECFMG/USMLE. Not having an impartial verification process, ECFVG appeals committees base their decisions solely on the examiners' records, i.e. the very

items under dispute in the first place. This procedural flaw is evident in the handling of the plaintiff's appeal, where she disputed a single entry in her score report. Plaintiff's position can be easily proven/disproven by a videotape of her Anesthesia exam section. ECFVG first declined to release this videotape [email dated 12/20/2017, page 8 of Ex.1]. Then in response to her petition for review, ECFVG stated that there is no videotape. Either way, they have provided no impartial evidence to support their position, and the COE review panel's decision falls short of the substantial evidence standard.

20. ECFVG prohibits candidates from obtaining any evidence from their own exam, leaving candidates with no way to prove their position in appeal. In response to the plaintiff's appeal, the review panel states: *"ECFVG policy allows, but does not require, video recording of the examination, and thus the lack of video documentation does not constitute failure to follow stated procedures. Furthermore, video recordings, if performed, cannot be used to reverse failing scores."* If candidates cannot obtain or use videotape evidence of their exam sections, a factual dispute on the events during an exam can never be resolved in an impartial manner. Appeals will be automatically decided against the candidate simply due to purported "lack of evidence", thus making the appeals procedure one-sided and redundant. This is a significant flaw in the stated procedures. Plaintiffs contend that the stated procedures are unconscionable, and adverse decisions made under these procedures should be null and void.

21. Having deprived candidates of the most critical evidence, the appeals process also disregards any other evidence a candidate presents in support of their claim. In the plaintiff's case, the review panel has stated *"The CPE is based on the anesthesia skills demonstrated during the examination, not based on the past or what may happen in the future"* thus

8

disregarding the additional evidence she presented demonstrating her ability to perform these tasks in time. Considering that professional skills need to be ongoing and permanent, this statement is incorrect, and contradicts the AVMA Principles of veterinary medical ethics.

22. The lack of transparency occurs in all steps of the appeals process. While candidates are required to send all documentation to ECFVG, candidates do not get to see any statements made or evidence presented by the ECFVG. The review panel members for both steps of the appeal are selected by the ECFVG/COE/AVMA at their sole discretion, with no input from the candidate.

23. Candidates may request a hearing, but are required to bear all expenses including travel and lodging for all participants. Hearings have no standard procedural guidelines, and candidates are not allowed legal representation. The review panels are not required to consider all evidence presented, or to show reasons for their decisions.

24. The aforementioned policies violate the Administrative Procedures Act. If AVMA/ECFVG/COE are not subject to the APA or equivalent statutes, that in itself deprives ECFVG candidates of their right to equal protection and due process, considering that the federal government has given these organizations absolute decision-making power over a specific group of people in a profession with far-reaching impact on the welfare of patients and clients. Candidates have no further recourse once the two steps of internal appeal are exhausted.

25. The aforementioned restrictions strongly contrast with the exams and appeal procedures for other equivalent professionals, such as US veterinary graduates or both foreign and US medical graduates. For example, the clinical exams in the USMLE/ECFMG are routinely videotaped; the appeals process is transparent; and candidates have opportunity for external appeal and legal representation.

English Language Requirement [page 10 Ex.3]

26. A waiver is available only for candidates from a few countries. All other foreign candidates have to pay for the English language test, even if they had completed their education in English, and/or can provide ample proof of English proficiency.

In addition to the appeals procedure, there are general problems with the CPE administration and the contract as a whole. The following are just a few examples.

CPE Candidate Bulletin [Exhibit 4]

27. ADA non-compliance: While the CPE candidate bulletin allows disability accommodation requests, it mandates the requests be made 90 days or more prior to exam date, thus excluding all disabilities that may occur within 90 days of the exam. [Page 6, Ex.4: CPE testing accommodations]. Plaintiff was denied an accommodation request in October 2016, resulting in failure of her previous Anesthesia section. This incident is described separately in Ex.5.

28. CPE format [page 2, Ex.4; page 12, Ex.3]: The CPE involves testing of hands-on skills of all aspects of veterinary medicine, including surgery, anesthesia, and clinical medicine in

several different species. While plaintiffs have no objection to this, it is noteworthy that such requirements are not made from US veterinary graduates, foreign medical graduates in the US, or foreign veterinary graduates in other countries like the UK. All these groups have gone through rigorous clinical training during their professional education, and only foreign veterinary graduates in the US are required to re-demonstrate all clinical/surgical skills before they can apply for license to practice. This requirement in itself places foreign veterinary graduates in an unequal position to their US counterparts, and the situation is exacerbated by the exorbitant fees and flawed appeals procedure associated with the ECFVG program.

29. Subjective nature: CPE sections are scored based solely on the examiners' evaluations, which are subject to human error. Lacking independent verification, this allows unfair treatment of candidates through mistake, incompetence or active bias on the examiners' part [not to mention compromising patient welfare].

30. Excessive burden on candidates: If a candidate fails any single section three times, they have to repeat all 7 sections of the whole exam [page 5, Ex. 4; CPE retakes]. Having to repeat sections in which one has already demonstrated proficiency is unfair in several ways. It is a substantial burden on time and resources, considering the exam cost of $7200-$7600 plus travel and lodging. Due to the subjective nature of scoring, candidates may fail one or more sections they had passed before, forcing them to retake the full exam many times. [Such incidents would be evident in the ECFVG records, and there are personal accounts of such incidents on online forums.] Again, these are stricter standards than those imposed on foreign medical graduates or US veterinary graduates.

11

31.  Not only are the ECFVG exam fees much greater than those for equivalent medical exams [page 3, Ex.4: Fees for the Full CPE], but they are non-refundable even in cases of family or medical emergencies [page 6, Ex.4: Application Process for retaking CPE sections; Rescheduling a Full CPE or retake sections]. This policy imposes a particular burden on foreign veterinary graduates from developing countries. ECFVG site shows a number of additional fee increases and time restrictions, making it that much harder for foreign veterinary graduates to enter the workforce in the US.

32.  It is noteworthy that foreign Medical graduates from non-accredited institutions who wish to enter the US workforce get to take the exact same exam alongside US medical graduates [USMLE], where they are tested for both written and clinical skills in a transparent manner, with access to an appeal procedure compliant with the Administrative Procedures Act. In contrast, foreign veterinary graduates are subjected to a number of *additional* exams not required of US veterinary graduates; conducted in a non-transparent manner; *without* access to a fair appeals process compliant with the APA.

33.  The aforementioned policies and practices reduce competition in the veterinary profession in an unethical manner, by imposing excessive restrictions on foreign graduates and making it difficult for them to enter the US workforce. The most obvious evidence for this is the far lower percentage of foreign veterinarians employed in the US compared to that of foreign physicians.

**Count I:**

Violation of contract laws

34.  ECFVG engages in a contract with each candidate for a service in exchange for money, to evaluate their professional knowledge and skills for a certificate making them eligible for licensure in the US. The contract is created by ECFVG under the oversight of AVMA.  As described in paragraphs 18-32 above, this contract is one-sided and unfair; lacks transparency and oversight; consequently making it impossible for the majority of candidates to pass. This fact would be evident by the high fail rates in the ECFVG program, as would be shown in ECFVG records.

35.  The contract is unconscionable due to the following reasons.

- All documents associated with the contract specify numerous duties and obligations for candidates, but few or none for ECFVG.

- There are no requirements for ECFVG to act in a fair and transparent manner.

- There is no external oversight of the CPE exam process to ensure that examiners and staff act fairly towards candidates (or humanely towards patients).

- The Appeals procedure is not fair or transparent, is entirely one sided, and designed in such a way that a candidate can never prevail.

- All aforementioned factors make for gross inequality of bargaining power.

Dr. Gunawardana paid the AVMA with the expectation that the ECFVG program would assess her skills in a fair and unbiased manner, which constituted an offer and acceptance [Ex.6].  She did not receive fair treatment, as described in paragraphs 10-15 and Ex.1 above. (Williams v.

13

Walker-Thomas Furniture Co., 350 F.2d 445 (D.C. Cir. 1965): a relevant case where plaintiff entered the contract not understanding the terms as they were not evident, with gross inequality of bargaining power.

**Count II:**

Violations of Title VII, 42 U.S.C. § 1981, and 42 U.S.C. § 1985(3)

36.  The very nature of the ECFVG is spelled out in their name: Educational Commission for Foreign Veterinary Graduates. Dr. Gunawardana, a foreign graduate originally from Sri Lanka, is part of a protected class due to race and national origin in Title VII of the Civil Rights Act, 42 U.S.C. § 1981, and 42 U.S.C. § 1985(3). Pryor v. Nat'l Collegiate Athletic Ass'n, 288 F.3d 548, 569 (3d Cir. 2002). While The ECFVG's function of evaluating and certifying foreign veterinary graduates is entirely legitimate and necessary, plaintiffs contend that the ECFVG certification process is intentionally discriminatory towards the very population it serves. Compared to other equivalent professional programs, the ECFVG program is exorbitantly and unnecessarily expensive; intentionally not transparent and lacks any of the mechanisms for fair and unbiased arbitration during disputes; and lacks regulation and oversight. As a result there are very few foreign veterinarians in the US compared with other professions.

37.  The AVMA functions as an "employment agency" per Title VII, as they are the gatekeeper for all veterinary graduates seeking employment in the US, and also provide job opportunity notices to potential employees.

14

38.  42 U.S.C. § 1985(3) prohibits conspiracies designed to deprive a person of equal protection of law. *"(1) a conspiracy; (2) for the purpose of depriving, either directly or indirectly, any person or class of persons of the equal protection of the laws, or of equal privileges and immunities under the laws; and (3) an act in furtherance of the conspiracy; (4) whereby a person is injured in his person or property or deprived of any right or privilege of a citizen of the United States."* Farber v. City of Paterson, 440 F.3d 131, 134 (3d Cir. 2006) (quoting United Bhd. of Carpenters & Joiners v. Scott, 463 U.S. 825, 828-29 (1983).

39.  It appears the AVMA created the ECFVG policies in such a way as to single out an entire group[s] to minimize their entry to the veterinary field. This would be evident from the high fail rates in the ECFVG program. While inclusivity is one of AVMA's stated core values, 93.2% of US veterinarians are white as of 2016 [Ex.7]. Even though there are three AVMA-accredited foreign universities from predominantly non-white countries [Mexico and the West Indies], this is not reflected in the population of practicing veterinarians in the US.

**Count III**

Violations of the Sherman Act

40. In its capacity as the ultimate authority on Veterinary Medicine in North America, the AVMA was founded in 1863 to: "*lead the profession by advocating for its members and advancing the science and practice of veterinary medicine to improve animal and human health.*" AVMA's Core Values state:

- *Ethical: We act with integrity, honesty and respect.*

15

- *Inclusive: We represent and support a diverse community of veterinarians with unique perspectives.*

- *Science-based: We lead with science, providing trusted and evidence-based information, and promote research to improve the health and well-being of animals and humans.*

- *Animal-focused: We support veterinarians in their stewardship of animal health and welfare and their role in promoting public health.*

- *Member-centric: We are accountable to the needs of our members.*

- *Supportive: We invest in the development of our staff and volunteer leaders.*

- *Fiscally responsible: We practice prudent financial decision-making and accountability.*

- *Efficient: We continuously assess and improve our delivery of products and services.*

- *Innovative: We promote creativity and embrace change.*

41.  These core values are not reflected in the way the ECFVG program operates.  As described in paragraphs 18-32 above, they have created standards for foreign veterinarians that domestic veterinarians don't have to meet, designed to minimize the numbers of foreign veterinarians entering the US workforce. The results are evident in job statistics. According to the AVMA there are 120,652 veterinarians in the US as of 2018 [Ex.8]. *"In 2014, more than 191 ECFVG certificates will be awarded to graduates of more than 75 different veterinary schools in approximately 40 different countries. Since the inception of the current certification program (January 1, 1973) through December 31, 2014, the ECFVG has awarded more than 5,869 certificates."* [Ex.9]. This is a mere fraction of the total number of veterinarians who have

16

practiced between 1973 and 2014. To underline this point one must only look at the number of foreign medical graduates practicing in the US. "*There are more than 247,000 doctors with medical degrees from foreign countries practicing in the United States, making up slightly more than one-quarter of all doctors.*" [Ex.10; American Immigration Council report].


42.  The AVMA is also the sole authority on accrediting veterinary education institutions. By deciding at their sole discretion, which institutions are accredited and which graduates from non-accredited institutions are certified, the AVMA effectively controls who can enter the market. This has been widely discussed in the profession. An article in JAVMA [Journal of the American Veterinarian Medical Association] July 1, 2014 by Malinda Larkin states: *Antitrust caution clashes with workforce concerns: "When talk of the veterinary job market has arisen, some have said the AVMA should take action to limit the number of veterinary graduates. Or that the AVMA Council on Education should no longer accredit foreign veterinary schools as a result of perceived workforce issues associated with students graduating from these institutions who come to the U.S. to practice... Most recently, Dr. Robert R. Marshak, dean emeritus of the University of Pennsylvania School of Veterinary Medicine, sent a letter this spring to state VMAs asking them to support him in his efforts to persuade the Department of Education's National Advisory Committee for Institutional Quality and Integrity to recommend that the USDE withhold recognition of the COE as the accrediting body for veterinary medicine until reforms are made to its composition—not mentioning the fact that most of these reforms had already taken place (see JAVMA, Sept. 1, 2013). In the letter, Dr. Marshak wrote as one of his arguments against the COE: "This proliferation of accredited vocational and foreign schools, and the increase in student numbers to make up for severe cut backs in funding for our*

*traditional state supported schools, are adding significantly to the number of new graduates, many marginally trained, at a time when there is already a surplus of veterinarians and the applicant pool as a whole appears to be diminishing. ... The negative financial impact of the growing workforce surplus on private veterinary practices, especially in an economy that may take decades to recover, cannot be overestimated."* (emphasis in original)" [Ex.11] While these reforms that "had already taken place" are not specified, it is interesting that the ECFVG program imposes stricter and stricter standards on its candidates each year.

43. *"In 2012 the Department of Education National Advisory Committee on Institutional Quality and Integrity (NACIQI) demanded significant changes in how the COE operates. The USDE received over 800 complaints and staff summarized the negative comments this way:*

- *Non-acceptance of current COE standards and processes, with accusations that standards are vague, inconsistently enforced and weakened to justify the accreditation of substandard schools.*

- *The commingling of the AVMA and AAVMC and allegations that these groups' close oversight of the COE breeds conflicts of interest. The COE acts at the whim of AVMA leaders whose interests might conflict with the good of the profession and public.*

- *The profession's progress as a science-based medical profession is compromised due to the accreditation of substandard schools that lack robust research programs and the inadequate training of graduates.*

- *The decision to accredit foreign veterinary schools was made unjustly by the AVMA Executive Board and not the COE. The decision is strongly opposed by many in the veterinary community."* [EX.12]

18

44.  An in-depth look at the criticisms mentioned in paragraphs 42 and 43 indicate an overwhelming opposition expressed by the domestic veterinarian community to the entry of new veterinarians into the field. This sentiment of protectionism from its members is a significant incentive for the AVMA to actively limit the numbers of foreign graduates entering the field, as evidenced by the statement "the reforms have already taken place" [Ex.11]; increasingly strict standards for ECFVG certification each year; and the population statistics in the veterinary field [Ex.7].

45.  The Sherman Antitrust Act of 1890 is a federal statute which prohibits activities that restrict interstate commerce and competition in the marketplace (15 U.S.C. §§ 1, 2).  AVMA has the sole authority to decide which veterinary colleges are accredited, and which graduates from non-accredited institutions are allowed to enter the workforce. Such absolute power over a profession with far-reaching impact on public welfare is an enormous responsibility. Yet, AVMA conducts this business with seemingly no regulation or oversight, and its board members consist of active players in the market. This set of circumstances in itself is conducive to corruption, and evidence suggests that AVMA's decisions on accreditation and certification are not geared towards public welfare but towards satisfying their member base, who are domestic predominantly white professionals apparently guarding the market [Ex. 7;11;12].

46.  Nonprofits and other associations are subject to antitrust laws, whether they are aware of the violation or not. American Soc'y of Mech. Eng'rs v. Hydrolevel, 456 U.S. 556 (1982).

**Count IV**

Violations of the ADA

47.  In October 2016 Dr. Gunawardana was denied an accommodation request for a 'temporary' disability by ECFVG, resulting in failure of her previous Anesthesia section. This incident is described separately in Exhibit 5. At the time she thought it was temporary [osteoarthritis of the 1st carpometacarpal joint] but it is ongoing and requires surgery, something she is hesitant to do as it can affect the use of her hand and skill as a surgeon. According to ECFVG regulations, candidates have to request accommodations at least 90 before the scheduled exam, and they are not allowed to reschedule without forfeiting all exam fees, even in the event of a medical or family emergency [page 6, ex.4]. Again this contrasts with the policies of the USMLE, where candidates can always reschedule exams, either at no charge or for a small fee depending on the timing. If ECFVG had the same option for rescheduling, plaintiff wouldn't have had to ask for accommodation. She could have simply rescheduled, payed the fee, got treatment for her hand and taken the exam later. The option isn't there, which also places an undue hardship on candidates who are disabled: if their condition worsens and they need to reschedule they just have to forfeit the whole exam fee of $7400 or section fees of $1400 each.


48. According to the Act the one requesting accommodation has: *a physical or mental impairment that substantially limits one or more major life activities, or has a record of such an impairment, or is regarded as having such impairment.* Plaintiff has an ongoing medical record of the arthritis that limits function of her right hand, first diagnosed in October 2016. But she never got the opportunity to provide evidence; her request was dismissed because it was within 90 days from the exam date. Plaintiffs believe ECFVG's policy and actions violate the

20

ADA because they don't give an option to reschedule. As for time: The Act simply states the reply must be in a "timely manner". Plaintiffs contend that the 90-day limit is arbitrary and violates the Act. In the event of a temporary disability or a change in health (such as blood sugar levels in a diabetic patient, or an accident) there is no option to reschedule. The Act further states that a testing agency or provider – offering *"examinations or courses related to applications, licensing, certification, or credentialing for secondary or post-secondary education, professional, or trade purposes shall offer such examinations or courses in a place and manner accessible to persons with disabilities or offer alternative accessible arrangements for such individuals."* 42 U.S.C. § 12189.

**Count V**

Violations of Equal Protection Clause

49. The Fourteenth Amendment says: *No State shall make or enforce any law which shall abridge the privileges or immunities of citizens of the United States; nor shall any State deprive any person of life, liberty, or property, without due process of law; nor deny to any person within its jurisdiction the equal protection of the laws.* [emphasis added] The AVMA, being entrusted by the federal government with sole authority for accreditation of veterinary education programs, is essentially an arm of the government for this purpose, and is subject to the equal protection clause.

50. The AVMA is a quasi-government entity, working for all state licensing boards to ensure candidates have the proper qualifications. This is well and good. However, the AVMA also participates in the market and supports their members, a predominantly white group seemingly

21

determined to fight "oversaturation" of the market [Ex.11 &12]. Their behavior is not that of a non-profit, but more of a for-profit organization, that has lost their original foundation in its quest for control of the market.

51.  Dr. Gunawardana passed all but one CPE section, which they cannot prove she failed. Now she must repeat the entire process at great expense and time, with no guarantee of the outcome under these subjective evaluations. We have discussed at length the extra burden they put on foreign veterinary graduates compared to foreign medical graduates and domestic veterinary graduates. Is it fair to require this? We believe the whole testing procedure [equivalent to taking final exams for graduation all over again], the expense, not being able to reschedule, and the appeal process all violate equal protection.

52.  "*The Board has the power ultimately to protect the public from unqualified practitioners, but its exclusions, whether based on statute or the Board's own judgment, must be rationally related to that objective.  Since that is not the case here, I would conclude that the absolute bar imposed by the Board pursuant to the statute and regulation violates Dr. Linton's right to equal protection.*" Linton v. Missouri Veterinary Medical Board.,  988 S.W.2d 513 (Mo.banc 1999)

## V.    Relief

Defendants' actions have caused damage to public welfare through lack of transparency and oversight in the veterinary profession; restriction of the entry of qualified candidates into the profession; and monopoly of the field by a single organization.   Defendants' actions have caused damage to plaintiffs through unfair drain on time and resources, including impediments to advancement in Dr. Gunawardana's current career.

22

Plaintiffs respectfully request the Court to grant the following relief:

I.  Reversal of the adverse decision in question, followed by either a passing grade for the Anesthesia section, or an opportunity to re-take the Anesthesia section at no cost to the plaintiff; in a transparent setting with video recording of every aspect of her exam; and ability to use said video recordings as impartial evidence of the events.

II. Full reform of the ECFVG/COE policies in such a way that the equal rights of all its candidates are protected.

III. Actual, statutory and punitive damages of an amount in excess of $15,000.

IV. Court costs and attorney's fees as supported by statute.

V.  Any other relief the court deems fit.

Respectfully Submitted,

Dr. Subhadra Gunawardana

David Seely

Plaintiffs

4308 Marion Garden Ln
Florissant, MO 63034
615-674-8461; 615-423-8851
subhadra.gunawardana@wustl.edu