# IN THE UNITED STATES DISTRICT COURT
## FOR THE SOUTHERN DISTRICT OF ILLINOIS

| | | |
|---|---|---|
| Subhadra Gunawardana and David Seely, pro se | ) ) ) | |
| Plaintiffs, | ) ) | Case No. 3:19-cv-00096-NJR-MAB |
| v. | ) ) ) | |
| American Veterinary Medical Association (AVMA), Educational Commission for Foreign Veterinary Graduates (ECFVG) and Council on Education (COE) | ) ) ) ) ) ) ) | |
| Defendants. | ) ) ) | |

## PLAINTIFFS' MEMORANDOM OF LAW IN OPPOSITION TO DEFENDANTS' MOTION TO DISMISS

Plaintiffs state the following in opposition to the Defendants' Motion to Dismiss, and respectfully request the Court to deny the Motion.

### INRODUCTION

In their complaint, Plaintiffs set forth the Defendants' violations of multiple statutes concisely, pursuant to Federal Rules of Civil Procedure 8(a) and 10:

- Contract
- Civil rights violations under Title VII, 42 U.S.C. § 1981, and 42 U.S.C. § 1985(3)
- Sherman Antitrust Act
- ADA
- Equal Protection clause

The complaint went into detail on the functions of the AVMA, the process for veterinary graduates to enter the US workforce and AVMA's role in it. The complaint provided evidence on the AVMA's monopoly in the veterinary field and how it engages in economic protectionism and discrimination against

certain populations, including statistics showing that 97% of US veterinarians are white Americans. None of this was mentioned or rebutted in the Defendants' Motion, which merely attempts to dismiss the complaint based on technicalities and erroneous interpretations of cases. Plaintiffs hereby address each argument point by point.

## FACTUAL BACKGROUND

1.   Defendants contend that AVMA is "an Illinois non-profit organization…a private organization that provides educational accreditation and certification programs to obtain a veterinary license to practice in the United States". AVMA is much more than that, with far-reaching power and numerous conflicts of interest, as evident by the differences between the medical and veterinary licensure pathways and the organizations who provide them.

2.   Licensure in each professional field requires passing of a national licensing examination. Applicants eligible to take such examination are either graduates from accredited institutions, or graduates from non-accredited institutions who are certified by the appropriate educational commission.

3.   On the medical side, each function is performed by a separate entity:

- Examination: USMLE, United States Medical Licensing Examination, owned and operated by the Federation of State Medical Boards (FSMB) and the National Board of Medical Examiners (NBME)

- Accreditation: LCME, Liaison Committee on Medical Education, sponsored by the Association of American Medical Colleges and the American Medical Association

- Certification: ECFMG, Educational Commission for Foreign Medical Graduates

4.   All three are separate distinct entities with separate distinct responsibilities. Graduates from both LCME accredited and non-accredited institutions take the same national licensing exam with the same testing standards, USMLE.  Graduates from non-accredited institutions are first verified and approved through the ECFMG, which merely involves credential verification and other paperwork prior to the

examination. There is no separate exam administered by the ECFMG. [See https://www.usmle.org/apply/index.html]

5. The equivalent functions in the veterinary licensing process are:

• Examination: North American Veterinary Licensing Examination (NAVLE), administered by the International Council for Veterinary Assessment (ICVA)

• Accreditation: Council on Education (COE), branch of the AVMA

• Certification: Educational Commission for Foreign Veterinary Graduates (ECVFG), branch of the AVMA; Program for the Assessment of Veterinary Education Equivalence (PAVE), American Association of Veterinary State Boards (AAVSB)

6. Similar to the medical licensing process, NAVLE is a pre-requisite for all applicants who wish to practice in the US, whether they graduated from an AVMA accredited or non-accredited institution. *Unlike* the medical licensing process, graduates from non-accredited institutions are subjected to a number of additional burdens before they can take the NAVLE. In contrast to the ECFMG certification which only involves credentials verification, the ECFVG certification involves a 4 step program including credentials verification; English language testing, a written exam of basic and clinical skills; and a clinical proficiency exam (CPE), which includes seven sections of hands-on practical skills testing. In other words, unlike foreign/US medical graduates and US veterinary graduates, foreign veterinary graduates are made to repeat all their final exams before they are allowed to take the national licensing exam.

7. A limited number of state veterinary boards accept the PAVE certification for foreign veterinary graduates. PAVE program also has 4 steps: credentials verification, English language testing, a written exam, and the final step of Evaluated Clinical Examination (ECE). The ECE involves enrollment in the final year clinical rotations in an *AVMA accredited institution*, paying out-of-state tuition, and taking and passing the final examination there. Thus the PAVE certification is still controlled by the AVMA, is even more expensive and time-consuming than the ECFVG certification, and is not accepted by a number of states including Missouri.

8.    Regardless of which path to certification they choose, foreign veterinary graduates have to go through the AVMA one way or another. Furthermore, such certification requires the extra step of repeating the final exams they already passed in their home institution, a requirement not made of foreign medical graduates, US medical graduates or US veterinary graduates.

9.    Unlike the medical program where the examination, accreditation and certification are performed by separate and distinct entities, on the veterinary side all functions are performed or controlled by the AVMA.

10.   Unlike most companies or non- profits, AVMA has members in virtually every state and province in North America, and in every institute, board, company and association concerned with veterinary medicine. For example:  Linda Scorse, DVM, is on the Veterinary Licensing Board in Missouri and the Missouri Veterinary Medical board. She is also the Missouri delegate to the House of Delegates, the policy making arm of the AVMA. [https://pr.mo.gov/veterinarian-board-members.asp; https://cornerstonevet.info/our-team/] The director of American Association of Veterinary State Boards (AAVSB) Vito DelVento, DVM, is also a member of AVMA American Board of Veterinary Specialties (ABVS) of Washington, D.C., as well as a staff member on the D.C. licensing board. [https://aavsb.org/about-us/governance;

https://dchealth.dc.gov/sites/default/files/dc/sites/doh/Vet%20Board%20Meeting%20Open%20Session %20Minutes%2012-20-

18%20%28Draft%29.pdf;  https://www.avma.org/News/JAVMANews/Pages/180601j.aspx] It is very difficult to find a veterinarian who isn't a member in some form. So much co-inhabiting of boards and associations and ownership in private practices makes for numerous conflicts of interest and ethics violations.

11.   The medical licensing program has taken active steps to avoid such conflicts and violations. While the ECFMG used to administer exams for international medical graduates (IMGs) decades ago, they no longer do it.  Today IMGs do not have any other exams than those a US graduate takes for licensure. An

IMG must submit an application and prove graduation from or enrollment in "a medical school that is listed in the World Directory of Medical Schools (World Directory)". Then they must take the USMLE or COMLEX-USA and pass it. The ECFMG also helps with their visa and getting internships prior to testing. Furthermore, the ECFMG doesn't seem to waste time and ask the AMA to travel the globe accrediting institutions [which AVMA/COE routinely do, in exchange for huge fees]. ECFMG relies on accreditation processes within the candidates' country of origin. The ECFMG does not have an English test requirement either. Considering that the US licensing exams are only given in English, anyone who isn't fluent would take them at their own peril, and an additional English requirement, as in ECFVG, is redundant. [See https://www.ecfmg.org/about/index.html]. The AVMA has none of these mechanisms, and places all possible restrictions on foreign graduates. In summary, it appears that the medical side wants the best picks from the world, while the veterinary side engages in protectionism.

12. Considering the above, the ECVFG/CPE testing itself is redundant. While the Defendants' motion acknowledges Plaintiffs' allegation, stating "Plaintiff further alleges a litany of complaints she believes are discriminatory, including the requirement to test hands-on skills, the scoring on solely the examiner's evaluation, having to repeat all sections upon failing a single section three times, and the fee. (*Id.*, ¶¶ 27-31)" they never rebutted these points. The mere fact that the ECFVG/CPE exam process exists, with no transparency or regard to accepted standards, is proof of violations of equal protection.


### STANDARD OF REVIEW

13. Plaintiffs' complaint filled out on the court's standard form and filed on February 1, 2019, complies with all requirements of rule 8(a). Specifically, page 4 of the complaint address the jurisdiction requirement of 8(a)1; pages 5 and 6 makes a short and plain statement of the claim showing plaintiffs' entitlement to relief, satisfying 8(a)2; and page 5 outlines the relief sought by plaintiffs, satisfying 8(a)3.

14. Rule 8(a)2 states only that a pleading must contain a short and plain statement of the claim showing that the pleader is entitled to relief. Contrary to the implication in the Defendants' motion, Rule 8(a) does

not require such a statement to accompany each and every count of a complaint, making for unnecessary length and repetition. Plaintiffs' memorandum in support of the complaint simply elaborates on the statement of the claim already made in the complaint, and describes in detail several counts that arise from the actions of the Defendants.

15. "While the Complaint need not include detailed factual allegations, there "must be enough to raise a right to relief above the speculative level." Id. at 555. The plaintiff must "plead[] factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." [Motion p.3]

16. Again, this requirement is more than satisfied in Plaintiffs' complaint and memorandum. As stated in the complaint and throughout the memorandum: Defendants' actions barred the Plaintiff Dr. Gunawardana from entering the US workforce in the field of veterinary medicine, resulting in damages to both Plaintiffs. The damages are described both in the complaint and in the Plaintiffs' Response to the Court's Show Cause Order. Defendants' actions that injured the Plaintiffs arise from one general set of circumstances, i.e. the Defendants' policies on accreditation of veterinary education institutions and certification of graduates from non-accredited institutions. Plaintiffs allege, with evidence, that these policies are designed to discriminate against several groups [of which Plaintiff is part], with the specific intent of monopolizing the market.

17. Defendants are moving under Rule 12(b)(6) for Dr. Gunawardana and Rule 12(b)(1) for Mr. Seely. Plaintiffs have satisfied Rule 8(a) in their complaint and memorandum, and showed cause for Mr. Seely's standing in response to the Court's order.

## ARGUMENT AND ANALYSIS

### David Seely's Standing

18. Plaintiff Seely's standing was addressed in the Response to the Court's Show Cause Order, which the Defendant has not rebutted in this motion. Mr. Seely has standing on two theories: Article III and

Antitrust. His Article III standing is the time, money, effort and pain spent in this endeavor of getting Dr. Gunawardana's licensure [Show Cause Response 2,3,5, 8-11].

19.  His antitrust standing is direct as the AVMA is the gate-keeper with sole authority on who enters the veterinary profession in the US. AVMA also consists of active market players with a personal stake in controlling the numbers entering the market, thus keeping demand and prices high [an obvious conflict of interest]. This practice has damaged Mr. Seely who has owned and rescued animals from a young age to this day. Lack of access to affordable veterinary care has been a constant problem in poor communities such as the one he grew up in. [Show Cause Response 4,12-14]

20.  As a disabled person suffering from numerous health problems, Mr. Seely is a consumer of many pharmaceuticals and medical technologies, the development of which involves the skills of veterinary research professionals, and requires lab animal veterinary services. Market control by the Defendant hikes up the prices of all these services used by Mr. Seely as a patient and consumer, and deprives him of the opportunity to receive services from a wide and diverse group of qualified professionals. *Trafficante v. Metropolitan Life Ins. Co.* C-70 1754 ( N.D. Cal. ) "any person who claims to have been injured by a discriminatory housing practice," shows a congressional intention to define standing as broadly as is permitted by Article III of the Constitution, and petitioners, being tenants of the apartment complex, have standing to sue under § 810(a). Pp. 409 U. S. 208-212.

21.  Thus, Plaintiff Seely has established "(1) an injury in fact--an invasion of a legally protected interest which is (a) concrete and particularized, and (b) actual or imminent, not conjectural or hypothetical; (2) a causal connection between the injury and the conduct complained of, that is, the injury is fairly traceable to the challenged action of the defendant, not the result of the independent action of some third party not before the court; and (3) a favorable decision likely will redress the injury." O'Sullivan v. City of Chi., 396 F.3d 843, 854 (7th Cir. 2005) (quoting Lujan v. Defenders of Wildlife, 504 U.S. 555, 560-61 (1992)).

22.  Mr. Seely spent considerable time, money and effort in his wife's efforts seeking entry into the US workforce. This harmed him financially as well as physically. By controlling the market AVMA violated antitrust laws by keeping demand up and prices high. The relief requested in the complaint, i.e. awarding the CPE certificate to Dr. Gunawardana, some monetary compensation, and revising the AVMA policies, would redress the damages.

23.  Thus, Mr. Seely claimed factual injury, which Defendant failed to adequately address, merely stating he has no standing as a spouse. While under most circumstances spouses and relatives cannot be a party to contractual suits where they are not parties, there are exceptions. *International Ass'n of Firefighters v. City of Ferguson, 283 F.3d 969 (8th Cir. 2002)* "This court held that because of the economic effect on her (a joint bank account and the level of spousal support), she was asserting her own rights and thus had standing. Id. at 973." Alternate Fuels, Inc. V. Cabanas, No. 06-3794/07-1462 (8th Cir. Aug 18, 2008). In the above case a Ferguson resident and employee, and his wife, Alma Mendez-Thompson, challenged a provision of the Charter of the City of Ferguson which prohibited certain city employees from sponsoring, electioneering for, or contributing money to any candidate for mayor or city council. The plaintiffs claimed that the provision abridged their freedom of speech in violation of the First Amendment. The Eighth Circuit held that Mendez-Thompson had standing for two reasons: (1) she was directly injured by having her First Amendment freedom of speech rights chilled as a result of fears that the city would fire her husband if she participated in political activities; and (2) she sustained a threat of indirect economic injury because her husband's ability to provide economic support would be reduced if he were fired.

24.  In the instant case Mr. Seely's ADA rights were violated and he sustained economic injury, due to the physical and financial damage he suffered through AVMA's actions against his wife. His antitrust standing is more direct and separate, as described above.

25.  "A Rule 12(b)(1) attack can be a very different matter. A facial 12(b)(1) challenge, which attacks the complaint on its face without contesting its alleged facts, is like a 12(b)(6) motion in requiring the

court to "consider the allegations of the complaint as true." *Petruska v. Gannon Univ.*, *462 F.3d 294, 302 n.3 (3d Cir. 2006)* (internal quotation marks omitted). But a factual 12(b)(1) challenge attacks allegations underlying the assertion of jurisdiction in the complaint, and it allows the defendant to present competing facts. Constitution Party of Pa. v. Aichele, 757 F.3d 347, 358 (3d Cir. 2014). When considering a factual challenge, "the plaintiff [has] the burden of proof that jurisdiction does in fact exist," the court "is free to weigh the evidence and satisfy itself as to the existence of its power to hear the case," and "no presumptive truthfulness attaches to [the] plaintiff's allegations … ." Mortensen v. First Fed. Sav. & Loan Ass'n, 549 F.2d 884, 891 (3d Cir. 1977)." *Hartig Drug Co. Inc. v. Senju Pharmaceutical Co. Ltd., No. 15-3289 (3d Cir. Sept. 7, 2016).* "In arguing the motions to dismiss in the District Court, no one questioned whether Allergan's attack on Hartig's antitrust standing should have been brought under Rule 12(b)(6) instead of as a matter of subject-matter jurisdiction under Rule 12(b)(1)."

26.  Since Mr. Seely has shown significant pleading for his Article III standing, Defendants' challenge properly brought under Rule 12(b)(1) should be dismissed. Defendant neither mentioned Mr. Seely's antitrust standing, nor properly challenged it under Rule 12(b)6. Even if Defendant had done so under Rule 12(b)(6), Plaintiffs believe they have made ample showing to dismiss the challenge.

**Plaintiff Established a Violation of Contract claim and satisfied basic pleading requirements.**

27.  "Under Federal Rule of Civil Procedure 8(a), the plaintiffs-appellants had to provide short and plain statements of jurisdiction and entitlement to relief, and a demand for the relief sought. They satisfied these requirements by stating that: this action was brought under federal securities laws; AnchorBank allowed its employees to invest in its Unitized Fund, which is an investment option within AnchorBank's 401(k) retirement plan; Hofer was employed by AnchorBank; Plumb Trust is the Trustee for the Fund and is pursuing the claims on behalf of all Fund participants;2 and they demanded judgment in their favor on the raised claims and were thus entitled to damages, punitive damages, restitution, disgorgement, costs,

disbursements, and attorneys' fees." *Anchorbank, FSB v. Hofer Appeal Court of Appeals for the Seventh Circuit, Case No. 10-3935.*

28. In the instant case Plaintiffs did the same and more, stating short and plain statements on jurisdiction, entitlement to relief, and a demand for the relief sought. Count 1 in the complaint memorandum clearly states, with evidence, that the Defendant's contract was unconscionable. It further states that Plaintiff did not receive the fair treatment expected of said contract. Plaintiffs' claim was plain enough for the Defendants to understand and present a rebuttal with an unredacted exhibit as evidence.

29. The unconscionability of said contact is corroborated by Defendants' Exhibit 1, the waiver all candidates are required to sign as a condition of entry to the ECFVG program. Such a waiver which renders one party to a contract entirely powerless, would be unenforceable due to unequal bargaining power of parties.

30. The cases cited by the Defense in their Motion are not applicable in the instant action. As stated in *Sanjuan v. American Bd. of Psychiatry & Neurology, 40 F.3d 247, 1994 U.S. App. LEXIS 32958 (7th Cir. Nov. 21, 1994).* "Illinois does not permit professional associations full sway over admissions criteria if membership is an "economic necessity." *Treister v. American Academy of Orthopaedic Surgeons, 78 Ill.App.3d 746, 755, 33 Ill. Dec. 501, 507, 396 N.E.2d 1225, 1231 (1st Dist.1979)*." In that same case: "But both plaintiffs are successful practitioners, and in their reply brief they stoutly deny that they are trying to make the showing required by Treister. (That case held that membership in the American Academy of Orthopaedic Surgeons is not an "economic necessity" for the practice of orthopaedic surgery; Illinois likely would say the same about Board certification for a psychiatrist.)"

31. Unlike the memberships and board certifications in question in the cited cases, the ECFVG certification is an economic necessity. No foreign graduate can practice without it. Unlike the Plaintiffs in that case, Dr. Gunawardana is not practicing here in the US and the only way she can is through completing the ECFVG/CPE.

32.  In *Sanjuan v. American Bd. of Psychiatry & Neurology, 40 F.3d 247, 1994 U.S. App. LEXIS 32958 (7th Cir. Nov. 21, 1994)* both Plaintiffs were psychiatrists.  In *Whyte v. Am. Bd. of Physical Med. & Rehab., 393 F.Supp.2d 880, 888–90 (D. Minn. 2005)* once again the Plaintiff was already a practitioner, "a physician specializing in physical medicine and rehabilitation. He is licensed to practice medicine in the State of Louisiana."  Again in *Balaklaw v. Am. Bd. of Anesthesiology, Inc., 562 N.Y.S.2d 360, 361–63 (Sup. Ct. 1990)* Plaintiff was an anesthesiologist practicing in Cortland, N.Y. Plaintiffs failed to find *Am. Registry of Radiologic Technologists v. McClellan, No. 300-cv-2577, 2003.*

33.  It is erroneous to compare the board certifications in the above cases with the ECFVG certification in the instant case. None of the certifications/memberships in these cases are necessary to practice in those fields, but are merely continuing education to demonstrate proficiency in a specialty. They are not an *economic necessity* as is the ECFVG certification.

## Waiver

34.  In Illinois waivers are considered contracts and are heavily construed against the drafter. They must "(1) Clearly spell out the intention of the parties; (2) No social relationship between the parties preventing enforcement; and (3) not against public policy. *Evans v. Lima Flight Team, Inc., 373 Ill. App.3d 407 (Ill. App. Ct. 2007).*

35.  "More recently, we observed that exculpatory clauses are not favored and must be strictly construed against the benefitting party, particularly one who drafted the release." *Harris v. Walker, 119 Ill.2d 542, 548, 116 Ill.Dec. 702, 519 N.E.2d 917, 919 (1988).*

36.  "An exculpatory clause places two public policy interests at conflict: (1) a person should be liable for his or her negligent conduct, and (2) contracting parties may freely contract about their affairs." *Simmons v. Columbus Venetian Stevens Buildings, Inc., 20 Ill.App.2d 1, 11–12, 155 N.E.2d 372, 377 (1958)*; *Evans v. Lima Lima Flight Team, Inc., 373 Ill.App.3d 407, 412, 311 Ill.Dec. 521, 869 N.E.2d 195, 201 (2007).*

37.   " Illinois courts have identified categories of social relationships where enforcing an exculpatory clause between the parties would violate public policy as a matter of law, including (1) an employer and employee, and (2) the public and those charged with a duty of public service, such as " 'a common carrier, an innkeeper, a public warehouseman or a public utility.' " *Hamer v. City Segway Tours of Chicago, LLC, 402 Ill.App.3d 42, 45–46, 341 Ill. Dec. 368, 930 N.E.2d 578, 581–82 (2010)* (quoting *White, 256 Ill.App.3d at 358–59, 195 Ill. Dec. 152, 628 N.E.2d at 619–20). Spears v. Association of Illinois Electric Cooperatives, 2013 IL App (4th) 120289.*

38.   "These categories are not an exhaustive list of the social relationships in which exculpatory clauses are unenforceable, and a liability release may be invalid " 'where there is such a disparity of bargaining power that the agreement does not represent a free choice on the part of the plaintiff.'.., (uneven bargaining position "may arise [(1)] from the defendant's monopoly of a particular field of service, [(2)] from the generality of use of contract clauses insisting upon assumption of risk by all those engaged in such a field, so that the plaintiff has no alternative possibility of obtaining the service without the clause; or [(3)] it may arise from the exigencies of the needs of the plaintiff himself, which leave him no reasonable alternative to the acceptance of the offered terms")." Our research shows several sister states considering exculpatory clauses between an educator and a student have held such clauses are categorically void as matter of public policy. See Wagenblast v. Odessa School District No. 105–157–166J, 110 Wash.2d 845, 758 P.2d 968, 971–73 (Wash.1988)" *Spears v. Association of Illinois Electric Cooperatives, 2013 IL App (4th) 120289.*

39.   The mere existence of this waiver proves intent of unequal bargaining power in this case. To the Plaintiffs' knowledge the NBME does not require a waiver for USMLE candidates. Instead they must have insurance, both health and malpractice, which is not required for CPE candidates. It appears the AVMA is more concerned with their own liability than the health and welfare of their patients, candidates or clients.

40.   The language of the waiver in question is entirely one-sided, releasing and exonerating the AVMA and ECFVG from any and all claims arising from or related to any part of the certification process, thus allowing the AVMA/ECFVG to perform any act of negligence or injustice without consequence. Applicants who wish to practice in the US have no choice but to sign this waiver. These circumstances make for gross inequality of bargaining power, and conflict with public policy. Therefore, the waiver cannot be enforced.

### Count II

41.   Plaintiffs have fully complied with Rule 10(b), which states only that: "A party must state its claims or defenses in numbered paragraphs, each limited as far as practicable to a single set of circumstances. A later pleading may refer by number to a paragraph in an earlier pleading. If doing so would promote clarity, each claim founded on a separate transaction or occurrence—and each defense other than a denial—must be stated in a separate count or defense."

42.   All statutory allegations Plaintiffs make arise from a single set of circumstances, i.e. AVMA's policies on the admittance of veterinary professionals into the US workforce. Plaintiffs grouped the counts in a practical, plain way, hoping to streamline the whole complaint. They began with the contract which was the genesis of this action. Count II described the civil rights violations caused by Defendants' policies, and the remaining counts addressed other statutory violations arising from the same policies. The Defendants' responses indicate all counts were clearly understood.

43.   As far as "commingling of three separate statutory schemes in four allegations under one count violates basic pleading requirements": There is no mention of commingling in the cited cases. Only that the retaliation under Title VII and 42 U.S.C. § 1981 were two distinct claims. *Humphries v. CBOCS West, Inc., 474 F.3d 387, 402 (7th Cir. 2007)* Court affirmed the judgment as to Humphries's discrimination claim because Humphries forfeited this claim by failing to present an adequate argument before the district court and reversed the district court's grant of summary judgment as to Humphries's retaliation claim

because Humphries made a sufficient showing under the indirect method to establish a prima facie case of retaliation under section 1981, not for "commingling".

44.  Stating several related statutory allegations under one count does not violate rule 10(b) or any other pleading requirement, as long as the claims are stated with clarity in numbered paragraphs. Accordingly, Plaintiffs stated three related statutory allegations in four paragraphs under Count II of the complaint memorandum.  Further separation is not required by rule 10(b), and would not serve any purpose.

## AVMA as an Employer or Employment Agency and Title VII

45.  Plaintiffs contend that the AVMA functions as an employment agency under Title VII because they are the gatekeeper for all veterinary graduates seeking employment in the United States, and maintains a career center which functions as a liaison between potential employers and employees.

46.  "However, nonprofit professional certification organizations such as the AVMA do not constitute "employment agencies" under Title VII." [Motion p.8]

47.  According to the Defendants' own statements in this instant motion, the AVMA, the COE, and the ECVFG are one entity and cannot "conspire against itself". Therefore the ECVFG in this theory is a part of the AVMA, and cannot be likened to separate entities such as the American Dental Ass'n and Virginia Bd. of Bar Examiners, which were not considered  ""employer," an "employment agency," nor a "labor organization" within the meaning of the Act." *Woodard v. Virginia Bd. of Bar Examiners, 598 F.2d 1345 (4th Cir. 1979).*

48.  Unlike the associations in the cases in question, AVMA's functions are not limited to providing certification, far from it. The COE accredits medical schools and the AVMA supports research, publishes the JAVMA, maintains an employment website to assist veterinarians with employment, lobbies congress for the field and market, sells liability insurance, secures grant funding for veterinarians, and supports hospitals, food and agriculture etc. Most veterinarians are members paying dues and participating in and controlling the market, voting and serving on the boards and House of Delegates *while* being market

participants. If this doesn't meet the criteria of an "employment agency," or a "labor organization" within the meaning of the Act, nothing would.

49.  Plaintiffs dispute Defendants' claim that "….Plaintiff still cannot state a claim against AVMA because she has failed to exhaust her administrative remedies." Defendant is well aware that plaintiff exhausted all administrative remedies as required by Title VII. Defendant received the "Right to Sue" letter issued to Plaintiff by the EEOC in November 2018 [Exhibit 1]. The letter does not cite lack of jurisdiction but the following: "The EEOC issues the following determination: Based upon its investigation, the EEOC is unable to conclude that the information obtained establishes violations of the statutes. This does not certify that the respondent is in compliance with the statutes. No finding is made as to any other issues that might be construed as having been raised by this charge."

## U.S.C. § 1981

50.  "Plaintiff cannot state a claim under 42 U.S.C. § 1981 ("Section 1981") because she has failed to allege any of the elements of such a claim. In fact, besides the inclusion of the statute in the caption, Count II is devoid of any allegations that relate specifically to a Section 1981 claim. At most, Defendant assumes that Plaintiff is attempting to assert a national origin discrimination claim under Section 1981. (Dkt. #2, ¶ 36)." [Motion p.9]

51.  Plaintiffs did not attempt to use Section 1981 to bring a claim of national origin discrimination. Plaintiffs' claims under section 1981 allege race discrimination. As clearly stated in paragraph 36 of the complaint memorandum, Dr. Gunawardana is part of a protected class due to both *race* and national origin, giving rise to claims under several statutes including Title VII of the Civil Rights Act, 42 U.S.C. § 1981, and 42 U.S.C. § 1985(3).  As stated in paragraph 39 with supporting evidence, AVMA's practices disfavor the entry of non-white races into the US workforce. Discrimination against non-white races is evident in the statistics provided in exhibit 7 of complaint.  Thus the complaint alleged the presence of racial animus in AVMA's practices, which is the basis of the claim under section 1981.

### U.S.C. 1985(3)

52.  **"**Plaintiff fails to plead all four elements of a Section 1985(3) claim. First, she has not alleged that two or more defendants conspired**.** Plaintiff brings suit against one entity, the AVMA, but a corporation cannot conspire with itself.**"** [Motion p.10]

53.  This action includes three Defendants: AVMA, ECFVG and COE. When it suits their purpose, AVMA claims it has no say over the decisions of the ECFVG and COE, thus implying that they are separate entities. [Page 3 of complaint exhibit 2: President of AVMA's response to Plaintiff's request; Complaint exhibit 3: page 2 and 15 of AVMA policies and procedures]. Defendant's exhibit 1, the waiver, includes language to exonerate the AVMA and the ECFVG from all liability, again implying they are separate entities.  Now, making a defense for 42 U.S.C. § 1985(3) allegations, Defendant claims they are a single entity. It cannot be both.

54.  Also noteworthy that AVMA is unlike the typical corporation. Most veterinarians are dues-paying members who participate in and control the market, some voting and serving on AVMA's boards and House of Delegates *while* being active market participants. Members of the AVMA are also members on state veterinary boards across the country, affiliated with various government agencies, and the military. Those who administer the PAVE and NAVLE are also members of the AVMA.  The AVMA receives government funds directly or indirectly, and make decisions on allocating government funds.  Considering the above, would the Court in *Copperweld Corp* have applied the same doctrine to an entity like the AVMA?

55.  Notably, even if the intracorporate conspiracy doctrine applied, the conduct at issue falls within the exception for defendants acting outside of the scope of their employment. "…the doctrine does not apply in this case because the defendants are accused of conspiring to wrongfully divest DiLuzio of his property, which would fall outside the scope of their employment. These defendants cannot invoke this defense." *DiLuzio v. Village of Yorkville, Ohio, 796 F.3d 604 (6th Cir. 2015).*

56. Accordingly, the AVMA cannot be shielded by the intracorporate conspiracy doctrine. With many members who have aims that conflict with AVMA's stated principles, they are acting outside of the scope of employment. While AVMA's stated goals may not include barring foreigners or non-white races, the intent of individual members who make policy decisions may run counter to those goals, resulting in policy decisions that violate the stated goals and the law.

57. 42 U.S.C. § 1985(3) refers to a conspiracy by "two or more persons……. of depriving, either directly or indirectly, any person or class of persons of the equal protection of the laws, or of equal privileges and immunities under the laws……." Considering that the AVMA's membership is widespread; that the AVMA performs many different functions and has affiliations with many organizations including state and federal entities, such a conspiracy within AVMA members, within its committees, or between AVMA and outside entities, is more than plausible.

58. Direct requests from US veterinarians to the AVMA asking to limit the entry of foreign veterinarians into the US workforce, as shown in paragraph 42-44 and exhibits 11 and 12 of the complaint memorandum, are preliminary evidence of such a conspiracy.  "The purpose of depriving a class of persons of equal protection of the laws or of equal privileges and immunities under the laws" is evident in AVMA's policies and procedures which place a greater burden on foreign graduates, as described in detail in the complaint memorandum and in the Factual Background in this response. Enforcement of these discriminatory policies, as AVMA/ECFVG/COE have been doing for decades, constitute acting in furtherance of the conspiracy.  Plaintiffs' injuries were a direct result of said policies, as described in detail in the complaint memorandum.

## Sherman Antitrust Act

59. "However, it is unclear exactly what claim, injury, and relief Plaintiff is asserting in Count III." [Motion p.11]

60.  Plaintiffs stated succinctly how AVMA has a monopoly in the industry. Paragraphs 45 and 33 of the complaint memorandum: "AVMA has the sole authority to decide which veterinary colleges are accredited, and which graduates from non-accredited institutions are allowed to enter the workforce. Such absolute power over a profession with far-reaching impact on public welfare is an enormous responsibility. Yet, AVMA conducts this business with seemingly no regulation or oversight, and its board members consist of active players in the market." and "The aforementioned policies and practices reduce competition in the veterinary profession in an unethical manner, by imposing excessive restrictions on foreign graduates and making it difficult for them to enter the US workforce. The most obvious evidence for this is the far lower percentage of foreign veterinarians employed in the US compared to that of foreign physicians."

61.  Injury suffered by Plaintiffs as a result of aforementioned actions is first summarized in the short and plain statement on page 5 and 6 of the complaint form, and described in detail in the Facts section of the complaint memorandum. Briefly, Defendant denied Dr. Gunawardana's certification with no transparency/fairness/due process, thus barring her entry into the field, and violated both Plaintiffs' civil and economic rights and interests. The Relief for all the Counts were stated plainly under the section "V. Relief".

62.  "To state a claim for a Section 1 violation, Plaintiff must plead facts plausibly suggesting: (1) a contract, combination, or conspiracy (i.e., an agreement); (2) a resultant unreasonable restraint of trade in a relevant market; and (3) an accompanying injury. *Agnew v. Nat'l Collegiate Athletic Ass'n, 683 F.3d 328, 335 (7th Cir. 2012)."* [Motion p.11]

63.  As stated before, most veterinarians are AVMA members. As described with evidence in paragraph 42 and exhibits 11 and 12 of complaint memorandum, there are people in the field who wish to engage in economic protectionism, presumably veterinary practitioners who are AVMA members with the ability to control policy. The motion never defended these allegations.

64.   "Plaintiff has failed to allege any elements of a Section 1 Sherman Antitrust Act claim. Count III and Plaintiff's Complaint is devoid of allegations regarding what contract or agreement the AVMA holds, an unreasonable restraint of trade in the veterinarian field, and an injury other than her personal injury of failing the anesthesia portion of the CPE." [Motion p.11]

65.   AVMA members create contracts everyday as licensing board members, researchers, clinic owners and hospital employees etc. while functioning as AVMA representatives. For example, the director of the AASVB is also part of the AVMA. Most veterinarians are dues-paying members who participate in and control the market, some voting and serving on AVMA's boards and House of Delegates *while* being active market participants. Members of the AVMA are also board members on state veterinary boards across the country, affiliated with various government agencies, and the military. Those who administer the PAVE and NAVLE are also members of the AVMA.  The AVMA receives government funds directly or indirectly, and make decisions on allocating government funds. One obvious result of such cross inhabitation is unreasonable restraint of the market.

66.   Also there are other factors to weigh. "The purpose of the Sherman Act is to protect consumers from injury that results from diminished competition. "*Banks v. NCAA, 977 F.2d 1081, 1087 (7th Cir.1992)*." Thus, the plaintiff must allege, not only an injury to himself, but an injury to the market as well." Car Carriers, Inc. v. Ford Motor Co., 745 F.2d 1101, 1107 (7th Cir.1984)." *Agnew v. Nat'l Collegiate Athletic Ass'n, 683 F.3d 328, 335 (7th Cir. 2012).* By engaging in economic protectionism the Defendant has caused unmeasurable damage to consumers, to science, any industry associated with animal medical science: research, medicine, animal husbandry etc. In addition to the Plaintiffs' rights and concerns, the Defendants' actions have damaged the public, science, animals and the field in general.

67.   "It is insufficient to allege generally that the AVMA's actions restrict the veterinary field… Similarly, Plaintiff in the instant matter alleges that Defendants' position as the sole authority in the veterinary market unfairly restricts entry of veterinarians in the field. (Dkt. #2, ¶¶ 44, 45). While this conclusory statement is in sufficient to plead an antitrust claim, it is also inaccurate. The Complaint fails

to mention the "PAVE Certification program" as an alternative to the CPE for license eligibility." [Motion p.11-12]

68.  As explained in detail earlier in the Factual Background section, the PAVE program is not independent of the AVMA. PAVE candidates must be accepted by and attend clinical rotations at an *AVMA accredited school*, and pass the final exam there. PAVE is not accepted by many states, including Missouri. PAVE is administered by AAVSB whose director is an AVMA member. The PAVE program is extremely expensive and there are no statistics available for the numbers of those who take it.

69.  More importantly, the PAVE program puts no dent in the AVMA's position as the sole authority in the veterinary market.  All veterinary education institutions have to get accredited by the AVMA/COE every few years [at great expense], and all candidates from non-accredited institutions have to first obtain either the ECFVG certification directly administered by the AVMA, or the PAVE certification which is also under the ultimate control of the AVMA.  Any person who wishes to practice veterinary medicine in the US has to go through the AVMA one way or another, a fact the Defendants cannot dispute.

70.  "To recover under the antitrust laws, the plaintiff must show that its injury flows from that which makes the conduct an antitrust problem: higher prices and lower output." Ass'n of Am. Physicians & Surgeons, Inc., 2017 U.S. Dist. LEXIS 205845, at *15-16. The failure to allege a reduction in output of veterinary care or an increase in cost of veterinary case is fatal to Plaintiff's claim. Id. At *16." [Motion p.12]

71.  Plaintiffs alleged just that. "The aforementioned policies and practices reduce competition in the veterinary profession in an unethical manner, by imposing excessive restrictions on foreign graduates and making it difficult for them to enter the US workforce. The most obvious evidence for this is the far lower percentage of foreign veterinarians employed in the US compared to that of foreign physicians." [Complaint memorandum 33] Plaintiffs further described direct injury suffered by Mr. Seely as a consumer of veterinary services due to such high prices and inaccessibility to services from a wide and diverse group of professionals [Plaintiffs' Response to Show Cause order p.7-8]

72. The relief sought in the complaint will redress their injuries under the Sherman Act, including the injuries suffered by Mr. Seely.

### Americans with Disabilities Act

73. "Plaintiff cannot state a claim for violations of the Americans with Disabilities Act "(ADA") because it is barred by the statute of limitations. While the ADA does not contain a specific statute of limitations, the Seventh Circuit has held that Illinois's two-year statute of limitations for personal injury claims applies." [Motion p. 13]

74. Plaintiffs contend there is no statute of limitations as this is a continued violation. While the Plaintiff's injury started in October 2016, the Defendant's ADA violations are etched in their policies. ECFVG would not provide disability accommodations unless requested over 90 days before the scheduled exam, disregarding all possible problems that could occur within 90 days. To compound this, candidates cannot reschedule without losing all exam fees. This is in stark contrast to the USMLE which has a very flexible rescheduling policy.

75. Courts including the Seventh have upheld this theory. In *Scherr v. Marriott International, Inc.,F.3d, 2013 WL 57857 (7th Cir., Jan. 7, 2013)* "It is undisputed that Scherr brought her ADA claim in November 2010, more than two years after her personal injury claim in March 2008, and more than four years after her actual injury in March 2006. Marriott contends that Scherr's claim is time-barred because she knew of the alleged problem with the springhinged doors long before she filed her personal injury action, let alone her ADA claim. Scherr argues in response that, for a plaintiff seeking injunctive relief from ongoing violations, the cause of action continues to accrue each day the defendant remains in violation of the ADA… In her complaint, Scherr alleged that she is currently aware of what she believes to be ongoing ADA violations at the Overland Park Courtyard Marriott, and that she would return to the hotel but for these ongoing violations. Because the violations Scherr alleges are continuing, the applicable statute of limitations does not bar her claim."

76. Accordingly, because the policies that violate the ADA are still in effect with the ECFVG, Plaintiffs' claim is not time barred.

## Equal Protection Clause and AVMA as State actor

77. The AVMA's functions and its relationship with the federal and state governments makes it quasi-governmental entity, and there are many instances the courts have recognized private associations and institutions as state actors.

78. The performance of a public function, a function that has been traditionally and exclusively performed by the state, is state action. *Marsh v. Alabama, 326 U.S. 501 (1946).* If the government coerces, influences, or encourages the performance of an act, it is state action. *Rendell-Baker v. Kohn, 457 U.S. 830 (1982).* A private organization can be considered a state actor if there is sufficient entwinement between the state and the organization. *Brentwood Academy v. Tennessee Secondary School Athletic Association, 535 U.S. 971 (2002).*

79. The U.S. Department of Education (USDE) and National Advisory Committee on Institutional Quality and Integrity (NACIQI) *requires* the COE to send compliance reports for the accreditation of schools. The COE has operated under the association's umbrella since the 1950s, when USDE *named it the nation's sole programmatic accreditor* of domestic veterinary education. "Programmatic accreditors provide schools, including foreign programs that cater to U.S. citizens, the ability to offer students access to professional loans under Title VII of the U.S. Public Health Act."…"USDE *tapped* the COE for a bigger role — ensuring that foreign veterinary schools are qualified to participate in Title IV federal student aid, which includes programs such as Pell Grants, Direct Loans and Perkins Loans. The COE's new authority began July 1, per *federal regulations that ordered USDE to find an accrediting body* to do the job previously held by the National Committee on Foreign Medical Education and Accreditation (NCFMEA)." …" Now that the COE is a gatekeeper for Title VII *and* Title IV eligibility, U.S. veterinary

accreditation is even more attractive.*" VIN news article July, 3, 2015, Jennifer Fiala* [https://news.vin.com/VINNews.aspx?articleId=37274&callshare=1]

80. The National Committee on Foreign Medical Education and Accreditation or NCFMEA was authorized by the Higher Education Opportunity Act of 2008. The Committee (a part of the USDE) is authorized to evaluate the standards of accreditation applied to foreign medical schools, and to determine the comparability of those standards to standards applied to medical schools in the United States. Evidently the USDE and the Federal government decided the COE was a better choice to accredit foreign veterinary schools than a government committee. The Federal government required USDE to perform a specific task and they went directly to (tapped) AVMA, whom they have named the *sole* accreditor since the 1950's. They are a Title IV gatekeeper in respect to federal student funding sources.

81. In a letter dated 3/9/15 to Dr. Brandt of the COE, the USDE renewed their recognition of the COE. The USDE states "I am satisfied that accreditation by AVMA-COE is a *required* element in enabling the programs the agency accredits to establish eligibility to participate in non-HEA *federal* programs."…"Scope of recognition: The accreditation and preaccreditation ("Provisional Accreditation") in the United States of programs leading to professional degrees (D.V.M. or D.M.D.) in veterinary medicine"…"Please convey my appreciation to the members of AVMA-COE for their continuing efforts to improve the quality of postsecondary education in the United States."

82. This is a clear sign of the government influencing the act. According to certain USDE regulations the COE could lose their function of accreditation. Importantly, "accreditation by AVMA-COE is a *required* element in enabling the programs the agency accredits to establish eligibility to participate in non-HEA *federal* programs." Furthermore, state licensing boards require either ECFVG certification or graduation from an AVMA accredited school for all veterinarians applying for licensure.

83. Thus, the AVMA's functions of accreditation of veterinary education institutions and certification of graduates from non-accredited institutions represent the exercise of a right or privilege created by the

state or by a rule of conduct imposed by the state, making it a state actor.  If a private organization like an athletic association can be considered a state actor, how would AVMA not be?

84.  Also AVMA "prioritizes some programs administered by the U.S. Departments of Agriculture (USDA) and Health and Human Services (HHS) as "active pursuit of passage" and other programs as "support" passage during the congressional appropriations process" for them or their members. *See AVMA Fiscal Appropriations.*

85.  "Because passing the CPE is only one of several licensing criteria, the AVMA has not exercised any state right, privilege, or rule of conduct. See Staudinger v. Educational Comm. For Foreign Medical Graduates, No. 92-civ-8071-LJF, 1993 U.S. Dist. LEXIS 5576, at *5-16 (S.D.N.Y. Apr. 27, 1993) (holding that the "work performed by ECFMG – testing and otherwise certifying that foreign medical school graduates are qualified to practice medicine" – was not performed under color of state law because a certificate did not equal licensure). As a result, Plaintiff cannot establish the first prong of state action." [Motion p.14]

86.  First, passing the CPE and receiving the ECFVG certificate is a *pre-requisite* for licensure in most states including Missouri [20 CSR 2270-2.011 Educational Requirements].  Wrongfully depriving a candidate of their ECFVG certificate is equivalent to depriving them of licensure, considering they cannot apply for license without said certificate.

87.  Second, the Defense is misconstruing the cited case, erroneously implying that ECFVG is similar to ECFMG in every fashion. While they may have some similar functions, their operation, organizational structure and impact on the field and licensure are quite different.

88.  As stated in *Staudinger v. Educational Comm. For Foreign Medical Graduates, No. 92-civ-8071-LJF, (S.D.N.Y. Apr. 27, 1993)* the ECFMG is "a private, not-for-profit organization, which through its certification program assesses the readiness of a foreign medical school graduate (FMSG) to enter residency or fellowship programs in the United States. ECFMG is not a subdivision of or affiliated with any governmental entity, its Board of Trustees receives no funding from any governmental entity, no

individual from defendant New Jersey State Board of Medical Examiners (NJSBME) sits on ECFMG's Board of Trustees, and it sets its own standards for an FMSG's eligibility to take the United States Medical Licensing Examination (USMLE)."

89.  Thus, the ECFMG is a stand-alone entity who does not conduct testing but only verifies the candidates' eligibility to sit for the national licensing exam.  Further, they are not part of or affiliated with any government entity, receive no government finding, and no individual from defendant New Jersey State Board of Medical Examiners (NJSBME) sits on ECFMG's Board of Trustees.

90.  In contrast, the ECFVG is a critical decision maker through its exam process, and it is not a stand-alone entity but clearly part of the AVMA.  Members of the AVMA are also board members on state veterinary boards across the country, affiliated with the USDE, and the military.  They reside in state veterinary boards and associations, in government agencies across North America, while retaining their voting rights in AVMA. Those who administer PAVE and NAVLE are also members of the AVMA. The AVMA receives government funds directly or indirectly, and make decisions on allocating government funds. Such entwinement with state entities, and its role in receiving and distributing government funds, makes the AVMA (and ECFVG by proxy) a state actor subject to the Fourteenth Amendment.

91.  "Courts across the country have reached the same conclusion where a private entity creates and administers an examination that is required for state licensure." [Motion p.15]

92.  According to the Defendants' own statement, the AVMA, COE, and ECVFG are one entity that cannot "conspire against itself". If so, ECFVG cannot be a separate independent entity as they claim now. AVMA is a state actor because: They exercise of a right or privilege created by the state or by a rule of conduct imposed by the state (paragraphs 79-84 in this response); They are a Title IV gatekeeper; There is excessive entwining with government agencies; They receive federal funding and make decisions on allocating federal funding. Therefore Defendants are subject to the fourteenth Amendment.

93.  "Finally, Plaintiff cannot maintain a claim for violation of the Equal Protection Clause because she has no property interest in obtaining certification of her veterinary education, a step to obtain her

license to practice veterinary medicine. Courts have held that the expectation of a professional license is not a property interest protected by the 14th Amendment. Elias v. Educ. Comm'n for Foreign Med. Graduates, 2010 N.J. Super. Unpub. LEXIS 2663, 2010 WL 4340640 (N.J. App. Nov. 4, 2010); Metzger v. Nat'l Comm'n on Certif. of Physicians Assistants, 2001 U.S. Dist. LEXIS 658, at *13; Lim v. Central Du Page Hospital, 1988 U.S. Dist. LEXIS 399, at *6, 1988 WL 4931 (N.D. Ill. Jan. 15, 1988)." [Motion p.16]

94. Defendants misinterpret *Elias*: "Plaintiff attended the Universidad Autonoma de Guadalajara Medical School (UAGMS) in Mexico from 1987 to 1991. He admits he did not complete the two additional requirements of a clinical internship and community service, which are required to receive the Titulo de Medico Cirujano. Instead, he received the "Diploma de Medico Cirujano," which merely showed he completed the four-year didactic program."…" In 1994, plaintiff applied to ECFMG to take Step 1 of the USMLE. He certified that he had received the degree, "Medico Cirujano," from the UAGMS. Plaintiff failed the test. ECFMG subsequently learned that plaintiff was ineligible to take Step 1 because he did not have a final medical diploma within the meaning of ECFMG's eligibility requirements."…" On November 20, 2007, ECFMG notified plaintiff that it had rejected his application…"

95. The candidate in that case did not have a property interest simply because he was not a medical graduate to begin with, did not meet the criteria for the ECFMG program, and could not have received a medical license neither in the US nor in his home country. Dr. Gunawardana is not only a veterinary graduate but holds a license to practice in Sri Lanka.

96. "Assuming there was state action, summary judgment was still appropriate because plaintiff cannot prove a violation of his procedural or substantive due process rights." (*Elias*)

97. In the instant case, the AVMA is a state actor and did violate Dr. Gunawardana's due process rights during numerous steps of the exam and appeals process, as described in the complaint.

98. The *Elias* Court stated further: "Plaintiff lacks a legitimate claim of entitlement to take Step 1 because he has not completed all educational requirements to practice medicine in Mexico or received a

final medical diploma."… "Further, plaintiff has no right to a medical license. We have indicated that "a protected right in a professional license comes into existence only after a license has been obtained[,]" and that "[a]n applicant for a license has merely an expectation of obtaining a property interest. Such expectation is not afforded the same protection under the Fourteenth Amendment as is the property right itself."

99.  In the instant case, Dr. Gunawardana has a license and therefore a property interest. Notably, the case doesn't state a *US* licensure. "Bd. of Regents of State Colleges v. Roth, 408 U.S. 564, 577, 92 S. Ct. 2701, 2709, 33 L. Ed. 2d 548, 561 (1972)."To have a property interest in a benefit, a person clearly must have more than an abstract need or desire for it. He must have more than a unilateral expectation of it. He must, instead, have a legitimate claim of entitlement to it."

100. If years of education, practice in the field, service and income under her original licensure doesn't convey legitimate entitlement to Dr. Gunawardana to licensure here in the US, or at least a fair, transparent and straightforward path towards it, nothing does.

101. "As in *Elias*, Dr. Gunawardana does not allege that the AVMA is depriving her of a veterinary license she already obtained." [Motion p.17]

102. She alleges the AVMA deprived her of a veterinary licensure she is *entitled* to. They have not proven she is unqualified, and as a state actor they have certain obligations which they have violated, including due process, transparency and the Administrative Procedures Act.

103. "The Board has the power ultimately to protect the public from unqualified practitioners, but its exclusions, whether based on statute or the Board's own judgment, must be rationally related to that objective.  Since that is not the case here, I would conclude that the absolute bar imposed by the Board pursuant to the statute and regulation violates Dr. Linton's right to equal protection." *Linton v. Missouri Veterinary Medical Board., 988 S.W.2d 513 (Mo.banc 1999)*

104. Notably, the Plaintiff in *Linton* had not received her veterinary licensure at the time, and the Court found an *applicant's* right to equal protection was violated when she was treated differently from other applicants. Dr. Gunawardana is an applicant, already holding a license in Sri Lanka.

105. Also to consider that the policies of the ECVFG/COE/AVMA result in unequal treatment of all foreign veterinary graduates as opposed to US veterinary graduates and both foreign and US medical graduates, as described in detail in paragraphs 25,28,39,32,33 of the complaint memorandum, and the Factual Background in this response. The ECFMG/USMLE process provides transparency and due process, and complies with the Administrative Procedures Act. Their fees are a fraction of the ECFVG or PAVE. All medical graduates, domestic or foreign, take the same licensing exam with the exact same pre-requisites.  Whereas foreign veterinary graduates are forced to repeat a number of additional tests, without due process, under non-transparent conditions, before they can take the licensing exam. These are the doctors that treat you and your family; the veterinarians that treat your pets and farm animals.  Why is there a more stringent onus on foreign veterinary graduates than anyone in the medical field? All Plaintiffs request is the same treatment received by other equivalent professionals. Lack of such equal treatment under AVMA's current policies is an obvious violation of equal rights under the 14th amendment.

## Conclusion

Plaintiffs believe that the Statement of a Claim requirement under Rule 8(a), Form of Pleading under rule 10(b), and Standing for David Seely, were all completely addressed in the Complaint, Complaint memorandum, and Plaintiffs' Response to the Court's Order to Show Cause, with greater elaboration provided in the instant Response.

For the above reasons, Plaintiffs pray the Honorable Court to dismiss this Motion in its entirety and tax all costs to the Defendant.

If the Court deems the Complaint insufficient in any way, Plaintiffs respectfully request the Court's leave to file an Amended Complaint.

Respectfully Submitted,
/s/Dr. Subhadra Gunawardana
/s/David Seely, With Consent
Plaintiffs,
4308 Marion Garden Ln
Florissant, MO 63034
615-674-8461; 615-423-8851
subhadra.gunawardana@wustl.edu
david-seely@live.com

### Certificate of Service

The undersigned hereby certifies that a true and accurate copy of the foregoing document was forwarded by way of electronic filing on the Court's ECF notice list from 4308 Marion Garden Ln, Florissant, MO 63034, on July 3, 2019.

/s/Dr. Subhadra Gunawardana
/s/David Seely, With Consent