

PLAINTIFF'S
EXHIBIT

1

<u>Grounds for Appeal- Candidate # 273624</u>

The score report states: *"the candidate failed to secure endotracheal tube and inflate the cuff appropriately within the time allotted after induction of anesthesia"*.  This is incorrect.

The Manual of Administration 2017 (MOA) states "*Candidate will intubate the patient and secure the endotracheal tube within 5 minutes of initial administration of induction agent*" (page 20) and "*The 5 minute limit will start once the induction agent is given. Within this limit, you must administer an appropriate amount of induction drug to allow endotracheal intubation, secure and check the endotracheal tube, appropriately inflate the cuff, and connect the endotracheal tube to the anesthetic breathing machine.*" (page 23).

When I was told my time was up, I had already completed the endotracheal intubation; verified placement; secured the tube by tying behind the ears; inflated the cuff with a syringe; connected the patient to the anesthetic machine; and was starting inhalation anesthesia.  Thus, all tasks required for the 5-minute period were already completed, and <u>my performance met the standards of the MOA.</u>

It is true that I did not get to verify appropriate cuff inflation by checking for leaks while bagging at 20 mmHg with the APL valve closed. <u>However, this step comes after connecting the patient to the anesthetic machine, and is not among the tasks required within the 5-minute period.</u> (Please note that the workstation did not provide a cuff inflator with a manometer.)  According to the MOA, the tasks specified for the 5-minute period end with connecting the ET tube to the anesthetic machine (page 23), which I completed well within time.

The aforementioned is the primary basis for my appeal. The following additional points are also relevant.

1. I am used to performing the induction and intubation quickly and efficiently, as demonstrated in my previous anesthesia section in October 2016, where I completed all required tasks within the allotted 5-minute and 3-minute time limits (despite a temporary disability causing severe pain in my hand at the time).

2. While not required by the MOA, I could have completed the additional step of verifying cuff inflation within the 5 minute period <u>were it not for a specific patient factor in the current section.</u> My dog was not fully relaxed after receiving the full dose of induction agent (ketamine/diazepam IV preceded by premedication with acepromazine and hydromorphone). I had to wait for adequate relaxation (as indicated by jaw tone and eye position) before I could intubate.  Under the circumstances, the only way I could have finished the additional step of verifying cuff inflation via bagging at 20 mmHg within the 5 minutes was by forcibly intubating an inadequately relaxed dog who still had laryngeal reflexes.  This would have endangered the patient and contradicted the standard protocols of anesthesia.  Furthermore, attempting to intubate an inadequately anesthetized dog is a fatal flaw according to the MOA (pages 29 & 33).  In the period immediately after induction, the patient can become apneic if not intubated fast enough, or suffer tracheal

damage if intubated too fast.  Since my patient was not in immediate danger of apnea (she still had all reflexes), my main concern was, and should have been, to intubate without damage.  Standard protocols of anesthesia confirm this position (1-4).

3.  It is possible that the actual time limit allotted me was less than 5 minutes.  For example, the examiner may have started the clock at the beginning of induction rather than the end of induction.  The MOA states "*the 5 minute time limit will start once the anesthetic induction drug is given*" (page 23).  As with most IV agents, ketamine/diazepam requires titrating to effect, which can take up-to a minute.  If the clock was started at the beginning of the injection rather than the end, this would have taken a minute or more out of my allowed time. It is also possible that the examiner accidentally set the clock to a time less than 5 minutes, since the site conditions were somewhat chaotic/distracting due to equipment problems and other people calling for his attention.

4.  It is known that some patients take a longer time than others for relaxation sufficient to intubate.  Literature shows that with ketamine/diazepam IV, the time from induction to intubation can range from 30 seconds to 5 minutes (5-10)  Considering the existence of such variation, and the fact that the patients provided for this exam are of unknown history, it is unrealistic to expect every patient to be induced and intubated within 5 minutes even by an expert.  Such a time limit in this sense is unethical in itself, and could lead to endangerment of the patient, thus contradicting sections I and IV of the Principles of Veterinary Medical Ethics of the AVMA (11).

5.  Standard protocols dictate that IV induction agents be titrated to effect, and additional IV agent be given if the patient is not fully relaxed (1,2,8,10).  The MOA states: "*You must administer an appropriate amount of induction drug to allow endotracheal intubation*" (page 23).  Since my patient was not fully relaxed, I requested additional induction agent, but my request was declined.  This directly contradicts what we were told during Anesthesia orientation that morning, during drug calculations the previous day, and what is stated in the MOA and standard protocols.  We were specifically instructed not to calculate extra induction agent beforehand, but to request additional drugs if necessary during the exam.

The grounds for my appeal can be easily verified with a videotape of the exam section.  My request for this videotape evidence was declined, as were my requests for other existing evidence such as the candidate reports completed by me.  Thus, while ECFVG requests evidence for my claims in appeal, it has denied me access to the most relevant evidence. As an alternative, I would welcome an opportunity to demonstrate my ability to perform these tasks in front of the appeal review panel.

I am requesting reversal of this adverse decision, followed by either a passing grade for anesthesia, or a chance to retake the anesthesia section at no additional expense to me, with video evidence which I would be allowed to review. Thank you.

References:

1. Lumb WN, Jones EW. Veterinary Anesthesia and Analgesia, Fourth Edition. *Blackwell Publishing, Ames IA, USA,* 2007.

2. https://www.scribd.com/document/321814304/Anesthesia-Guide-VASG-12-4-04

3. https://instruction.cvhs.okstate.edu/vmed5412/pdf/22Canine-FelineAnesthesia.pdf

4. http://humanealliance.org/downloads/Reference_Anesthesia_Analgesia.pdf

5. White KL, Shelton K, Taylor PM. Comparison of diazepam-ketamine and thiopentone for induction of anaesthesia in healthy dogs. *Vet Anaesth Analg.*  28(1):42-48, 2001

6. Hellyer PW, Freeman LC, Hubbell JA. Induction of anesthesia with diazepam-ketamine and midazolam-ketamine in greyhounds. *Vet Surg.* 20(2):143-7, 1991

7. Gross ME, Dodam JR, Pope ER, Jones BD. A comparison of thiopental, propofol, and diazepam-ketamine anesthesia for evaluation of laryngeal function in dogs premedicated with butorphanol-glycopyrrolate. *J Am Anim Hosp Assoc.*  38(6):503-6, 2002

8. Ferreira JP, Dzikit TB, Zeiler GE, Buck R, Nevill B, Gummow B, Bester L. Anaesthetic induction and recovery characteristics of a diazepam-ketamine combination compared with propofol in dogs. *J S Afr Vet Assoc.* 86(1):1258, 2015

9. Riccó CH, Henao-Guerrero N. Cardiovascular effects of orotracheal intubation following anesthetic induction with propofol, ketamine-propofol, or ketamine-diazepam in premedicated dogs. *J Am Vet Med Assoc.*  244(8):934-9, 2014

10. Fayyaz S, Kerr CL, Dyson DH, Mirakhur KK. The cardiopulmonary effects anesthetic induction with isoflurane, ketamine-diazepam or propofol-diazepam in the hypovolemic dog. *Vet Anaesth Analg.* 36(2):110-23, 2009

11. https://www.avma.org/KB/Policies/Pages/Principles-of-Veterinary-Medical-Ethics-of-the-AVMA.aspx

EX.1

February 7, 2018

Dr. Subhadra Gunawardana
4308 Marion Garden Ln
Florissant, MO 63034

VIA EXPRESS MAIL AND E-MAIL TO SUBHADRA.GUNAWARDANA@WUSTL.EDU (Candidate ID: 273624)

Dear Dr. Subhadra Gunawardana:

The Appeals Subcommittee of the Educational Commission for Foreign Veterinary Graduates (ECFVG) recently completed review of your petition for reconsideration of the adverse decision regarding your failure of the Anesthesia section of the Clinical Proficiency Examination (CPE) administered in November 2017 at WVC CPE site.

After careful deliberation, the subcommittee decided to deny the appeal and uphold your failing scores in the Anesthesia section of the CPE.  In the anesthesia section, you received one minor skill failure and one fatal flaw. You failed to secure the endotracheal tube and inflate the cuff properly within the time allotted after induction of anesthesia.

In accordance with ECFVG policy, you will need to successfully complete a full retake CPE in order to complete Step 4 of the certification program. Information on retaking the entire CPE was sent to you previously and can be found here also:
https://www.avma.org/professionaldevelopment/education/foreign/pages/ecfvg-cpe-bulletin.aspx#cpe-retakes-associated-fees.

You may appeal this decision by filing a "petition for review" in accordance with the ECFVG appeals process, which is available online at
https://www.avma.org/professionaldevelopment/education/foreign/pages/ecfvg-pp-appeal.aspx. If you have any questions regarding the retake application or the appeal process, please contact the ECFVG office (ecfvg@avma.org; 800-248-2862, ext. 6778).

Sincerely,

Nicole Gallant, DVM
Chair, ECFVG

JLC/jlc

4

**Educational Commission for Foreign Veterinary Graduates (ECFVG)**
**Petition for Review of an Adverse Decision**

Name: Subhadra Gunawardana

Date: 03/01/2018

ECFVG ID#: 273624

Adverse decision being appealed or CPE section(s) being appealed:

Failing grade for Anesthesia, and Denial of Petition for Reconsideration

CPE Site and Date (if applicable): November 2017, WVC Las Vegas

**Mark which of the following you are requesting:**

☑ Written Appeal only
☐ I am requesting an In-person Hearing ($5,000 deposit required – see ECFVG Appeals
Process #2.e.vi)

**I.      Basis for Appeal -** *Mark each of the following that form the basis for the appeal*
*(mark all that apply):*

☐ The ECFVG has disregarded the established AVMA criteria for certification of
ECFVG candidates
☑ The ECFVG failed to follow its stated procedures
☑ The ECFVG failed to consider relevant evidence and documentation presented

**II.     Statement of Grounds for Appeal -** *This statement must include all grounds for*
*appeal. This statement and all supporting evidence must relate to the facts and*
*circumstances that existed at the time of the adverse decision/exam that is the*
*subject of the petition for review. Once the petition for review is submitted, it will*
*be considered complete and final. No further statements or evidence will be*
*considered unless the ECFVG determines that such statements or evidence could*
*not have been made or discovered with the exercise of reasonable diligence prior*
*to submission of the petition for review.*

**Statement of Grounds for Appeal** (If additional space is needed, please attach additional pages and
indicate by checking one or both of the boxes below the text boxes.)**:**

Please see the attached statement (1 page with link to video) and supporting
documents (2 pages).

EX.1

Mark each of the following that apply:

☑A separate statement of grounds for appeal is attached to this form
☑Document(s) or other evidence in support of this appeal are attached to this form

I certify that the above is my entire petition for review.

Signature: Subhadra Gunawardana          Date: 03/01/2018
Candidates may type name above as signature to submit electronically.

Statement of Grounds for Appeal- Candidate # 273624

In the Petition for Reconsideration submitted on January 5, 2018, I explained why the score report was incorrect, and pointed to specific evidence which would verify my position. I outlined a number of additional points relevant to the situation, with supporting documentation.

ECFVG has denied the petition without addressing or rebutting any of the points presented.

ECFVG has provided no evidence to support its claim that "You failed to secure the endotracheal tube and inflate the cuff properly within the time allotted after induction of anesthesia." As stated in the petition, I believe the videotape of my anesthesia exam section would demonstrate that I completed all required tasks, including securing the endotracheal tube and appropriately inflating the cuff, well within the allotted time. In denying the petition without providing a copy of the videotape, ECFVG falls short of the transparency and rules of evidence typically expected for arbitration procedures.

The fatal flaw alleged in the score report did not happen, as would be demonstrated in the aforementioned videotape. Since ECFVG has refused to release this evidence (Email dated 12/20/2017, attached), I hereby provide new evidence demonstrating my ability to complete these tasks within 5 minutes. These include:

1.  Link to a videotape of me performing these tasks at the veterinary office of Dr. Raymond Geisman, demonstrating that I completed the IV anesthetic induction, endotracheal intubation, checking and securing the tube, appropriately inflating the cuff, and connecting the patient to the machine in a total of 2 minutes and 32 seconds.
    https://www.dropbox.com/s/ssvqmktniy6jz62/WP_20180202_09_03_48_Pro.mp4?dl=0

2.  A letter from Dr. Geisman confirming the same.

My ability to perform these tasks in a timely manner was further demonstrated in my previous anesthesia section in October 2016, where I completed all tasks well within the 5-minute limit despite a temporary disability, i.e. severe pain in my hand due to arthritis. (It is also noteworthy that my accommodation request for this disability was denied.)

ECFVG's decision on my petition for reconsideration disregards critical evidence, and fails to address any of the points raised in the petition. I respectfully request the review committee to consider the original petition as well as the additional points presented here. I am requesting reversal of the adverse decision, followed by either a passing grade for anesthesia, or a chance to retake the anesthesia section at no expense to me, with video evidence which I would be allowed to review.

EX.1

# RE: 273624_extended score report

### Dr. Judy Coman <JComan@avma.org>

Wed 12/20/2017 7:45 AM

Inbox

To: Gunawardana, Subhadra <subhadra.gunawardana@wustl.edu>;

Dear Dr. Gunawardana:
The extended score report is the only feedback available to candidates. With respect to your request to obtain the videotape and the candidate record completed by you during drug calculation and exam, the materials are not made available to candidates in accordance with ECFVG policy. The Rules of Conduct in MOA clearly states: "You understand and acknowledge that all examination materials remain the property of the CPE site and ECFVG, and you will maintain the confidentiality of the case content for all seven sections of the CPE."
Sincerely yours,

**Judy Lee Coman, DVM, DACLAM**
**Assistant Director | Education & Research**
American Veterinary Medical Association
www.avma.org



*"This communication is confidential and is not intended for public disclosure. If you have received it in error, please notify the sender by reply email and immediately delete it and any attachments without copying or further transmitting the same."*

---

**From:** Gunawardana, Subhadra [mailto:subhadra.gunawardana@wustl.edu]
**Sent:** Tuesday, December 19, 2017 12:57 PM
**To:** Dr. Judy Coman
**Cc:** ECFVG
**Subject:** Re: 273624_extended score report

Dear Dr. Coman,
I hope to appeal this decision, and request copies of the following documents:

1. The videotape of my exam session
2. The candidate record completed by me during drug calculation and exam

Thank you,
Suba Gunawardana
Candidate ID # 273624

# HAMPTON ANIMAL HOSPITAL
## RAYMOND A. GEISMAN, D.V.M.
**2826 HAMPTON ST. LOUIS, MO   63139    314-647-8818 (VOICE)    314-647-9013 (FAX)    RAY@GEISMAN.COM (E-MAIL)**

February 9, 2018

To Whom It May Concern,

On Friday, February 2, 2018, Dr. Subhadra Gunawardana came to my office in St. Louis Missouri to film a video.   I had met her once before, when I invited her to my office to see if my facilities were acceptable for her project.   She had not previously worked at or trained at my hospital.   She had sent me an e-mail, asking if she would be able to induce anesthesia per the guidelines for certification by ECFVG.   She had mentioned that she had thought she had successfully completed these requirements, but that the certifying group had a different opinion, and she wanted to videotape her performing these procedures in the required amount of time.

I had previously obtained permission from my client to have her take these steps with their pet. On that Friday I watched her successfully place an intravenous catheter and secure it in place. She then started her timer and I watched her induce anesthesia by intravenous injection through the catheter, check for depth of said anesthesia, place an endotracheal tube, check for proper position and secure the tube, inflate the cuff and check for leaks and connect the tube to my anesthetic machine, all well before 5 minutes had elapsed.   I then proceeded with surgery, which went well, and the dog recovered nicely.

Please let me know if you need me to elaborate on anything that occurred here.

Sincerely,

Raymond A. Geisman, D.V.M.



# MEMORANDUM

**Date**: April 20, 2018

**To:** Dr. Subhadra Gunawardana, ECFVG Candidate (candidate ID: 273624)

Dr. Nicole Gallant, Chair of the ECFVG

Dr. Patrick Farrell, Chair of the Council on Education

**From:** COE Review Panel

**Re:** ECFVG's adverse decision related to Dr. Subhadra Gunawardana

In compliance with the Educational Commission for Foreign Veterinary Graduates (ECFVG) Appeal Procedure, a Review Panel was composed to issue this written report regarding the Petition for Review filed by Dr. Subhadra Gunawardana (Candidate ID: 273624). This report provides the opinion of the Review Panel constituted to evaluate the ECFVG adverse decision concerning Dr. Subhadra Gunawardana.

Dr. Gunawardana took the anesthesia section of the Clinical Proficiency Examination (CPE) in November 2017 at the Western Veterinary Conference (WVC) CPE site in Las Vegas, NV. Prior to that, Dr. Gunawardana received the 2017 edition of the CPE Candidate Manual of Administration (MOA) which outlines the skills on which each candidate is assessed.

Dr. Gunawardana received a fatal flaw in the anesthesia section.  Dr. Gunawardana submitted a petition for reconsideration to the ECFVG, and the adverse decision was upheld.  In compliance with the ECFVG's appeal procedure, Dr. Gunawardana subsequently submitted a petition for review for failure of the anesthesia section, alleging that the ECFVG failed to follow its stated procedures and failed to consider relevant evidence and documentation presented. Dr. Gunawardana asserts in the Petition for Review that in the Anesthesia section, induce and intubate patient, she had completed the required activities within 5 minutes of initial administration of induction agent: intubate the patient, inflate cuff appropriately and secure endotracheal tube.  She asserts that the grounds of her appeals can be easily verified with a videotape of the exam section. As an alternative, she provides an evidence (video link) and a letter from Dr. Geisman, demonstrating her ability to perform the required tasks.

The Review Panel reviewed all of the relevant materials provided (including the MOA, scoresheets, the candidate' petition for reconsideration, and the ECFVG's response to the petition) and concludes that proper procedures were followed during the exam and the appeals process.  Dr. Gunawardana asserts that review of video documentation of the examination will support her claim. This Review Panel was informed there was no video recording of Dr. Gunawardana's examination. ECFVG policy allows, but does not require, video recording of the examination, and thus the lack of video documentation does not constitute failure to follow stated procedures. Furthermore, video recordings, if performed, cannot be used to reverse failing scores. Subsequently, the Review Panel found that established and published ECFVG processes were followed, and the candidate was evaluated in a structured manner and environment. The records indicate the candidate did not

secure the endotracheal tube within the 5-minute limit and received a fatal flaw, and thus the candidate performed below the level of minimal competency on skills in the anesthesia section identified by the examiner and reconsidered by ECFVG. The CPE is based on the anesthesia skills demonstrated during the examination, not based on the past or what may happen in the future.

The Review Panel did not find any information or documentation in the candidate's petition for review, or in review of the other documents, that would alter the outcome. Thereby, the Review Panel recommends that the ECFVG affirm its adverse decision and deny the candidate's appeal of a failing score in the anesthesia section of the CPE.

Sincerely,

James Hoffmann, DVM
Chair, COE Review Panel

May 18, 2018

Dr. Subhadra Gunawardana
4308 Marion Garden Ln
Florissant, MO 63034

VIA MAIL (FIRST CLASS) AND E-MAIL subhadra.gunawardana@wustl.edu (Candidate ID: 273624)

Dear Dr. Subhadra Gunawardana:

In compliance with the Appeal Procedure for the Educational Commission for Foreign Veterinary Graduate (ECFVG), the following is the Commission's written opinion regarding your Petition for Review.

The Commission will abide by the Review Panel's recommendation pertaining to the Anesthesia section of the Clinical Proficiency Examination (CPE). The commission formulated its opinion on the basis of a careful review of your Petition for Review, the Review Panel's recommendations in its April 20, 2018 report and the original score sheets and other relevant case information.

Specifically, the ECFVG affirms the failing scores in the Anesthesia section of the Clinical Proficiency Examination (CPE) administered in November 2017 at WVC CPE site.

The basis for affirmation includes the following reasons:
- You received one minor skill failure and one fatal flaw. You failed to secure the endotracheal tube within the time allotted after induction of anesthesia.
- Your primary examiner's documentation of your skills failure was supported by a second examiner who signed the original assessment score sheet for anesthesia.
- There was no video recording of your CPE examination. ECFVG policy allows, but does not require, video recording of the examination, and thus the lack of video documentation does not constitute failure to follow stated procedures. Furthermore, video recordings, if performed, cannot be used to reverse failing scores as stated in Manual of Administration.
- The established and published ECFVG processes were followed, and you were evaluated in a structured manner and environment. The Commission followed its policy while assessing your original petition for reconsideration of the adverse decision regarding your performance in Anesthesia section of the CPE administered in November 2017.

The records indicate you did not secure the endotracheal tube within the 5-minute limit and received a fatal flaw, and thus you performed below the level of minimal competency on skills in the anesthesia section identified by the examiner. The CPE is based on the anesthesia skills demonstrated during the examination, not based on the past, what may happen in the future, or what happens outside the administration of the examination.

In accordance with the ECFVG policy, you will need to retake the entire CPE to successfully complete Step 4 of the certification program. Information on retaking the entire CPE can be found here: https://www.avma.org/professionaldevelopment/education/foreign/pages/ecfvg-cpe-bulletin.aspx#cpe-fees.

Additional information regarding the ECFVG appeals process is available online at https://www.avma.org/professionaldevelopment/education/foreign/pages/ecfvg-pp-appeal.aspx.

In addition, the ECFVG office has attempted to deliver the cover letter with the COE Review Panel Report to you via request-for-signature mailing method without success. Because you have indicated by email that your street address we have on file is correct, and you were at work during delivery time, we will send you the decision letter by email and by first class mail.

If you have any questions regarding the retake application or the appeal process, please contact the ECFVG office (800-248-2862, ext. 6678; ecfvg@avma.org).

Sincerely,

Nicole Gallant, DVM
Chair, ECFVG

JLC/jlc

c:   Dr. Patrick Farrell, Chair of the Council on Education
     Dr. James Hoffmann, Chair, COE Review Panel
     Dr. Tony Pease, WVC CPE Site Coordinator

PLAINTIFF'S
EXHIBIT
2

# Request from veterinarian

Gunawardana, Subhadra

Wed 9/5/2018 9:17 PM

To: drjdejong@comcast.net <drjdejong@comcast.net>;

📎  1 attachments (1 MB)

Appeals Correspondence.pdf;

Dear Dr. de Jong,

This is to bring to your attention, certain problems with the policies and procedures of the Educational Commission for Foreign Veterinary Graduates (ECVFG) and the Council on Education (COE), committees of the AVMA. I am requesting your intervention to reform the ECFVG policies, and to correct a specific problem for me as a candidate, i.e. improper handling of my appeal of an adverse decision.  Please note that my main concern is not about specific internal decisions of the ECFVG but rather the overall policies and procedures that dictate those decisions, and AVMA executive board has the final say on those policies.  As explained below, the terms of the Appeals procedure are unconscionable, as are many clauses of the ECFVG contract itself.

In my case, the adverse decision was a failing grade for Anesthesia during my ECFVG clinical proficiency exam, at WVC November 2017. As reason for failure, the score report alleges a fatal flaw, i.e. *"Candidate failed to secure endotracheal tube and inflate the cuff appropriately within the time allotted after induction of anesthesia"*.  I am certain such a flaw did not happen, and appealed the decision with detailed evidence (correspondence attached). Even though ECFVG failed to provide any independent impartial evidence to support the score report, both review panels upheld the original adverse decision, breaching the substantial evidence rule.

I dispute the examiner's position in the score report, and strongly believe that the videotape of this exam section would uphold my position and show that I performed the tasks correctly and in time. ECFVG has refused to release this videotape; failed to address the specific points raised in my petition, and denied the petition without providing a valid reason (Decision letter dated 02/07/2018).
Subsequently I submitted a petition for review, pointing out the aforementioned facts and providing additional evidence demonstrating my ability to perform the tasks in question well within the time limit (Petition for Review, submitted 03/01/2018). While the COE review panel acknowledges the evidence I presented, they affirm the original adverse decision based solely on the disputed score report with no independent verification, and once again failing to address/rebut the key points I presented (Memorandum dated April 20, 2018).

The actions of both review panels deprive me of the right to procedural due process, falling short of the transparency and rules of evidence customary in arbitration procedures and the industry standards in equivalent professional commissions such as ECFMG/USMLE, not to mention ECVFG's own stated procedures of considering evidence presented by candidates.  I have attached relevant correspondence which explains the situation in detail, and request your attention on the following issues.

1.   When a candidate disputes an examiner's assessment on a specific matter, the appeals procedure should have an independent and unbiased method to verify whose position is correct. ECFVG/COE appeals procedure does not have such a process in place, in contrast to appeals in equivalent professional exams.  Not having an impartial verification process, the review panels base their decisions solely on the examiners' records, which may well include human error.
This procedural flaw is evident in the handling of my appeal, where I disputed a single entry in my score report. My position can be easily proven/disproven by a videotape of my Anesthesia exam section. ECFVG first declined to release this videotape (email dated 12/20/2017).  Then in response to my petition for review, ECFVG stated that there is no videotape. Either way, ECFVG has provided no impartial evidence to support their position, and the COE review panel's decision falls short of the substantial evidence standard.

2.   ECFVG prohibits candidates from obtaining any evidence from their own exams (Email dated 12/20/2017), leaving candidates with no way to prove their position in appeal.
In my case, the COE review panel states: *"ECFVG policy allows, but does not require, video recording of the examination, and thus the lack of video documentation does not constitute failure to follow stated procedures. Furthermore, video recordings, if performed, cannot be used to reverse failing scores."*
If candidates cannot obtain or use videotape evidence of their exam sections, a factual dispute on the events during an exam can never be resolved in an impartial manner. Appeals will be automatically decided against the candidate simply due to purported "lack of evidence", thus making the appeals procedure redundant and unconscionable.  This is a flaw in the stated procedures.
Having deprived candidates of the most critical evidence, the appeals process also disregards any other evidence a candidate presents in support of their claim. In my case, the COE review panel has stated *"The CPE is based on the anesthesia skills demonstrated during the examination, not based on the past or what may happen in the future"* thus disregarding the additional evidence I presented demonstrating my ability to perform these tasks in time. Considering that professional skills need to be ongoing and permanent, this

1

statement is incorrect, and contradicts the AVMA Principles of veterinary medical ethics.

3.   The aforementioned actions violate the Administrative Procedures Act. If the AVMA/ECFVG/COE are not subject to the APA or equivalent statute, that in itself deprives candidates of their right to equal protection and due process.

4.   The lack of transparency occurs in all steps of the appeals procedure. While candidates are required to send all documentation to ECFVG, candidates do not get to see any statements made or evidence presented by the ECFVG. The review panel members for both steps of the appeal are selected at the sole discretion of the ECFVG and/or COE, with no input from the candidate. Hearings have no standard procedural guidelines, and candidates are not allowed legal representation. These policies make the appeals procedure entirely one-sided.

5.   The appeals procedure does not provide a basis for appeal outside the stated procedures, thus imposing another limitation on candidates. Examiners can make an honest mistake  even while following all stated procedures.

**The improper handling of my appeal was a direct result of the deficiencies in the appeals procedure, which violate several statutes. These policies being under the oversight of the AVMA, you have the ability to reform the appeals procedure and correct erroneous decisions.**

In addition to the appeals procedure, there are general problems with the CPE administration and the contract as a whole. The following are just a few examples.

1. Lack of transparency: The CPE candidate bulletin lists many requirements for quality assurance of CPE sites, with no method in place to independently verify whether quality assurance occurs in an ongoing manner. The process assumes that all examiners and hired personnel would ensure patient welfare at all times and be fair to candidates, without ongoing unbiased evidence to support that assumption. This is a breach of the AVMA Principles of veterinary medical ethics, and falls short of industry standards on equivalent exams in the medical field.
2. ADA violations: While the CPE candidate bulletin allows disability accommodation requests, it mandates the requests be made 90 days prior to exam date, thus excluding all disabilities that may occur within 90 days of the exam. This violates the Americans with Disabilities Act. (As briefly mentioned in my appeal, during my previous Anesthesia section in 2016 I had a disability which started a few days prior to the exam. My accommodation request was declined, and I failed that section due to the disability i.e. arthritis in my hand preventing me from getting the pop-off valve open in time. It is interesting that during that section I successfully completed all tasks upto that point including the ET intubation I am alleged to have failed in the current section.)
3. Subjective nature: CPE sections are scored based solely on the examiners' evaluations, which are subject to human error.  Lacking independent verification, this allows unfair treatment of candidates through mistake, incompetence or bias on the examiners' part (not to mention compromising patient welfare).
4. Excessive burden on candidates: According to CPE rules if a candidate fails any single section three times, they have to repeat all 7 sections of the whole exam. Having to repeat sections in which one has already demonstrated proficiency is unfair in several ways. It is a substantial burden on time and resources, considering the exam cost of $7200 plus travel and lodging. Due to the subjective nature of scoring, candidates may fail one or more sections they had passed before, forcing them to retake the full exam many times. I am certain such incidents are evident in the ECFVG records. Case law and industry standards indicate that it is arbitrary and unreasonable to force candidates to keep repeating sections they have already passed.

In addition to enabling improprieties in exam administration in general, the aforementioned policies constitute unfair conduct towards foreign veterinary graduates, particularly those from underdeveloped countries, thus violating equal rights under the constitution. The most obvious evidence for this is the far lower percentage of foreign-born veterinarians employed in the US compared to that of foreign-born physicians or other equivalent professionals. In your capacity as the president of the AVMA, you have the power to correct this situation. I request your intervention to reverse the erroneous adverse decision in my case, and to reform the ECFVG policies for the benefit of the whole profession.

Thank you,
Suba Gunawardana
615-674-8461

*Subhadra Gunawardana, Ph.D.*
Associate Professor, Cell Biology and Physiology
Washington University School of Medicine
660 S Euclid Ave, Campus Box 8228
St Louis, MO 63110.
http://diabetesresearchcenter.dom.wustl.edu/subhadra-gunawardana-dvm-phd/

Re: Request from veterinarian

John de Jong <drjdejong@comcast.net>

Mon 9/17/2018 12:07 PM

Inbox

To:Gunawardana, Subhadra <subhadra.gunawardana@wustl.edu>;

Cc:Dr. Judy Coman <jcoman@avma.org>; uvmanebm@hotmail.com <uvmanebm@hotmail.com>; Dr. David Granstrom <dgranstrom@avma.org>;

Dear Dr. Subhadra Gunawardana:

Thank you for contacting the AVMA and for sending the documents related to your appeal with the AVMA Educational Commission on Foreign Veterinary Graduates (ECFVG). I also appreciate your thoughtful comments regarding the current ECFVG processes and procedures for evaluating candidates and appeals. We always welcome comments and suggestions on how the AVMA can improve as part of our continual process of reviewing and updating our policies.

As President of the AVMA, I have no role in reviewing or modifying the decisions of the ECFVG. However, I will forward your email to the ECFVG and request that they review their policies and procedures in light of your comments and provide a response to me.

Any questions about your appeal or the next steps in the ECFVG process should be addressed to ECFVG staff (Dr. Judy Coman at jcoman@avma.org  or Bob Cook at rcook@avma.org).

Best regards,

John de Jong, DVM
AVMA President
2018-2019

On Sep 5, 2018, at 10:17 PM, Gunawardana, Subhadra <subhadra.gunawardana@wustl.edu> wrote:

Dear Dr. de Jong,

This is to bring to your attention, certain problems with the policies and procedures of the Educational Commission for Foreign Veterinary Graduates (ECVFG) and the Council on Education (COE), committees of the AVMA. I am requesting your intervention to reform the ECFVG policies, and to correct a specific problem for me as a candidate, i.e. improper handling of my appeal of an adverse decision.  Please note that my main concern is not about specific internal decisions of the ECFVG but rather the overall policies and procedures that dictate those decisions, and AVMA executive board has the final say on those policies.  As explained below, the terms of the Appeals procedure are unconscionable, as are many clauses of the ECFVG contract itself.

In my case, the adverse decision was a failing grade for Anesthesia during my ECFVG clinical proficiency exam, at WVC November 2017. As reason for failure, the score report alleges a fatal flaw, i.e. *"Candidate failed to secure endotracheal tube and inflate the cuff appropriately within the time allotted after induction of anesthesia"*.  I am certain such a flaw did not happen, and appealed the decision with detailed evidence (correspondence attached). Even though ECFVG failed to provide any independent impartial evidence to support the score report, both review panels upheld the original adverse decision, breaching the substantial evidence rule.

I dispute the examiner's position in the score report, and strongly believe that the videotape of this exam section would uphold my position and show that I performed the tasks correctly and in time. ECFVG has refused to release this videotape; failed to address the specific points raised in my petition, and denied the petition without providing a valid reason (Decision letter dated 02/07/2018).
Subsequently I submitted a petition for review, pointing out the aforementioned facts and providing additional evidence demonstrating my ability to perform the tasks in question well within the time limit (Petition for Review, submitted 03/01/2018). While the COE review panel acknowledges the evidence I presented, they affirm the original adverse decision based solely on the disputed score report with no independent verification, and once again failing to address/rebut the key points I presented (Memorandum dated April 20, 2018).

EX.2

Re: Request from veterinarian

Gunawardana, Subhadra

Wed 9/19/2018 7:16 PM

To: Dr. Judy Coman <jcoman@avma.org>;

Cc: Dr. David Granstrom <dgranstrom@avma.org>; uvmanebm@hotmail.com <uvmanebm@hotmail.com>; John de Jong <drjdejong@comcast.net>;

Dear Dr. Coman,

This is in reference to my letter to Dr. John de Jong dated 09/05/2018, forwarded to you on 09/17/2018.

In light of the concerns I brought regarding the ECFVG Appeals procedures, I hereby formally request you to reverse the adverse decision in my CPE.

Thank you,
Suba Gunawardana
Candidate ID # 273624

---

**From:** John de Jong <drjdejong@comcast.net>
**Sent:** Monday, September 17, 2018 12:06 PM
**To:** Gunawardana, Subhadra
**Cc:** Dr. Judy Coman; uvmanebm@hotmail.com; Dr. David Granstrom
**Subject:** Re: Request from veterinarian

Dear Dr. Subhadra Gunawardana:

Thank you for contacting the AVMA and for sending the documents related to your appeal with the AVMA Educational Commission on Foreign Veterinary Graduates (ECFVG). I also appreciate your thoughtful comments regarding the current ECFVG processes and procedures for evaluating candidates and appeals. We always welcome comments and suggestions on how the AVMA can improve as part of our continual process of reviewing and updating our policies.

As President of the AVMA, I have no role in reviewing or modifying the decisions of the ECFVG. However, I will forward your email to the ECFVG and request that they review their policies and procedures in light of your comments and provide a response to me.

Any questions about your appeal or the next steps in the ECFVG process should be addressed to ECFVG staff (Dr. Judy Coman at jcoman@avma.org  or Bob Cook at rcook@avma.org).

Best regards,

John de Jong, DVM
AVMA President
2018-2019

On Sep 5, 2018, at 10:17 PM, Gunawardana, Subhadra <subhadra.gunawardana@wustl.edu> wrote:

Dear Dr. de Jong,

This is to bring to your attention, certain problems with the policies and procedures of the Educational Commission for Foreign Veterinary Graduates (ECVFG) and the Council on Education (COE), committees of the AVMA. I am requesting your intervention to reform the ECFVG policies, and to correct a specific problem for me as a candidate, i.e. improper handling of my appeal of an adverse decision.  Please note that my main concern is not about specific internal decisions of the ECFVG but rather the overall policies and procedures that dictate those decisions, and AVMA executive board has the final say on those

4

EX.2

Request from veterinarian [Gunawardana]

Dr. Judy Coman <JComan@avma.org>

Tue 9/25/2018 2:52 PM

Inbox

To: Gunawardana, Subhadra <subhadra.gunawardana@wustl.edu>;

Cc: Dr. David Granstrom <DGranstrom@avma.org>;

🖉 1 attachments (114 KB)

DecisionLtr_ECFVG_PetReview_273624.pdf;

Dr. Gunawardana:

Thank you for contacting the ECFVG about your appeal. At this point, you have filed a petition for reconsideration and a petition for review, both of which affirmed your failing score on the CPE exam in accordance with ECFVG procedures. Therefore, you have exhausted your appeals regarding your CPE exam. Therefore, the ECFVG is not in a position to reconsider your appeal.

Attached to this email is another copy of the May 18, 2018 letter to you with instructions on completing the CPE. Please let us know if you have any questions.

**Judy Lee Coman, DVM, DACLAM**
**Assistant Director | Education & Research**
American Veterinary Medical Association
1931 North Meacham Rd, Suite 100
Schaumburg, IL 60173
www.avma.org
-
*"This communication is confidential and is not intended for public disclosure.  If you have received it in error, please notify the sender by reply email and immediately delete it and any attachments without copying or further transmitting the same."*
-

**From:** Gunawardana, Subhadra <subhadra.gunawardana@wustl.edu>
**Sent:** Wednesday, September 19, 2018 7:16 PM
**To:** Dr. Judy Coman <JComan@avma.org>
**Cc:** Dr. David Granstrom <DGranstrom@avma.org>; uvmanebm@hotmail.com; John de Jong <drjdejong@comcast.net>
**Subject:** Re: Request from veterinarian

Dear Dr. Coman,

This is in reference to my letter to Dr. John de Jong dated 09/05/2018, forwarded to you on 09/17/2018.

In light of the concerns I brought regarding the ECFVG Appeals procedures, I hereby formally request you to reverse the adverse decision in my CPE.

Thank you,

Suba Gunawardana

Candidate ID # 273624



PLAINTIFF'S
EXHIBIT
3

*POLICIES AND PROCEDURES*
*AMERICAN VETERINARY MEDICAL ASSOCIATION*
*EDUCATIONAL COMMISSION FOR*
*FOREIGN VETERINARY GRADUATES®*

*May 2018*

**CONTACT INFORMATION FOR ECFVG CERTIFICATION PROGRAM**
ECFVG
American Veterinary Medical Association
1931 N Meacham Rd, Suite 100
Schaumburg, IL 60173-4360

Web:        www.avma.org/education/ecfvg/default.asp
Telephone:  800-248-2862 or 847-925-8070, ext. 6778 for general ECFVG information
            OR ext. 6682 for CPE and BCSE information
Fax:        847-285-5732
E-mail:     ECFVG@avma.org for general ECFVG information
            vwragg@avma.org for ECFVG Coordinator

### *ECFVG POLICES AND PROCEDURES—TABLE OF CONTENTS*

GLOSSARY OF ACRONYMS ..................................................................................- 1 -
HISTORY, DESCRIPTION, AND CHARGE OF THE ECFVG ..................................... 2
AVMA-LISTED VETERINARY COLLEGES ................................................................. 3
OVERVIEW OF THE ECFVG CERTIFICATION PROGRAM ...................................... 4
ECFVG RELATIONSHIP  WITH THE CANADIAN NEB ............................................. 6
SPECIFIC STEPS OF THE ECFVG CERTIFICATION PROGRAM .............................. 7
    Step One—Registration and Proof of Graduation ..................................................... 7
        *Refunds:* ............................................................................................................... 7
        *Re-registration:* ................................................................................................... 7
        *Verification of educational credentials* .............................................................. 8
    Step Two—English Language Ability ....................................................................... 8
    Step Three—Basic and Clinical Sciences Knowledge ............................................ 10
    Step Four—Clinical Skills Assessment ................................................................... 11
PETITIONING PROCESSES ...................................................................................... 13
    English Language Waiver Requirements—Spoken Section Only ............................ 13
ECFVG COMPLAINTS PROCEDURE ...................................................................... 14
ECFVG APPEAL PROCEDURE ................................................................................. 15
RELEASE OF INFORMATION/CHANGE OF CONTACT INFORMATION ...................... 20
APPENDICES ............................................................................................................ 21
    Appendix 1—ECFVG Certification of Graduation Form (read-only) ........................................

**GLOSSARY OF ACRONYMS**

| | |
|---|---|
| AAVMC | Association of American Veterinary Medical Colleges |
| AAVSB | American Association of Veterinary State Boards |
| ADA | Americans with Disabilities Act |
| AVMA | American Veterinary Medical Association |
| BCSE | Basic and Clinical Sciences Examination |
| CAEL | Canadian Academic English Language Assessment |
| CCT | Clinical Competency Test |
| COE | Council on Education |
| CPE | Clinical Proficiency Examination |
| ECFVG | Educational Commission for Foreign Veterinary Graduates |
| ETS | Educational Testing Service |
| iB-TOEFL | Internet-based Test of English as a Foreign Language |
| IELTS | International English Language Testing System |
| NAVLE | North American Veterinary Licensing Examination |
| NBE | National Board Examination |
| NBVME | National Board of Veterinary Medical Examiners |
| NEB | Canadian National Examining Board |
| QAP | Quality Assurance Program |
| VIVA | Veterinary Information Verifying Agency |

*POLICIES AND PROCEDURES OF THE EDUCATIONAL COMMISSION FOR FOREIGN VETERINARY GRADUATES® (ECFVG®)*

**HISTORY, DESCRIPTION, AND CHARGE OF THE ECFVG**

In 1971, the House of Delegates approved a "Procedure for Recognizing Graduates of Colleges of Veterinary Medicine Outside the United States and Canada." That procedure included a provision for the formation of "a special committee to be named the Educational Commission for Foreign Veterinary Graduates, advisory to the Council on Education, which shall be appointed by the AVMA Executive Board to maintain continuing surveillance over procedures for acceptance of graduates of colleges of veterinary medicine outside the United States and Canada." Today, the ECFVG continues to carry out its two-part charge:

1. To evaluate the professional competence of graduates of non-AVMA/Council on Education-accredited colleges of veterinary medicine listed by the AVMA, to the benefit of such graduates and of the state and provincial veterinary licensing agencies, and of other concerned parties; and
2. To allow utilization of ECFVG examinations and other assessment resources to evaluate the professional competence of graduates of AVMA/Council on Education-accredited colleges of veterinary medicine when such utilization is to the benefit of the state and provincial veterinary licensing agencies, and other concerned parties.

Recommendations pertaining to changes in ECFVG policies are forwarded to the AVMA Executive Board for consideration and approval. Decisions related to candidates and internal operational policies such as the Basic and Clinical Sciences Examination (BCSE) procedures, Clinical Proficiency Examination (CPE) Manual of Administration, petitioning processes, and application and other forms are made by the ECFVG alone and are independent of the AVMA. Further, such decisions are not influenced by the partner organization or its recognized affiliate organizations. Since the inception of the current certification program (January 1, 1973) through December 31, 2015, the ECFVG has awarded 6,052 certificates.

The ECFVG shall consist of 12 voting members as follows: one (1) member representing the AVMA Council on Education (COE); two (2) members representing State Veterinary Licensing Boards (either appointed members [veterinarian or non-veterinarian], senior administrative executives, or other staff members of state veterinary licensing boards); one (1) member representing the Association of American Veterinary Medical Colleges (AAVMC); one (1) member representing Government Service; one (1) member representing the Canadian National Examining Board (NEB); two (2) members representing Clinical Practitioners holding an ECFVG certificate, with at least one being a non-native English speaker; one (1) member representing Public Health or Food Safety; one (1) member representing Medical or Health Educators with expertise in clinical assessment methods; one (1) member representing Veterinary Surgery or Anesthesia (must be board-certified by the American College of Veterinary Surgeons or the American College of Veterinary Anesthesiologists); and one (1) member representing the Public. All members except members representing State Veterinary Licensing Boards; Medical or Health Educators, and the Public must be veterinarians. ECFVG certificate holders may be appointed to positions other than the 2 designated specifically for ECFVG certificate holders with the stipulation that certificate holders must comprise less than

50% of the twelve positions. ECFVG certificate holders must have completed the ECFVG program no less than 5 years prior to nomination to the ECFVG. Individuals associated with or employed by the institution or site that administers the Clinical Proficiency Examination (CPE) are not eligible for membership on the ECFVG.

Appointments for all voting representatives except the public member and one member representing state veterinary licensing boards are made by the AVMA Board of Directors for terms of six years beginning at the close of the AVMA annual meeting. One of the members representing state veterinary licensing boards shall be appointed by the American Association of Veterinary State Boards (AAVSB). ECFVG members who have served terms of three years or more are not eligible for re-appointment. The term of the representative of the Council on Education terminates concurrently with the end of the representative's term on the Council. If a position other than the public member position remains vacant for twelve (12) consecutive months, it will be advertised as an At-Large Veterinary Position for appointment by the AVMA Executive Board for the remainder of the term of the original vacancy, after which it will revert to its original categorization.

The public member is appointed by the Commission when a vacancy exists, for a non-renewable six-year term that begins at the close of the AVMA Annual Convention. Criteria used in the selection of public members specify that they shall not be:

1. A veterinarian.
2. A current or former employee of a college of veterinary medicine.
3. A vendor to the ECFVG.
4. Currently or formerly affiliated with any other constituent group represented on the ECFVG.

One Clinical Proficiency Examination (CPE) site coordinator from an ECFVG-approved site may be invited to attend ECFVG meetings as a non-voting liaison. The liaison may be asked to recuse him-/herself when requested by the Chair of the Commission.

The ECFVG office is located in the Education and Research Division at AVMA Headquarters in Schaumburg, Illinois. ECFVG information, including an application form, can be found on the AVMA Web site (home page: www.avma.org) at https://www.avma.org/ProfessionalDevelopment/Education/Foreign/Pages/default.aspx.

**AVMA-LISTED VETERINARY COLLEGES**

To be eligible to enroll in the ECFVG certification program, an individual must be a graduate of, or final-year student at, an AVMA-listed veterinary college.  A graduate of a non-listed veterinary college cannot enroll in the ECFVG program until the college becomes listed.

Neither the AVMA nor the ECFVG represents that the AVMA-listed Veterinary Schools of The World is a comprehensive list of all veterinary schools in the world. Other organizations, such as the World Veterinary Association (www.worldvet.org/) and the Royal College of Veterinary Surgeons (www.rcvs.org.uk), also maintain lists of veterinary schools. However, to enroll in the ECFVG program, a veterinarian must be a graduate of one of the institutions/programs included

in the AVMA-listed Veterinary Schools of The World.

The AVMA-listed Veterinary Schools of The World includes all schools that were listed by the World Health Organization in its World Directory of Veterinary Schools, published in 1973. Additional listed schools also were described in the 1983 Pan American Health Organization publication, Diagnosis of Animal Health in the Americas, and in the World Veterinary Directory 1991, edited by the World Veterinary Association in cooperation with the Food and Agriculture Organization of the United Nations, the World Health Organization, and the OIE. The list also includes additional schools that have come to the attention of the ECFVG for reasons related to the certification program.

The time required to verify that the school is officially recognized is variable and depends on the country or language of communication. Sometimes, it may take a long time – weeks, perhaps, even months or longer -- to get back the necessary information about school recognition within the country of origin. Candidates interested in registering for the ECFVG certification program should plan well in advance as the time required for some aspects of the certification process is beyond the control of ECFVG.

Should a graduate of a non-listed college apply to the ECFVG program, the ECFVG requires that the college obtain a letter from the federal Ministry of Education indicating that the college is recognized by the government of that country and that its graduates are eligible to practice veterinary medicine within that country without restriction. The letter must also include complete contact information for the college (full name, address, telephone and fax numbers, E-mail address, and Web site) and the full name and abbreviation of the veterinary degree awarded. After the ECFVG reviews and approves necessary documentation, the college will be added to the list.

**OVERVIEW OF THE ECFVG CERTIFICATION PROGRAM**

An ECFVG certificate may be accepted by state veterinary medical licensing agencies as fulfilling the educational prerequisite, either in full or in part, for state licensure eligibility. The majority of states require graduates of non-AVMA accredited veterinary schools to hold an ECFVG certificate. However, because licensing requirements can change, the ECFVG and AVMA urge all veterinarians to contact the licensing agency in the state in which they wish to become licensed to determine current requirements, including educational prerequisites.

The ECFVG certification program comprises 4 steps, each one designed to build from the previous. The purpose of the first step is to confirm an applicant's veterinary college credentials. The second step is designed to assess a candidate's English language ability. The purpose of the third step is to assess a candidate's basic and clinical veterinary science knowledge, whereas the purpose of the fourth and final step is to assess a candidate's hands-on clinical veterinary medical skills.

In addition, candidates who enroll into the ECFVG program on or after July 1, 2014, must submit validated **Surgical Experience Documentation** forms as proof of having performed, in the five-year period prior to date of CPE, at least one (1) ovariohysterectomy as the primary

surgeon and at least five (5) additional surgical procedures as either the primary or the assistant surgeon. The 5 additional procedures may be ovariohysterectomies or other surgical procedures, but each documented surgery should involve all elements of an aseptic surgical procedure, including gowning & gloving, draping of the patient, and use of sterile instrumentation. Validation of surgery experience can be provided by **one or more veterinarians licensed to practice veterinary medicine in any international jurisdiction**. Please note that, candidates who enrolled into the ECFVG program on or after July 1, 2014, will be eligible to register for the full CPE only when the required documentation is received in its entirety in the ECFVG office and processed by ECFVG staff. The ECFVG reserves the right to verify the documents received.  Candidates are reminded that falsification of documents would be a violation of the Rules of Conduct and can resolve in disciplinary actions up to and including dismissal from the program. Candidates who successfully fulfill this eligibility requirement will be notified of their Step 4 eligibility by e-mail and will be able to register and apply for CPE through ECFVG Online.

This CPE eligibility requirement does not apply to candidates enrolled in the ECFVG program prior to July 1, 2014. However, the ECFVG strongly recommends that all candidates have the experience described above prior to attempting the surgical section of the CPE.

The examinations used within the ECFVG certification program are rigorous. The program assesses educational equivalency of graduates of veterinary schools that are not accredited by the AVMA Council on Education (COE). Therefore, the program reflects veterinary educational and practice standards within the USA and Canada. All potential and current ECFVG candidates are encouraged to critically consider whether the veterinary education they received is sufficient to provide them with the necessary knowledge and skill level to perform well on the ECFVG Step 3 (Basic and Clinical Sciences Examination [BCSE]) and Step 4 (Clinical Proficiency Examination [CPE]) examinations. For example, to succeed in the surgery and anesthesia sections of the BCSE and CPE, candidates will need to not only have knowledge about performing surgery and anesthesia in small and large animals (for the BCSE), but they should also have experience performing small-animal surgery and anesthesia in an instructional or clinical setting prior to attempting the CPE.

Communication skills and service to clients are also a high priority in veterinary practice in the USA and Canada. Throughout the ECFVG program, candidates will be assessed on their ability to communicate clearly and effectively in English (or French in Canada). Lack of adequate entry-level communication skills in English (or French in Canada) will negatively impact a candidate's performance in the ECFVG certification program.

An applicant who satisfactorily completes the following 4 steps (in order) will be awarded an ECFVG certificate:
1. Provide proof (diploma and final transcripts) of graduation from an AVMA-listed college of veterinary medicine. The ECFVG will seek verification of the applicant's credentials by direct request to the college from which the individual claims graduation.
2. Provide proof of comprehension and ability to communicate in the English language by attaining passing scores on the internet-based TOEFL (iB-TOEFL) as administered by Educational Testing Service of Princeton, NJ; **OR** the International English Language Testing

System (IELTS) as administered by the University of Cambridge Local Examinations Syndicate, the British Council, and IDE Education Australia; **OR** the Canadian Academic English Language Assessment (CAEL) as administered by Carleton University in Ontario, Canada. For candidates completing secondary school in the United States, United Kingdom (England, Wales, Scotland, and Northern Ireland), Australia, New Zealand, or Canada (except Quebec), the English language examinations may be waived, provided such candidates submit documentation attesting to at least three years full-time attendance at a secondary (high) school located in one of the above countries and at which the complete language of instruction was English or, for graduates of US high schools only, a certified, notarized, or official copy of the final transcript. A degree from a US college or university is not considered adequate proof of English language ability.

3. All candidates who enroll in the ECFVG program on or after January 1, 2014, must pass the Basic and Clinical Sciences Examination (BCSE) to satisfy the requirements of Step 3 of the ECFVG program. Candidates will no longer be permitted to submit passing scores from the National Board Examination (NBE), Clinical Competency Test (CCT) and/or North American Veterinary Licensing Examination (NAVLE) to complete Step 3 of the ECFVG program.   Those candidates who are enrolled in the ECFVG program prior to January 1, 2014, and have successfully completed the NAVLE during or prior to the April 2007 administration or the NBE and CCT prior to year 2000, can have those original score reports submitted directly from the Veterinary Information Verifying Agency (VIVA) of the American Association of Veterinary State Boards (AAVSB) for completion of Step 3 of the ECFVG program.

4. Attaining a passing score on all sections of the Clinical Proficiency Examination (CPE) approved by the ECFVG.

## ECFVG RELATIONSHIP WITH CANADIAN NEB

Both the ECFVG and Canadian National Examining Board (NEB; see http://www.canadianveterinarians.net) use the same examinations as part of their certification programs—namely the Basic and Clinical Sciences Examination (BCSE) and the Clinical Proficiency Examination (CPE)—and each agency accepts BCSE and CPE score transfers from the other agency. As such, the ECFVG and NEB recognize that foreign veterinary graduates may wish to apply for certification concomitantly through both offices in order to earn certification that is accepted by US licensing agencies and employers (ECFVG certification) or Canadian licensing agencies and employers (NEB certification). However, each agency expressly prohibits candidates from accepting a full or retake CPE position if they are already scheduled for the CPE through the other agency. In addition, candidates may only reserve one BCSE seat per application period, which must be reserved through either the ECFVG or NEB office.

To help ensure that ECFVG and NEB candidates do not double-book testing appointments by scheduling examinations through both agencies at the same time, the ECFVG and NEB will share candidate information. Neither the NEB nor ECFVG office will knowingly assign an examination date to candidates who have already been assigned a position through the other office. Candidates who have already accepted an examination position through one agency must also decline a testing position inadvertently offered through the other agency. Candidates who attempt to circumvent this requirement by accepting a testing position through one agency while

already scheduled through the other agency will be withdrawn from the second testing position and will lose all fees and deposits paid.

## SPECIFIC STEPS OF THE ECFVG CERTIFICATION PROGRAM

### Step One—Registration and Proof of Graduation
To register in the ECFVG certification program, an applicant must complete the online application and submit the payment of $1,400.00 (USD; $675.00 ECFVG program application fee; $725.00 ECFVG Quality Assurance Program [QAP] fee). This payment can be made by credit card (Visa, MasterCard, or American Express) online at the end of the application. Payment can also be submitted to the ECFVG office as a personal check from a US bank only, or by cashier's check or money order made payable to the AVMA. Candidates must also submit the following to the ECFVG office within 7 business days of submitting the online application:

i. A completed and notarized ECFVG confirmation page available at the end of the online application.

ii. Two passport-sized photographs of the applicant.

iii. Certified, notarized, or official (issued directly by school) photocopies of the applicant's veterinary college diploma and final transcripts (for each year of study), both in the language of issuance and as a certified English translation if necessary. Provisional Certificates and Certificates of Graduation are unacceptable for ECFVG program purposes.

   a. If the applicant is a final-year student at an AVMA-listed veterinary college, transcripts, as described above, for those years of study completed and a letter from an official of the veterinary college stating that the applicant will graduate within the year must be submitted with the ECFVG application form. After graduating from the AVMA-listed veterinary college, such candidates will need to submit certified, notarized, or official (issued directly by school) photocopies of their veterinary college diploma and final transcripts before Step 1 can be considered complete.

iiii. Request to return original or official diploma and transcripts will result in a $25.00 document processing fee which is non-refundable.

All items must be sent to: ECFVG, American Veterinary Medical Association, 1931 N Meacham Road, Suite 100, Schaumburg, IL 60173-4360, USA.

_Refunds:_ The $675.00 ECFVG program application fee is nonrefundable. However, if a candidate wishes to withdraw from the ECFVG certification program within 60 days after initially applying, the $725.00 ECFVG Quality Assurance Program (QAP) fee will be refunded upon request to the ECFVG office. Requests must be done online through ECFVG Online (the online candidate database) or by written request. No fees will be refunded for withdrawal requests received more than 60 days after initially applying to the program.

_Re-registration:_ The original registration fee is valid for two years. To remain active in the program, candidates must re-register every two years by notifying the ECFVG and paying a $120.00 re-registration fee. Candidates will be notified 60 days prior to their re-registration

deadline by email and through their online status. Files of candidates who do not re-register in the ECFVG certification program will be made inactive. An inactive file may be reactivated within eight years upon the written request of the candidate and payment of all past-due re-registration fees. Inactive candidate files older than eight years will be destroyed. Future entrance into the ECFVG certification program would require new registration according to guidelines currently in effect.

_Verification of educational credentials_: The ECFVG verifies all applicants' educational credentials. The ECFVG Coordinator sends a "certification of graduation" form (Appendix 1) with the applicant's photograph to the dean of the veterinary college from which the applicant graduated. The dean or other college official must verify the applicant's identification and graduation date and return the completed form with the college seal affixed to the ECFVG office. Applicants may proceed with Steps 2 and 3 of the certification program while verification is being obtained. However, Step 1 will not be considered completed until such verification is obtained, and applicants will not be eligible to apply for Step 4 of the certification program (the CPE) until Steps 1, 2, and 3 are completed.  The time required to verify step 1 credentials of a candidate is variable and depends on school, country or language of communication. Sometimes, it may take a long time – weeks, perhaps, even months or longer -- to receive the necessary information about individual candidates. Candidates interested in registering for the ECFVG certification program should plan well in advance as the time required for some aspects of the certification process is beyond the control of ECFVG.

Once enrolled, candidates must submit address and name change requests through ECFVG Online (the online candidate database) or in writing, listing any relevant changes in telephone numbers or E-mail addresses. Name changes are not able to be completed online. Candidate name changes must be submitted in writing along with a copy of appropriate legal documents.

### Step Two—English Language Ability

To complete Step 2, candidates must provide the ECFVG with proof of comprehension and ability to communicate in the English language by meeting the minimum requirements established by the ECFVG on one of the following assessment tools: the TOEFL internet-based test (TOEFL iBT), the IELTS, the CAEL Assessment, or Waiver policy.

### TOEFL iBT

The TOEFL iBT is offered by Educational Testing Service (ETS P.O. Box 6151, Princeton, NJ 08541; Web site: www.toefl.org; telephone: 609-771-7100). Candidates must contact ETS for information regarding the TOEFL iBT, including dates and location of examinations, fees, and application procedures.

For ECFVG program purposes, candidates choosing to take the TOEFL iBT **MUST** take each subsection of the TOEFL iBT. The minimum required scores on the TOEFL iBT are 25 in listening, 22 in writing, 22 in speaking, and 23 in reading; no minimum overall score is required. All candidates MUST pass all required sections of the TOEFL iBT in a single examination administration.

**The ECFVG requires original score reports directly from ETS; copies are not acceptable.** Please use institution code 1212 when requesting score reports from ETS. Because ETS only maintains score reports for two years from the date of examination, candidates should plan accordingly to ensure that score reports do not expire before requesting that they be submitted to the ECFVG. The ECFVG office cannot hold score reports longer than two years for individuals who are not currently enrolled in the ECFVG certification program. However, once an enrolled ECFVG candidate submits a passing score report, that score report will remain valid as long as the candidate remains actively enrolled in the ECFVG program.

**International English Language Testing System (IELTS)**
The International English Language Testing System (IELTS) is administered by the University of Cambridge Local Examinations Syndicate, the British Council, and IDE Education Australia. For information in North America, contact IELTS Inc at 825 Colorado Boulevard, Suite 112, Los Angeles, CA 90041 (Web site: www.ielts.org; telephone: 323-255-2771).

For ECFVG program purposes, candidates choosing to take the IELTS **MUST** take the academic IELTS. The minimum required score on the academic IELTS is 6.5 (overall band score), with at least a 6.5 in the listening band, a 6.0 in the writing band, and a 7.0 in the speaking band; no minimum reading score is required. All candidates MUST pass all required sections of the academic IELTS in a single examination administration.

**The ECFVG requires original score reports directly from IELTS Inc.; copies are not acceptable.** Because IELTS Inc. only maintains score reports for two years from the date of examination, candidates should plan accordingly to ensure that score reports do not expire before requesting that they be submitted to the ECFVG. The ECFVG office cannot hold score reports longer than two years for individuals who are not currently enrolled in the ECFVG certification program. However, once an enrolled ECFVG candidate submits a passing score report, that score report will remain valid as long as the candidate remains actively enrolled in the ECFVG program.

**Canadian Academic English Language (CAEL)**
The Canadian Academic English Language (CAEL) Assessment is administered by Paragon Testing Enterprises, a subsidiary of The University of British Columbia. Please contact the CAEL Assessment Testing Office, 110-2925 Virtual Way, Vancouver, British Columbia, Canada V5M 4X5 (Web site: www.cael.ca; telephone: within Vancouver: 604-674-8664; toll-free within North America 855-520-2235). For ECFVG program purposes, candidates choosing to take the CAEL Assessment **MUST** take each subsection of the CAEL Assessment. The minimum required score on the CAEL Assessment is 60 (overall score), with at least a 60 in the listening band, a 50 in the writing band, and a 60 in the speaking band. All candidates MUST pass all required sections of the CAEL Assessment in a single examination administration.

**The ECFVG requires original score reports directly from the CAEL Assessment Testing Office; copies are not acceptable.** Because CAEL only maintains score reports for two years from the date of examination, candidates should plan accordingly to ensure that score reports do not expire before requesting that they be submitted to the ECFVG. The ECFVG office cannot hold score reports longer than two years for individuals who are not currently enrolled in the

ECFVG certification program. However, once an enrolled ECFVG candidate submits a passing score report, that score report will remain valid as long as the candidate remains actively enrolled in the ECFVG program.

**Waiver Policy**
For candidates completing secondary school in the United States, United Kingdom (England, Wales, Scotland, and Northern Ireland), Australia, New Zealand, or Canada (except Quebec), the English language examinations may be waived. To do so, eligible candidates must provide documentation of at least three years full-time attendance at a secondary (high) school located in one of the above countries at which the complete language of instruction was English. Acceptable documentation includes a letter directly from school officials stating dates of attendance (month and year of both initial and final dates of attendance are required) and verifying that the complete language of instruction was English or, for graduates of US high schools only, a certified, notarized, or official copy of the final transcript. A degree from an English-speaking college or university is not considered adequate proof of English language ability.

### *Step Three—Basic and Clinical Sciences Knowledge*
All candidates who enroll into the ECFVG program on or after January 1, 2014 must attain a passing score on the Basic and Clinical Sciences Examination (BCSE) in order to complete Step 3 of the ECFVG certification program. Candidates who enrolled prior to January 1, 2014, and have taken the North American Veterinary Licensing Examination (NAVLE) during the April 2007 or prior administrations **ONLY**, or the National Board Examination (NBE) and Clinical Competency Test (CCT) prior to year 2000 may be eligible to use successful score reports from those prior examinations to complete ECFVG Step 3.

Candidates will be notified by e-mail and through ECFVG Online (the online candidate database) of their eligibility to apply for the Step 3 examination. Please note that candidates only become eligible to apply for and take the BCSE upon successful completion of ECFVG Step 2.

The AVMA owns and administers the BCSE, a computer-based examination, lasting approximately four hours and consisting of 225 questions designed to help assess basic and clinical veterinary sciences knowledge. Complete information on the BCSE, including application procedures, rescheduling rules, rules of conduct, and testing accommodations, can be found in the BCSE Candidate Bulletin. All candidates must review this document before taking the BCSE.

The Canadian National Examining Board (NEB; http://www.canadianveterinarians.net/) also uses the BCSE as part of its certification program. NEB candidates must register for the BCSE through the NEB office; score reports for NEB candidates will also be through the NEB office. Both ECFVG and NEB candidates may reserve only a single testing seat per BCSE application, regardless through which agency that single testing seat is reserved.

For ECFVG candidates taking the BCSE, scores will automatically be entered into candidate files; a passing score will result in completion of ECFVG Step 3 and successful candidates will

then be notified of their eligibility to apply for ECFVG Step 4, the Clinical Proficiency Examination (CPE). Both passing and failing BCSE scores will also be reported directly to candidates by the Testing Coordinator via e-mail and through ECFVG Online (the online candidate database). BCSE scores will not be available to candidates via telephone.

For ECFVG candidates who enrolled into the ECFVG program prior to January 1, 2014 and who have successfully completed the NAVLE during or prior to the April 2007 administration or the NBE and CCT prior to 2000, the ECFVG requires original NAVLE or NBE/CCT score reports directly from the Veterinary Information Verifying Agency (VIVA) of the American Association of Veterinary State Boards (AAVSB). NAVLE and NBE/CCT scores are ONLY reported to the ECFVG at the request of the ECFVG candidate. Requests for score transfers must be directed to the VIVA, 380 W. 22nd Street, Suite 101, Kansas City, MO 64108 (E-mail: viva@aavsb.org; telephone: 816-931-1504, ext. 23; Web site: www.aavsb.org/VIVA/). The ECFVG office will notify each applicant when his/her scores have been received. Again, VIVA will not report scores to the ECFVG without a request from the candidate, and the ECFVG will consider Step 3 complete only on receipt of a score report from VIVA indicating a passing score on the NAVLE (April 2007 and previous administrations only) or the NBE and CCT (prior to spring 2000) for those candidates who enrolled into the ECFVG program prior to January 1, 2014.

CQ (Certificate of Qualification) holders who enrolled after January 1, 2014 and had taken the North American Veterinary Licensing Examination (NAVLE) during the April 2007 or prior administrations **ONLY**, or the National Board Examination (NBE) and Clinical Competency Test (CCT) prior to year 2000 are eligible to use successful score reports from those prior examinations to complete ECFVG Step 3 of the certification program.

ECFVG candidate addresses listed on Step 3 examination score reports (BCSE, NAVLE or NBE/CCT) that vary from the address on record must be explained in writing, listing both the old and new address, before ECFVG can record and acknowledge receipt of the score report. Therefore, it is important that all candidates provide the ECFVG office with address updates as soon as possible. Address changes must be made through ECFVG Online or in writing.

For information regarding the NAVLE, which is a licensing examination, please contact the National Board of Veterinary Medical Examiners (NBVME), PO Box 1356, Bismarck, ND 58502 (Web site: www.nbvme.org; telephone: 701-224-0332).

### Surgery Documentation Requirement
In addition, candidates who enroll into the ECFVG program on or after July 1, 2014, must submit validated Surgical Experience Documentation forms as proof of having performed, in the five-year period prior to date of CPE, at least one (1) ovariohysterectomy as the primary surgeon and at least five (5) additional surgical procedures as either the primary or the assistant surgeon. The 5 additional procedures may be ovariohysterectomies or other surgical procedures, but each documented surgery should involve all elements of an aseptic surgical procedure, including gowning & gloving, draping of the patient, and use of sterile instrumentation. Validation of surgery experience can be provided by **one or more veterinarians licensed to practice veterinary medicine in any international jurisdiction**. Please note that, candidates who enrolled into the ECFVG program on or after July 1, 2014, will be eligible to register for the full

CPE only when the required documentation is received in its entirety in the ECFVG office and processed by ECFVG staff. The ECFVG reserves the right to verify the documents received.  Candidates are reminded that falsification of documents would be a violation of the Rules of Conduct and can resolve in disciplinary actions up to and including dismissal from the program. Candidates who successfully fulfill this eligibility requirement will be notified of their Step 4 eligibility by e-mail and will be able to register and apply for CPE through ECFVG Online.

This CPE eligibility requirement does not apply to candidates enrolled in the ECFVG program prior to July 1, 2014. However, the ECFVG strongly recommends that all candidates have the experience described above prior to attempting the surgical section of the CPE.

**Step Four—Clinical Skills Assessment**
To complete Step 4, candidates must attain a passing score on all sections of the Clinical Proficiency Examination (CPE); only the CPE approved by the ECFVG will meet the requirements for assessment of clinical skills.

The CPE is a 3-day, 7-section, hands-on clinical skills examination, administered by the faculty of a college of veterinary medicine or other authorized testing institution. The skill level expected for a passing grade on each of the 7 sections of the CPE is that of an entry-level graduate of an accredited veterinary college. Only well-prepared candidates will be able to pass the CPE.

Complete information on the CPE, including format, eligibility requirements, fee structure, application procedures, scoring, location of approved sites, rescheduling, rules of conduct, and testing accommodations, can be found in the CPE Candidate Bulletin. All candidates are encouraged to read this document to understand the CPE eligibility and application process.

Please note that candidates only become eligible to apply for and take the CPE after ECFVG Steps 1, 2, and 3 are successfully completed.

Please refer to the CPE Candidate Bulletin for complete details regarding the CPE application process and fee structure.

The Canadian National Examining Board (NEB; http://www.canadianveterinarians.net) also uses the CPE as part of its certification program. NEB candidates must register for the CPE through the NEB office; CPE score reports for NEB candidates will also be through the NEB office. Both ECFVG and NEB candidates may only reserve a single full or retake CPE position at any one time, regardless through which agency that single testing seat is reserved.

**TIME BETWEEN ECFVG CERTIFICATION PROGRAM STEPS**
Candidates enrolled in the ECFVG program on or after January 1, 2015, will be required to complete Step 3 and Step 4 requirements within seven years of completing Step 2 requirements, in order to successfully complete certification requirements.  Those candidates who do not complete certification within seven years of completing Step 2 requirements, will be required to

start over again at the Step 2 level of the program while maintaining registration in the program. That is, candidates who do not complete certification requirements within the stipulated seven-year period will be required to resubmit scores from English language proficiency exams and from BCSE prior to becoming eligible for the CPE again.  Candidates beginning at the Step 2 level again will not be expected to complete Step 1 requirements again as long as registration in the program is maintained.

This seven-year time stipulation between program steps will not affect ECFVG candidates enrolled in the program prior to January 1, 2015.

All candidates working towards completion of certification requirements will be required to maintain registration in the program by paying the required bi-annual fees towards re-registration

**PETITIONING PROCESSES**
Petitions will be accepted only from candidates currently registered in the ECFVG certification program and not from third parties. A petition for variation in procedure will be considered only after a completed ECFVG application is on file. Letters of recommendation or character references are not considered in the petitioning process.

***English Language Waiver Requirements—Spoken Section Only***
The following policy for waiver of the spoken section requirements for speech impediments or other relevant disabilities was approved in April 2008:
1. The candidate must provide ECFVG a written request to have the spoken section of the English language examination waived. The request must provide the reason(s) for the request with a description of the nature of the disability.
2. An original signed letter from a physician/professional with appropriate expertise must be addressed to ECFVG. The letter must describe the candidate's speech impediments or other relevant disabilities that affect his/her speech and further certify that the speech impediment will not limit the candidate's ability to communicate with coworkers and clients in assuring safety in a veterinary practice setting.
3. A personal conversation will be conducted with the ECFVG candidate requesting the waiver. The conversation will be conducted by a) an ECFVG member or former member, b) an Executive Board member, or c) AVMA staff in a manner mutually acceptable to the candidate and the interviewer (eg, in person or via telephone, videoconference, Web conference or other appropriate communication devices). The identity of the candidate must be verified (eg, through use of a photograph identification card such as a driver's license or passport) at the time of the interview by an AVMA member (for interviews conducted via telephone or other communication devices) or the person conducting the interview (for in-person interviews).
4. The candidate must pass all other sections of the English language proficiency examinations.

If documentation obtained merits a waiver of the spoken section of the English language examination, AVMA staff will notify the candidate of the waiver.

**ECFVG COMPLAINTS PROCEDURE**

The ECFVG will review complaints related to the following aspects of the program:

- Candidate performance/compliance with guidelines regarding any of the four steps of the certification program.
- CPE site compliance with the CPE Manual of Administration.

Complaints must be written, addressed to the ECFVG, and signed with a personal signature for consideration. Contents of complaints will be discussed with the candidate or site. The candidate or site will be given the opportunity to respond to the complaint, and that response will be used by the ECFVG in resolving the complaint.

The ECFVG is interested in sustained quality and continued improvement in the assessment of veterinary educational equivalence, but does not intervene on behalf of individuals or act as a court of appeal for individual matters of admission, appointment, promotion, or dismissal. The ECFVG also does not address complaints against licensed veterinarians who are ECFVG certificate holders. Such complaints should be directed to the appropriate state veterinary regulatory board.

Interested parties may submit an appropriate signed complaint to the ECFVG regarding performance of an ECFVG candidate or compliance of a CPE site. The ECFVG will take every reasonable precaution to protect the identity of the complainant from being revealed to the candidate or site; however, the ECFVG cannot guarantee confidentiality of the complainant.

An appropriate complaint is defined as one alleging:

1. An ECFVG candidate has not complied with requirements of one or more of the four steps of the certification program as outlined in the ECFVG Policies and Procedures Manual, or a CPE site has not complied with requirements outlined in the CPE Manual of Administration or ECFVG Policies and Procedures Manual, respectively; and
2. The practice, condition, or situation is of a continuing or pervasive nature, as opposed to an unfair or arbitrary act of an individual or an act isolated in nature.

In accordance with the role of the ECFVG, matters will be addressed in an investigative manner rather than as a mediator. Only written signed complaints will be considered by the ECFVG. The ECFVG strongly encourages all parties to attempt resolution of complaints before they are brought to the Commission. If the complaint includes issues already being addressed by other entities, the Commission will take no action on the complaint until such adjudication or litigation is concluded.

Any written complaint concerning the quality or ethical conduct of an ECFVG candidate or CPE site will be received by AVMA staff, who will acknowledge receipt of the complaint within seven (7) business days. AVMA staff will make a preliminary review of the initial complaint and report to the ECFVG Chair within 30 days of receipt of the complaint. As part of this review, staff will determine whether the complaint is appropriate for review by the Commission (ie,

whether the complaint is related to items that have specific impact on the assessment of educational equivalence or program guidelines/requirements).

After review of the complaint and staff report, the ECFVG Chair will report his/her findings to the Commission and the complainant within 30 days from receipt of the staff report. If, in the judgment of the ECFVG Chair, the complaint appears to be of sufficient substance to affect the status of the candidate or site, it will be investigated further by the full Commission. Upon completion of the investigation, the Commission will take appropriate action to bring the candidate or site into compliance with established program requirements. If an investigation of the complaint by the Commission is deemed necessary, it should be completed within a period of not more than six (6) months after receiving the report from the Chair.

If an adverse decision is made concerning the candidate or site, the candidate or site shall have the right of appeal (see ECFVG Appeal Procedure). In any case, the candidate or site complained against will be informed of the nature and source of the complaint and the resultant action, if any, contemplated by the Commission before such action is taken. The complainant will be notified in writing of the results of the investigation and any action taken.

## ECFVG APPEAL PROCEDURE

**Attention ECFVG candidates: All ECFVG candidates must use the appropriate forms for submitting petitions. Neither the petition for reconsideration nor the petition for review will be accepted or processed if submitted without completing the new submission forms linked to below.**

Petition for Reconsideration form
Petition for Review form

**Candidates wishing to file a complaint must make a separate submission by following the complaints policies and procedures.**

An adverse decision may occur at any one of a number of required steps in the AVMA ECFVG certification program. The described appeal steps below apply only to those decisions that are made by the ECFVG. Adverse decisions by the ECFVG may include, but are not necessarily limited to: (i) determination that proof of graduation is not adequate; (ii) determination that a candidate did not abide by rules of procedure during the examination; (iii) determination that any examination score is inadequate; and (iv) dismissal of candidate from the program.

In the event of an adverse decision by the ECFVG, the ECFVG shall advise the affected person, in writing, of the grounds therefore and of the procedure for appeal. An affected person may appeal the Commission's adverse decision on the following grounds only- that the ECFVG has ruled erroneously by: (i) disregarding the established AVMA criteria for certification of ECFVG candidates; (ii) failing to follow its stated procedures; or (iii) failing to consider relevant evidence and documentation presented. Appeals may only be submitted and processed through the ECFVG. Any attempt to appeal or lobby through other AVMA avenues will be considered void and shall not extend the time in which to file an appeal.

If an ECFVG candidate applies to retake a failed examination while an appeal is pending, any examination fees paid will not be refunded, even if the appeal is successful and the candidate does not retake the examination. If a candidate files an appeal regarding a failed section(s) of the Clinical Proficiency Examination (CPE; ECFVG Step 4) and the appeal is unsuccessful, the time during which the appeal was pending will not count against the prescribed period in which the candidate must pass failed sections of the CPE.

An affected person desiring to appeal the Commission's adverse decision must first file a PETITION FOR RECONSIDERATION as outlined in paragraph 1 below.

1. ***Petition for reconsideration***—An affected person may petition the ECFVG to reconsider its decision by filing with the ECFVG a complete and adequate written petition for reconsideration which shall include a statement of the grounds for reconsideration and documentation, if any, in support of the petition in accordance with the following requirements:

   a. Candidates wishing to file a petition for reconsideration of an adverse outcome related to the Clinical Proficiency Examination (CPE) must first request & receive extended score reporting for the candidate's performance on that examination. Extended score reporting must be requested within 14 days of the notification of the adverse decision. The petition for reconsideration of the CPE adverse decision must then be received in the AVMA ECFVG office within 21 days after the date that extended score reporting was sent. Petitions submitted without a request for extended score reporting within 14 days of the notification of the CPE decision will not be considered by the ECFVG. All other petitions for reconsideration must be received in the AVMA ECFVG office within 30 days of the postmark date on which the ECFVG announced its adverse decision (Petition for Reconsideration form). Petitions may be submitted to the AVMA ECFVG office as follows: via US or Express Mail to 1931 N. Meacham Rd, Suite 100, Schaumburg, IL, 60173-4360, USA; via E-mail to ECFVG@avma.org; or via fax 847-285-5732.

   b. The petition for reconsideration will be immediately forwarded to the ECFVG Appeals Subcommittee, which has the authority to decide whether to affirm, modify, or reverse the adverse decision. Decisions of the ECFVG Appeals Subcommittee have the same force and effect as decisions made by the full ECFVG.

   c. Within 35 business days of receiving the petition for reconsideration, the ECFVG Appeals Subcommittee must reach a decision as to whether to affirm, modify, or reverse the adverse decision.

   d. The ECFVG reserves the right to seek additional information during review of a petition for reconsideration from:

      i.   The initial source of the adverse action (eg, test administrators)
      ii.  The candidate
      iii. Other outside experts

   e. The affected person may, at the sole discretion of the ECFVG or ECFVG Appeals Subcommittee, be invited to participate in any meeting and/or teleconference at which

the ECFVG or ECFVG Appeals Subcommittee decides whether to affirm, modify, or reverse the adverse decision.

f.   The ECFVG shall notify the affected person in writing via E-mail and/org certified mail (return receipt requested) or other traceable delivery method (eg, FedEx or UPS) of its decision to affirm, modify, or reverse its adverse decision.

g.   In the event that the affected person is not satisfied with the ECFVG decision regarding his or her petition for reconsideration, the affected person may appeal the decision further by submitting a **PETITION FOR REVIEW** as outlined in paragraph 2 below.

2.   *Petition for Review*—The affected person may petition for a review of the ECFVG's adverse decision and subsequent determination on his or her petition for reconsideration by first submitting written notification of intent to file a written petition for review (see paragraph 2a below) followed by submitting a full and adequate written petition for review (see paragraph 2b below) in accordance with the following requirements:

a.   *Written Notification:* The affected person shall notify the ECFVG in writing that he or she intends to file a petition for review. Such written notification must be received in the AVMA ECFVG (via US or Express Mail to 1931 N. Meacham Rd, Suite 100, Schaumburg, IL, 60173-4360, USA; via E-mail to **ECFVG@avma.org**; or via fax 847-285-5732), within 15 days after the postmark date (or date of the E-mail) of the ECFVG's notification letter to the affected person regarding its reconsideration decision.

b.   *Written Petition for Review:* The affected person must then file a complete and adequate written petition for review of the ECFVG's adverse decision, which shall include: (i) a statement of the grounds for review; (ii) documentation, if any, in support of the petition; and (iii) a request for a hearing and all applicable fees (refer to paragraph 2e below regarding hearing costs and procedures) if a hearing is desired by the affected person (Petition for Review form). Such written petition for review and any applicable fees must be received in the AVMA ECFVG office (via US or Express Mail, E-mail or fax to the addresses/numbers noted in paragraph 2a above) no later than 45 days after the postmark date (or date of the E-mail) of the ECFVG's notification letter to the affected person regarding its reconsideration decision. The ECFVG office shall promptly forward the petition for review to the Chair of the AVMA Council on Education ("COE Chair"), who shall, within 12 business days of receipt, determine, in his or her sole discretion, whether the petition for review is adequate under these procedures. If the petition for review is adequate, the petitioner shall be so notified. If the petition for review is deficient for any reason, the COE Chair will notify the petitioner of the deficiencies, and the petitioner shall have 15 days in which to correct those deficiencies. If the deficiencies are not corrected within 15 days as determined by the COE Chair in his or her sole discretion, the adverse decision will be considered final and no further appeal is available.

c.   *ECFVG's Response:* The COE Chair shall forward to the ECFVG a copy of the complete and adequate petition for review. The ECFVG may file a written response to the petition for review with the COE Chair within 25 business days of receipt. This

17

response may include a statement of the basis for the adverse decision, documentation, if any, in support of the adverse decision; and a request for a hearing, if a hearing is desired by the ECFVG (refer to paragraph 2e below regarding hearing costs and procedures).

d.   *Review Panel:* Within 25 business days after receiving a complete and adequate written petition for review, ==the Chair of the AVMA Council on Education shall appoint a Review Panel composed of three members of the AVMA Council on Education ("COE"), none of whom shall be, or have been within the past six (6) years, members of the ECFVG or have any other conflict of interest. The COE Chair shall designate the Chair of the Review Panel from among the three persons chosen to sit on the Review Panel.==

e.   *Optional Hearing:* If the petition for review contains a request for a hearing, or if the ECFVG requests a hearing, and if appropriate fees are submitted, the Review Panel shall hold a hearing at a mutually convenient time and place within 60 days after receiving the complete and adequate written petition for review. The hearing shall comprise the affected person, the three members of the Review Panel, and the Chair of the ECFVG or his or her designee. If the Chair of the Review Panel so requests, the AVMA staff consultant to the ECFVG and/or legal counsel for the Review Panel may also attend the hearing to provide guidance on procedural issues. If a mutually convenient location cannot be agreed upon by the parties, the Chair of the Review Panel shall determine the location of the hearing in his or her sole discretion. The hearing will proceed according to the following procedures:

   i.    AVMA staff to the ECFVG will schedule and organize the hearing and provide reasonable notice (no less than 10 business days) of the time and place of the hearing to the Review Panel, the affected person, and the Chair of the ECFVG by certified mail (return receipt requested) or other traceable delivery method (eg, FedEx or UPS).

   ii.   The procedures and conduct of the hearing will be determined by the Chair of the Review Panel, in his or her sole discretion, including but not limited to the admission and order of presentation of evidence and/or testimony, the length of testimony and/or cross-examination, and the length of any argumentation and opening or closing remarks.

   iii.  Subject to clause 2e(ii) above, the affected person and the Chair of the ECFVG shall, at the hearing, have the right to present witnesses and to submit any evidence pertinent to the case not previously submitted. However, all new evidence to be presented shall be in written form and distributed to the Review Panel and other participants for receipt at least five (5) business days prior to the hearing.

   iv.   ==Neither the ECFVG nor the affected person shall be represented by legal counsel at the hearing.== The Review Panel may, at the request of the Review Panel Chair, have legal counsel present to advise it in matters of procedure.

   v.    At the discretion of the Review Panel Chair or upon the advance written request of either the affected person or ECFVG, a transcript of the hearing shall be made. The cost of such transcript shall be borne by the party requesting it.

      vi.   ==Reasonable expenses for meeting arrangements in accordance with AVMA travel policy, including but not limited to travel, meals, and lodging for the Review Panel and other participants, shall be borne by the party requesting the hearing.== The party requesting the hearing shall pay a deposit of $5,000.00 (US) to cover expenses associated with the hearing. The $5,000.00 deposit must be in the form of a cashier's check or money order only, made payable to the AVMA, and must be submitted, via certified mail (return receipt requested) or other traceable delivery method (eg, FedEx or UPS), at the same time the written petition for review and request for a hearing are submitted. Following the hearing, any additional expenses exceeding the $5,000 deposit shall be paid by the party who requested the hearing within 30 days of receipt of an invoice from the AVMA. Any surplus of the deposit shall be returned within 30 days of the hearing date to the party who requested the hearing.

f.  *Review Panel Recommendations:* After review and consideration of the ECFVG's adverse decision, the affected person's petition for review, and the relevant evidence presented at the hearing, if any, the Review Panel shall within 12 business days of the close of the hearing, or in the event no hearing is requested within 25 business days after receipt of the affected person's complete and adequate written petition for review, issue a written report of recommendations, which may include affirming, modifying, or reversing the ECFVG's adverse decision, and the reasons therefore. The Review Panel shall provide copies of its written report via E-mail and/or certified mail (return receipt requested) or other traceable delivery method (eg, FedEx or UPS) to the Chair of the ECFVG, the affected person, and the COE Chair. In the event that the Review Panel recommends reversal of or modifications to the ECFVG's adverse decision, the ECFVG shall accord substantial deference to the Review Panel's recommendations in deciding whether to reverse or modify its adverse decision.

g.  *ECFVG Written Opinion:* Within 25 business days of receipt of the Review Panel's report, the ECFVG shall issue a written opinion stating, to the extent applicable: (i) whether and to what extent it shall abide by the Review Panel's recommendation(s); (ii) how its opinion accords substantial deference to the Review Panel's recommendation(s); and (iii) the bases of its opinion. The ECFVG shall provide copies of its opinion to the Review Panel and to the affected person via E-mail and/or certified mail (return receipt requested) or other traceable delivery method (eg, FedEx or UPS).

3.  **_Rehearing_**—If a hearing was held in connection with a petition for review, the affected person or the ECFVG may file a written petition for rehearing no later than 30 days after the postmark date of the written opinion of the ECVFG. Such written petition for rehearing may be filed only on the basis of new evidence that could not, with reasonable diligence, have been discovered and produced at the original hearing. The decision to grant a petition for rehearing is made by the Chair of the Review Panel, in his or her sole discretion, and his or her decision is final. The procedure for a rehearing shall be the same as that described in paragraph 2e above. No more than one petition for rehearing may be filed by any party in a case. If the ECFVG files a petition for rehearing, it shall also provide a copy of its petition for rehearing to the affected person. If a hearing was not requested by either party at the time the petition for review was initially submitted, neither the affected person nor the ECFVG can request a rehearing.

**RELEASE OF INFORMATION/CHANGE OF CONTACT INFORMATION**

Release of information concerning ECFVG candidate's certificate status cannot be implemented without the direct written consent of the candidate. The written consent may take the form of a letter to the ECFVG Coordinator, fax (847-285-5732), or E-mail (ECFVG@avma.org).

The candidate should indicate in his/her request the exact contact information to be changed or the program status information to be released to a third party (include name and address of whom the release should be sent to).

Requests or consent for release of information verification to state boards or other interested parties of ECFVG candidate enrollment, status, or certification must be made in writing 2 weeks prior to any deadline. The ECFVG cannot be held responsible for last minute requests or letters of verification that have been lost in the mail. Verification requests made by telephone will not be honored.

Documents submitted as part of the application process become the property of the American Veterinary Medical Association (AVMA) and will not be returned or released to third parties. Documents will be retained for a maximum period of 10 years after successful completion of the ECFVG program.

EX.4

Join |     Store | Career Center | Public Resources | Sign In



Membership        News & Publications        Professional Development        Economics & Practice        Advocacy        Meetings & Events        About AVMA        Policy

**You are here:** Home | Professional Development | Education | Foreign                                    PRINT        SHA

| About Us |
|---|
| News |
| FAQs |
| Contacts |
| **Program Steps** |
| Enrollment Application/Online Status |
| English Language Requirement |
| BCSE Candidate Bulletin |
| CPE Candidate Bulletin |
| **Policies & Procedures** |
| AVMA-Listed Veterinary Colleges |
| Processing Times |
| Appeals |
| Complaints |
| Release of Information |
| Canadian NEB |
| **Related resources** |
| Classification of Colleges |
| Veterinary Medical Degrees Granted Throughout the World |

# ECFVG - Clinical Proficiency Examination Candidate Bulletin



Updated November 2017

## Table of Contents

Introduction to the Clinical Proficiency Examination
CPE Format
CPE Common Diagnoses
CPE Sites and Schedule
ECFVG Program Steps and CPE Eligibility
Fees for the Full CPE
Application Process for the Full CPE
Scoring the CPE
Passing Standard and Score Reporting
Extended Score Reports to Candidates
CPE Retakes and Associated Fees
Application Process for Retaking Failed CPE Sections
Rescheduling a Full CPE or Retake Sections
CPE Testing Accommodations
CPE Rules of Conduct
Score Validity
Limitation of Liability
Appeals and Complaints
Contacts
Appendix 1-Requirements for Sites Providing The CPE
Appendix 2-Quality Assurance for the CPE Site
Appendix 3-ECFVG Policy on Testing Accommodations

## Introduction to the Clinical Proficiency Examination

The Clinical Proficiency Examination (CPE) has been developed by the American Veterinary Medical Association (AVMA) Educational Commission for Foreign Veterinary Graduates (ECFVG) and the Canadian Veterinary Medical Association (CVMA) National Examining Board (NEB) as the fourth step in assessing educational equivalency for purposes of ECFVG or NEB certification, respectively. It is intended to assess the practical clinical veterinary skills of an "entry-level" veterinarian.

The hands-on, performance based CPE is a 3-day, 7-section, clinical skills examination, administered by the faculty of a college of veterinary medicine or other authorized testing institution. The skill and knowledge level expected to receive a passing score on each section of the CPE is that of an entry-level US or Canadian veterinarian (ie, new graduate of an AVMA/Council on Education-accredited veterinary school).

EX 4

The CPE assesses a subset of entry-level clinical veterinary skills taught in an AVMA/Council on Education veterinary school. All candidates taking the CPE are encouraged to critically consider whether the education they received is sufficient to provide them with the necessary skill level to perform at a passing level on the CPE. For example, to succeed in the surgery and anesthesia sections of CPE, candidates will need not only to have knowledge about performing surgery and anesthesia, but they should also have experience performing small-animal surgery and anesthesia in an instructional or clinical setting prior to attempting the CPE.

A candidate preparing to take the CPE should have clinical experience and basic animal handling/husbandry skills working with the species used in this exam. Most emphasis is placed on the dog, cat, horse, and cow with a lesser emphasis on goats, sheep, and pigs. Candidates are advised to focus on these species. A candidate lacking in experience working with any of these species should seek this experience before taking the examination.

Although experience gained from reading material and viewing videotapes, DVDs, CDs, PowerPoints, etc, is helpful in preparing for the CPE, the candidate must not consider these to be a substitute for the "hands-on" clinical instructional experience outlined above.

Communication skills and service to clients are a high priority in veterinary practice in the United States and Canada. Throughout the CPE candidates will be expected to communicate clearly and effectively with a client (role played by the examiner) in order to take an accurate history, and to communicate information to the client including clinical findings, diagnostic plans, test results and interpretation, therapeutic options, and prognosis. Other sections will require the candidate to explain findings to the examiner directly. Lack of adequate entry-level communication skills in English (or French at the Université de Montréal, St. Hyacinthe for NEB purposes only) will negatively impact a candidate's performance on the CPE.

Although only well-prepared candidates will be able to pass the CPE, no candidate is expected to obtain a perfect score on the seven sections of the CPE. However, in the opinion of the ECFVG and NEB, every candidate should have considerable familiarity and entry-level experience with the skills and knowledge to be assessed in each section of the CPE.

All ECFVG candidates are **strongly encouraged** to read this entire Candidate Bulletin, which is designed to ensure complete familiarity with application and scheduling procedures (including accommodation requests), examination fees, security and test behavior expectations, and score reporting for the CPE. If questions remain after reading the Candidate Bulletin in its entirety, please contact the ECFVG Testing Coordinator at **ECFVG** or 800-248-2862, ext 6682.

In addition, policy and schedule changes impacting candidates taking the CPE may occur at any time. It is the **candidate's responsibility** to monitor the ECFVG Web site for information about ECFVG program policies and changes.


## CPE Format

The seven sections of the CPE include: anesthesia (canine), equine practice, food animal practice, necropsy, radiographic positioning (small animal), small animal medicine, and surgery (canine ovariohysterectomy). The CPE *Manual of Administration* (MOA) describes specific sections and skills to be assessed and serves as the guide for administering the CPE to all candidates. All sites offering the CPE must adhere to the standards set forth in the *MOA* and two other quality assurance documents (**Appendix 1** and **Appendix 2**).

ECFVG candidates have access to the **current MOA** online. The MOA is updated on a yearly basis and it is the candidates' responsibility to ensure that they have the most up-to-date MOA. Candidates are urged to carefully read this MOA and understand the skill requirements of the CPE prior to completing their CPE application. After having done this, each candidate will be able to critically self-assess his/her competencies to determine those areas of weakness that require further training/education. If further training/education is required, the support and expertise of a veterinary mentor is strongly recommended prior to scheduling and attempting the CPE.


## CPE Common Diagnoses

The CPE is a test of "entry-level skills." Therefore, cases/conditions selected for inclusion on the examination should be common conditions with which the new graduate of an AVMA-accredited school should be familiar. The ECFVG maintains an **example list of common diagnoses**, however, candidates must realize that this list is not exhaustive and that there is no requirement that the CPE be limited to the diagnoses and conditions on this **list**.


## CPE Sites and Schedule

The ECFVG administers the CPE in cooperation with approved sites. The approval process, which is rigorous and ongoing, is outlined in **Appendix 2.**

In 2017, the following two sites will administer the CPE for the AVMA/ECFVG:

- Mississippi State University College of Veterinary Medicine (Starkville, MS)
- Western Veterinary Conference Oquendo Center (Las Vegas, NV)

EX. 4

Candidates who complete any portion of their clinical education (pre- or post-graduation) at an AVMA-accredited veterinary college cannot take the CPE administered at that college.  Candidates are not permitted to take examinations at the same site which they were a resident or an intern, or an employee or former employee of that site or school/college.

Candidates may take the CPE at a site at which they took Continuing Education (CE) courses, provided that candidates are not tested by the same individual(s) who provided the training.  Also, training must have taken place at least six months prior to examination at same site.

The CPE is administered multiple times each year, at one or more of the above sites. All sites administer retake sections as well, although not all sections are offered as retakes by all sites.

After a candidate's CPE application is processed and a testing date is assigned, the candidate will receive a confirmation letter, which will contain information (eg, test site and date(s), nearby airport/driving directions, and lodging information) to allow the candidate to make travel arrangements. Expenses related to travelling to, and staying at, the CPE site are the responsibility of the candidate. Approximately two weeks prior to the assigned CPE date(s), CPE site personnel will send the candidate more detailed information regarding his/her on-site examination schedule.

## ECFVG Program Steps and CPE Eligibility

The ECFVG certification program includes the following four steps:

- Step 1: Enrollment in the ECFVG program and proof of graduation from a non-AVMA/Council on Education accredited veterinary school or college
- Step 2: Demonstration of English language competency
- Step 3: Assessment of basic and clinical sciences knowledge
- Step 4: Assessment of hands-on clinical veterinary skills

Candidates must recognize that enrollment into the ECFVG program does not automatically result in application for the CPE. To be eligible to apply for the CPE (ECFVG Step 4), a candidate must first register in the certification program and complete ECFVG Step 1 (verification of graduation); complete ECFVG Step 2 (English language assessment); and complete ECFVG Step 3 (BCSE; assessment of basic and clinical sciences knowledge).  Please note that Step 1 is considered complete only after the ECFVG office has received and accepted the "certification of graduation" form from the candidate's veterinary college administration as well as appropriate copies of the candidate's veterinary college diploma and final transcripts.

In addition, candidates who enroll into the ECFVG program on or after July 1, 2014, must submit validated **Surgical Experience Documentation** forms as proof of having performed, in the five-year period prior to date of CPE, at least one (1) ovariohysterectomy as the primary surgeon and at least five (5) additional surgical procedures as either the primary or the assistant surgeon. The 5 additional procedures may be ovariohysterectomies or other surgical procedures, but each documented surgery should involve all elements of an aseptic surgical procedure, including gowning & gloving, draping of the patient, and use of sterile instrumentation. Validation of surgery experience can be provided by **one or more veterinarians licensed to practice veterinary medicine in any international jurisdiction**. Please note that, candidates who enrolled into the ECFVG program on or after July 1, 2014, will be eligible to register for the full CPE only when the required documentation is received in its entirety in the ECFVG office and processed by the ECFVG staff. The ECFVG reserves the right to verify the documents received.  Candidates are reminded that falsification of documents would be a violation of the Rules of Conduct and can resolve in disciplinary actions up to and including dismissal from the program. Candidates who successfully fulfill this eligibility requirement will be notified of their Step 4 eligibility by e-mail and will be able to register and apply for CPE through ECFVG Online.

This CPE eligibility requirement does not apply to candidates enrolled in the ECFVG program prior to July 1, 2014. However, the ECFVG strongly recommends that all candidates have the experience described above prior to attempting the surgical section of the CPE.

## Fees for the Full CPE

All fees for the CPE are non-refundable and non-transferable. Currently, the entire CPE fee is forwarded to the site administering the CPE to defray costs associated with the examination. Beginning on January 1,  2017, a $200 administrative fee will be collected to defray costs associated with examination scheduling and administration. In addition for CPE's conducted after July 1, 2017 and January 1, 2018, the CPE fee will increase by $200, respectively. After January 1, 2019 and 2020, the CPE fee will increase by $215; respectively.

For CPEs administered from 2017 - 2020, the following full CPE expense structure will apply:

- 2017 administrations after July 1: $7,000 (USD); ($6,800 CPE Application fee + $200 Administrative fee)
- 2018 administrations after January 1: $7,200 (USD); ($7,000 CPE Application fee + $200 Administrative fee)
- 2019 administrations after January 1: $7,415 (USD); ($7,215 CPE Application fee + $200 Administrative fee)
- 2020 administrations after January 1: $7,630 (USD); ($7,430 CPE Application fee + $200 Administrative fee)

EX 4

Candidates who initially registered in the ECFVG certification program on/after January 1, 2006 have already paid a one-time Quality Assurance Program (QAP) fee of $725 and will not be required to pay any additional QAP fee when applying for the CPE. Candidates who initially registered in the ECFVG certification program before January 1, 2006 will be required to pay a one-time QAP fee of $725 when scheduling their CPE. Additional details regarding the fee structure for the full CPE are provided below. Contact the ECFVG office (ECFVG; 800-248-2862, ext 6682) with any questions.

The following payment schedule for the full CPE applies:

1. For candidates who initially registered in the ECFVG certification program on/after January 1, 2006:
   ○ A $1,000 CPE fee deposit must be submitted when completing the application through ECFVG Online.
   ○ The remaining balance is due 60 days prior to examination
2. For candidates who initially registered in the ECFVG certification program prior to January 1, 2006:
   ○ A $1,725 combined CPE fee deposit ($1,000) and one-time QAP fee ($725) must be submitted when completing the application through ECFVG Online. The QAP is restricted to fund processes that ensure and enhance quality of the ECFVG certification program.
   ○ The remaining CPE fee balance is due 60 days prior to examination

The final balance must be sent (post-marked) to the AVMA/ECFVG no later than 60 days prior to the scheduled exam. Final payment must be in the form of a cashier's check or money order made payable to the AVMA. Failure to pay this balance by the required deadline will result in forfeiture of all fees and loss of the reserved examination space.

**PLEASE NOTE:** CPE fees and adminstrative fees (full or retake) cannot be refunded if the candidate fails to receive a visa or other required travel documentation to allow travel to the CPE site. Candidates are responsible for ensuring all documents permitting travel are in place prior to submitting any non-refundable/non-transferable fee. Please also make sure all other CPE policies both in this Bulletin (eg, **rescheduling**) and in the *ECFVG Policies and Procedures Manual* **(eg, Canadian NEB)** are understood before requesting or submitting a CPE application, because all fees are non-refundable and non-transferable. Please contact the Testing Coordinator (**ECFVG**; 800-248-2862, ext 6682) if you have any questions regarding these policies.

## Application Process for the Full CPE

CPE- eligible candidates must complete the CPE application through ECFVG Online and submit the appropriate fee (as indicated in the **Fees for the Full CPE** section of this Bulletin) by credit card at the end of the application or in the form of a cashier's check or money order (non-refundable/non-transferable) payable to the AVMA. Candidates requesting testing accommodations must indicate this on the application and also submit the CPE Test Accommodation Request Form at this time (please refer to **Appendix 3** of this Bulletin for complete information regarding accommodations requests).

**PLEASE NOTE:** candidates who complete any portion of their clinical education (pre- or post-graduation) at an AVMA-accredited veterinary college cannot take the CPE administered at that college.  Candidates are not permitted to take examinations at the same site which they were a resident or an intern, or an employee or former employee of that site or school/college.

Candidates may take the CPE at a site at which they took Continuing Education (CE) courses, provided that candidates are not tested by the same individual(s) who provided the training.  Also, training must have taken place at least six months prior to examination at same site.

Candidates have access to the current **CPE Manual of Administration (MOA)** online. The MOA provides candidates with detailed information regarding skills to be assessed during the CPE. Candidates are urged to carefully read the MOA and understand the skill requirements of the CPE. After having done this, each candidate will be able to critically self-assess his/her competencies to determine those areas of weakness that require further training/education. If further training/education is required, the support and expertise of a veterinary mentor is strongly recommended prior to scheduling and attempting the CPE.

After the candidate's application is processed, a confirmation letter will be sent via e-mail, confirming the date and location of the scheduled CPE. Examination dates are assigned on a first-come/first-serve basis.

**PLEASE NOTE:** CPE fees and adminstrative fees cannot be refunded if you fail to receive a visa or other required travel documentation to allow travel to the CPE site. Make sure all documents permitting travel are in place prior to submitting your non-refundable/non-transferable fees. Please also make sure all other CPE policies both in this Bulletin (eg, **rescheduling**) and in the ECFVG Policies and Procedures Manual **(eg, Canadian NEB)** are understood before requesting or submitting a CPE application, because all fees are non-refundable and non-transferable. Please contact the Testing Coordinator (**ECFVG**; 800-248-2862, ext 6682) if you have any questions regarding these policies.

## Scoring the CPE

For each of the seven sections of the examination, specific grading rubrics are published in the CPE *Manual of Administration* (MOA).

The MOA specifies the knowledge and technical skills (globally referred to as clinical proficiency skills) that will be asked during the examination. Examiners will assess each candidate's knowledge and technical skills by direct observation, and in some

EX.4

cases, will assess their written descriptions of findings or conclusions.

The term "efficiency" is an element in some of the assessments. Efficiency is a component of competency. Candidates are to be assessed on their timeliness and effective use of resources to complete a procedure. A candidate who, in the judgment of the examiner, requires an unreasonable amount of time to the extent that the outcome of the procedure is jeopardized will be penalized. The penalty for this type of assistance will be reflected in the number of points assigned to the particular clinical skill. A candidate who cannot complete a skill or set of skills in the maximum time allowed will be penalized and may receive no points for a given station or section.

Communication skills and service to clients form a high priority in veterinary practice in the United States. Throughout the CPE, there are frequent requirements of the candidate to communicate with a client (role-played by the examiner). This occurs most often during history taking and communicating a clinical message to a client. Throughout the CPE the candidate must be able to demonstrate the ability to take a history from a client by asking appropriate questions. Lack of adequate entry-level communication skills in English will negatively impact a candidate's performance on the CPE.

Further, if a candidate compromises his/her personal safety or the safety of personnel while working around animals during the course of the CPE (eg, too close to the rear legs of a horse), the examiner will intervene, may terminate the procedure and will assign a penalty that will be reflected in the number of points assigned to the particular skill. The section may also be scored as unsatisfactory (fail) depending on the nature of the safety violation(s).

The examiner will also assist an animal and terminate the section if a candidate by an act of omission or commission puts an animal into an inhumane or life-threatening situation and the situation is not corrected by the candidate. The section will be scored as unsatisfactory (fail) regardless of the score accumulated at the point of termination.

## Passing Standard and Score Reporting

The skill level to pass each section of the CPE is that expected of a minimally competent new graduate of an AVMA/Council on Education-accredited veterinary school. This passing standard corresponds with a minimum score of 60 points (out of a total of 100) for all sections except anesthesia and surgery, both of which are scored as "pass" (at least minimally competent) or "fail." A score of 60 points or greater or a "pass" in each of the 7 sections of the CPE is required in order to pass the entire examination.

Score reports (stating pass or fail only for each section) will be reported by the ECFVG via e-mail and through ECFVG Online. Scores will be released no more than twenty (20) business days following the final day of any given CPE administration. Scores **CANNOT** be released via fax or telephone. To ensure timeliness in delivery of score reports, it is essential that candidates update contact information immediately through ECFVG Online or by e-mailing or faxing the ECFVG office (**ECFVG**; 847-285-5732).

## Extended Score Reports to Candidates

An unsuccessful candidate may request an extended but standardized score report of failed section(s) from the office of administration (ie, ECFVG or NEB offices). The report will identify major areas in which the candidate has demonstrated a deficit of knowledge and/or technical proficiency. As such, the purpose of the report is to aid that candidate in preparation for a career in veterinary medicine rather than helping the candidate pass a limited number of skills on the CPE. Requests for extended score reports must be received within two weeks (14 days) of distribution of the candidate's CPE score report. Candidates intending to file an appeal of a failing score must request an extended score report within 14 days of the score notification and before initiating the ECFVG Appeal Process. ECFVG candidates must request the extended score report via E-mail to **ECFVG@avma.org**. The extended score report will then be returned to the candidate via E-mail within 10-15 business days of receipt of the request. **Candidates may only request extended score reports from the ECFVG office (or the NEB office for CPEs administered in Canada) and are prohibited from asking examiners for feedback or for more details of their failure during or after completion of the CPE.**

## CPE Retakes and Associated Fees

A candidate with a "fail" in four or more sections of the examination must retake the entire examination by repeating the application process for the full CPE and paying all associated CPE fees and adminstrative fees (no additional QAP fees will be required for all candidates including those candidates who initially enrolled into the ECFVG program prior to January 1, 2006).

A candidate with a "fail" in one, two, or three sections is allowed two additional opportunities to retake and successfully pass the failed sections as long as the candidate applies for retakes within six months of each failure and accepts one of the first available retakes offered. Failure to successfully pass the retake sections within these two attempts or failure to accept one of the first available retakes will necessitate the candidate retaking the entire CPE.

For retakes administered in 2016, and 2017, the following retake expense structure will apply:

- 2016 administrations: $1,400 (USD) per section

- 2017 administrations: $1,450 (USD) per section ($1,400 CPE Application fee + $50 Adminstrative fee)

Other than the adminstrative fee, all retake fees are forwarded to the CPE site administering the retake sections to defray costs associated with the examination. All fees to retake failed sections of the CPE are also non-refundable and non-transferable.

**PLEASE NOTE:** CPE fees and adminstrative fees cannot be refunded if you fail to receive a visa or other required travel documentation to allow travel to the CPE site. Please also make sure all other CPE policies both in this Bulletin (eg, rescheduling) and in the ECFVG Policies and Procedures Manual (eg, Canadian NEB) are understood before requesting or submitting a CPE application, because all fees are non-refundable and non-transferable. Please contact the Testing Coordinator (ECFVG; 800-248-2862, ext 6682) if you have any questions regarding these policies.

## Application Process for Retaking Failed CPE Sections

Candidates retaking one or more sections must complete the CPE retake application through ECFVG Online and submit a total payment of $1,450 per section (non-refundable/non-transferable) by credit card at the end of the online application or in the form of a cashier's check or money order made payable to AVMA.

**PLEASE NOTE:** CPE fees and adminstrative fees cannot be refunded if you fail to receive a visa or other required travel documentation to allow travel to the CPE site. Make sure all documents permitting travel are in place prior to submitting your non-refundable/non-transferable fees. Please also make sure all other CPE policies both in this Bulletin (eg, rescheduling) and in the ECFVG Policies and Procedures Manual (eg, Canadian NEB) are understood before requesting or submitting a CPE application, because all fees are non-refundable and non-transferable. Please contact the Testing Coordinator (ECFVG; 800-248-2862, ext 6682) if you have any questions regarding these policies.

## Rescheduling a Full CPE or Retake Sections

Candidate who request to reschedule a confirmed CPE date (full or retake sections) in the event of emergencies and unforeseen situations (such as a medical condition pertaining to the candidate or a death in the immediate family) may do so without expectation of a refund. All fees are non-refundable. If given sufficient notice, the ECFVG will try to fill that vacated CPE date. Only if the vacated CPE date is filled by another paid candidate, the original candidate's fees will be transferred to his/her rescheduled CPE date. Requests to reschedule a confirmed CPE date must be submitted as soon as possible in writing to the ECFVG Testing Coordinator at ecfvg@avma.org.  However, fees will not be refunded and may only be transferred if the ECFVG will succeed in finding another candidate to fill the vacated CPE dates.

## CPE Testing Accommodations

In accordance with the Americans with Disabilities Act and other applicable laws, the AVMA/ ECFVG provides equal opportunities for access to programs and services for individuals with documented disabilities. Completed accommodation requests with all necessary documentation *must* be submitted immediately following the completion of the CPE application and must provide the ECFVG with sufficient time (at least 90 days before the first day of the preferred CPE administration) to review the accommodation request and reach a decision. CPE Accommodations Request Form

The ECFVG Policy on Testing Accommodations (see Appendix 3 in this Candidate Bulletin) provides individuals, schools, professional diagnosticians, and service providers with information regarding how to document a disability and a related need for accommodations for candidates for the CPE. The information and documentation submitted should be as comprehensive as possible in order to allow the ECFVG to make an informed decision on the accommodation request and to avoid time delays in the decision-making process.

## CPE Rules of Conduct

The ECFVG has established Rules of Conduct to govern administration of the CPE to ensure that no examinee or group of examinees receives unfair advantage on the examination, inadvertently or otherwise.

If there is a reason to believe that the integrity of the examination process is jeopardized, the ECFVG may invalidate all or any part of a CPE administration. If information indicates that continued testing would jeopardize the security of examination materials or the integrity of scores, the ECFVG reserves the right to suspend or cancel any CPE administration.

CPE site team members (ie, coordinators, examiners, technicians, and assistants) monitor all sections of the CPE. If CPE site team members observe a candidate violating the Rules of Conduct or engaging in other forms of irregular behavior during a CPE, the team members will not necessarily advise the candidate at the time of the examination, but shall report such incidents to the ECFVG. Each report shall be fully investigated.

By applying to take the CPE, a candidate agrees to the following Rules of Conduct:

- You are the person named on the CPE application.

EX 4

- You will place in a locker or cubicle or other designated area all personal belongings, including cellular telephones, watches with computer communication and/or memory capability, pagers, personal digital assistants (PDAs), formulas, study materials, notes, papers, and your purse or wallet, before you enter the secure testing areas.

- You will not use a telephone at any time while you are in the secure areas.

- You will not give, receive, or obtain any form of unauthorized assistance during the testing session, including any breaks.

- You will not have in your possession any formulas, study materials, notes, papers, or electronic devices of any kind unless you are out of the secure testing areas of the CPE site.

- You will not remove materials in any form (written, printed, recorded, or any other type) from the secure testing area unless instructed to do so by the examiners.

- You understand and acknowledge that all examination materials remain the property of the CPE site and ECFVG, and you will maintain the confidentiality of the case content for all sections of the CPE. You will not reproduce or attempt to reproduce examination materials through memorization or any other means, nor will you provide information relating to examination content that may give or attempt to give unfair advantage to individuals who may be taking the examination, including, without limitation, by posting information regarding examination content on the Internet.

Unless specifically authorized, candidates may not bring personal belongings into secure testing areas of the CPE site. Failure to follow these rules shall constitute a violation of the Rules of Conduct for the administration of the CPE and may lead to adverse action regarding a candidate's examination. For the CPE, candidates should understand that the entire testing session over the 3-day testing period, including all breaks, is considered a closed and secure testing session, and that the entire CPE site, including any on-site lunch room, break rooms, and restrooms, is a secure testing area. Therefore the rules regarding unauthorized possession during the CPE extend to lunch, if lunch is provided on site, and all breaks.

For the CPE, unauthorized personal belongings include, but are not limited to:

- mechanical or electronic devices other than simple calculators, such as cellular telephones, personal digital assistants (PDAs), watches with computer communication and/or memory capability, electronic paging devices, recording or filming devices, radios;

- outerwear, such as coats, jackets, head wear, gloves;

- book bags, backpacks, handbags, briefcases, wallets; and

- books, notes, study materials, or scratch paper.

If candidates bring any personal belongings to the CPE site, they must store them in a designated locker or storage cubicle or other designated area as directed by the CPE site team. All stored mechanical or electronic devices must be turned off. Upon reasonable suspicion, a candidate's personal belongings and their contents may be inspected. Any materials that reasonably appear to be reproductions of any case material specific for the CPE administration in which a candidate is participating will be confiscated. Making notes of any kind during the CPE, except on the materials provided by the CPE site for this purpose, is not permitted. If candidates have any questions regarding the appropriateness of personal belongings to be brought into the CPE site, contact the ECFVG or a CPE site team member prior to admission.

*Admission to the CPE*—When candidates arrive at the CPE site for orientation and check in, they must present a photo ID with signature. Acceptable forms of identification include the following forms of unexpired identification:

- passport;

- driver's license;

- national identity card; or

- other form of unexpired, government-issued identification.

The identification must contain both the candidate's signature and photograph. If a candidate does not bring acceptable identification, he/she will not be admitted to the CPE. In that event, the candidate will be required to reschedule the CPE in accordance with current ECFVG policy. The candidate's name as it appears on his/her CPE application must match the name on the form(s) of identification exactly. If a candidate's name listed on his/her CPE application is not correct, contact the ECFVG office immediately at **ECFVG**, or by phone at 800-248-2862, ext 6682 or 6778.

*Test Centers and Testing Conditions*—The time and location for arrival at the CPE site for orientation and check in will be sent to each candidate by e-mail prior to the administration of the examination. If a candidate arrives late, he/she will not be admitted, and will have to reschedule the test date in accordance with current ECFVG policy.

At the time of check-in, candidates will be required to present unexpired identification. Prior to beginning each day of the examination, candidates will be directed to a small storage cubicle or locker or other designated area in which they must place personal belongings. These cubicles may not be secure, so do not bring valuables.

In addition, candidates should please note the following:

- You should bring only the equipment specified for each section within the CPE Manual of Administration; all other equipment is provided at the CPE

- You should wear comfortable, professional clothing.

- There are no waiting facilities for family and friends at the center; plan to meet them elsewhere after the examination ends.

7

- CPE site team members (wearing name tags) will direct you throughout each day of the CPE, and their instructions should be followed at all times.

- There will be an on-site orientation to each section of the CPE to acquaint candidates with specific procedures and regulations.

Once candidates enter the secure testing area of the CPE site, they may not leave that area until directed to do so by a member of the CPE site team. Breaks, including a lunch break, are provided. CPE site team members will direct candidates to any on-site break and lunch rooms. Candidates may not discuss the cases with fellow examinees at any time, and conversation among examinees in any language other than English is prohibited at all times. CPE site team members will monitor all examinee activity. See "Irregular Behavior" below.

CPE site team members are not authorized to answer questions from examinees regarding examination content or scoring.

Should a candidate wish to file a concern regarding the CPE testing experience, he/she may do so at the site on the test day(s). If a candidate does not file a report at the site, he/she must notify the ECFVG office in writing within three weeks of the final day of the administration of the CPE. Concerns that are reported in this way will be investigated in accordance with the current **ECFVG Complaints Procedure**.

**NOTE: Visitors as approved by the ECFVG, may, on some occasions, be observing a CPE in progress. Other than site evaluators, they will be given no information regarding examinee identity or performance and will have no interaction with examinees.**

*Irregular Behavior*—Irregular behavior consists of any action by CPE candidates or others that subverts or attempts to subvert the examination process, including, without limitation:

- Falsification of information on the application form, including additional documentation, or failure to provide the ECFVG with information material to your application.

- Impersonating an examinee or engaging someone else to take the examination for you

- Giving, receiving, or obtaining unauthorized assistance during the examination, or attempting to do so.

- Unauthorized possession, reproduction, or disclosure of any materials, including, but not limited to, examination cases, before, during, or after the examination.

- Making notes of any kind during an examination except on the writing materials provided by the CPE for that purpose.

- Disruptive or unprofessional behavior at a CPE site.

- Offering any benefit to any CPE site team member or agent of the ECFVG in return for any right, privilege, or benefit which is not usually granted by the ECFVG to other similarly situated candidates.

**NOTE: Talking to another examinee during the examination may be reported as evidence of giving, receiving, or obtaining unauthorized assistance.**

If a candidate is determined to have failed to abide by the Rules of Conduct of the ECFVG or otherwise to have engaged in any form of irregular behavior, the ECFVG may terminate the candidate's participation in an examination, invalidate the results of an examination, withhold or revoke the candidate's scores or certification, bar the candidate's participation in future examinations, and/or take other appropriate adverse action. In addition, such determination shall become part of the candidate's permanent ECFVG record and the fact of such determination may be provided to third parties that receive or have received verification of ECFVG status. Such information may also be provided to other legitimately interested entities.

Candidates also should understand that the ECFVG may or may not require a candidate to retake one or more portions of the ECFVG if presented with sufficient evidence that the security of the examination has been compromised, notwithstanding the absence of any evidence of a candidate's personal involvement in such activities.

Appeal Process-Candidates determined to have violated the Rules or Conduct or otherwise engaged in irregular behavior may appeal the decision by following the current **ECFVG Appeal Procedure**.

# Score Validity

The ECFVG reserves the sole right to determine whether or not an examination is valid or invalid. The acceptance of a candidate's application to take the examination, the scoring thereof, or the release of said examination results to any party shall not act in any way to amend the right of the ECFVG to determine whether such examinations or the scores achieved thereon are valid or invalid in whole or in part. A determination that an examination and the scores achieved thereon are invalid may be made at any time by the ECFVG. The ECFVG also reserves the right to cancel any scores that may already have been reported when subsequent information raises doubt of their validity.

Occasionally testing irregularities occur that affect a group of test takers. Such problems include, without limitation, administrative errors, defective equipment or materials, improper access to test content and/or the unauthorized general availability of test content, as well as other disruptions of test administrations. When group testing irregularities occur, the CPE site will provide information to the ECFVG. Based on this information, the ECFVG will determine what, if any, action needed to be taken. Affected test takers will be notified of the reasons for the invalidation and their options for retaking the examination. **Please note, the ECFVG Appeal Procedure does not apply to group testing irregularities.**

## Limitation of Liability

In no case shall the AVMA or ECFVG be liable to any test taker or group of test takers, either in contract or tort, for cancelling, invalidating, withholding, or changing a test score or result, as provided in this Bulletin. When appropriate, the ECFVG, at its discretion, may provide affected test takers with an opportunity to retake an examination or provide a refund of the testing fee paid.

## Appeals and Complaints

Should a candidate wish to file an appeal regarding a failing score on one or more sections of the CPE after requesting and receiving an extended score report for his/her performance on the examination, he/she may file a Petition for Reconsideration of the adverse decision by following the **ECFVG Appeal Procedure**. Appeals submitted without a prior request for an extended score report will not be considered by the ECFVG.

Complaints:  Should a candidate wish to file a concern regarding the CPE testing experience, he/she may do so by notifying the ECFVG office in writing within three weeks of the candidate's test date. Concerns that are reported in this way will be investigated in accordance with the current **ECFVG Complaints Procedure**.

## Contacts

Should you have questions, please use the following contact information:

| Topic | Contact |
|---|---|
| - Eligibility to take the CPE<br>- Application Procedure<br>- Special testing accommodations<br>- Scheduling and confirming your testing appointment<br>- Directions to test centers | *ECFVG Testing Coordinator*<br>- E-mail: **ECFVG**<br>- Phone: 800-248-2862, ext. 6682<br>- Fax: 847-285-5732<br>- Address: 1931 N. Meacham Rd, Suite 100; Schaumburg, IL 60173-4360 |
| - Examination results | - No results will be released by phone or fax. Results will be sent via e-mail and posted online within 20 business days after the final day of the exam. |
| - Name and address change | *ECFVG Coordinator*<br>- E-mail: **ECFVG**<br>- Phone: 800-248-2862, ext. 6682<br>- Fax: 847-285-5732<br>- Address: 1931 N. Meacham Rd, Suite 100; Schaumburg, IL 60173-4360 |

## Appendix 1—Requirements for Sites Providing the CPE

**GENERAL REQUIREMENTS AND DEFINITIONS**

In order for any entity to become a CPE provider, three resource areas must be assured.  The site must provide appropriate animals and their care; qualified personnel; and adequate facilities and equipment. The CPE *Manual of Administration* (MOA) describes specific sections and skills to be assessed and serves as the guide for administering the CPE to all candidates. The ECFVG recognizes that there are variables that cannot be controlled completely (eg, the temperament of the animals used, equipment malfunction, etc), but expects that each site will adhere as closely as possible to the standards set forth in the CPE Manual. All CPE sites (existing or new) must agree to be monitored by the Educational Commission for Foreign Veterinary Graduates (ECFVG) or the National Examining Board (NEB) of the Canadian Veterinary Medical Association.  The process for monitoring CPE sites is described in the ECFVG document titled *Quality Assurance for the CPE—Site Proposal*, available as an appendix in the CPE Candidate Bulletin at **www.avma.org/professionaldevelopment/education/foreign/pages/ecfvg-cpe-bulletin.aspx**; see specifically **www.avma.org/professionaldevelopment/education/foreign/pages/ecfvg-cpe-bulletin.aspx#cpe-appendix-2**.

Candidates will not be assessed at a CPE examination site if:

EX.4

He/she is a graduate of that school/college.*

He/she has participated in a clinical training program at that site or school/college.*

He/she is an employee or former employee of that site or school/college.*

*Exception only for Université de Montréal, St. Hyacinthe (French speaking; for NEB purposes only).

## ANIMAL REQUIREMENTS

It is imperative that the CPE site provide for humane care and treatment of animals.  In order to assure proper care and treatment, the following are required:

- Animal resources (species, weights, age, sex, numbers, etc) must meet the standards set forth in the CPE *Manual of Administration*.

- Local, state, and United States federal animal welfare laws, or similar laws applicable in Canada, must be enforced and the facility must meet the standards of the most current United States Federal Animal Welfare Act or the Canadian Council on Animal Care.

Acceptable sources of live and necropsy animals and bovine fetuses may include the following:

- Those consistent with Provincial Animals for Research Acts

- United States Department of Agriculture, licensed animal dealers

- Purpose bred animals

- Animal Shelters

- Food animal producers

- Livestock sales

- Slaughter houses

- Institution/practice owned

- Donated animals must be accompanied by a signed consent form from the donor.

- Owned animals with signed consent from the owner.

Examinations centered on real, or simulated, cases with the use of live animals provides the ability to assess a candidates skills beyond what can be assessed through traditional test methods. However, the use of animals provides a dynamic variable to an otherwise standardized test situation. To ensure that candidates are tested and assessed as accurately as possible and to improve the defensibility of the examination in the face of appeals, the ECFVG strongly recommends that best test practices for the use of live animals include confirmation of signs consistent with the tested diagnosis on the day of examination – when using animals repeatedly over multiple examinations, examiners should recognize that signs may change over time. For example, a horse with navicular disease that is predominantly lame on the LF when originally examined and used for the CPE may be predominantly lame on the RF at a subsequent CPE date. Therefore, it is recommended that examiners examine animals on the date of use for the CPE and document physical exam findings rather than relying on historical findings for that animal.

All weights provided for animals used in the CPE will be given in kilograms (kg).

## PERSONNEL REQUIREMENTS

Personnel utilized for administration and scoring of the CPE must possess demonstrated expertise to test entry-level clinical skills of veterinary graduates.  The site and section coordinators and examiners must possess well-founded knowledge of the list of common conditions/diseases and pharmaceuticals/biologicals as they pertain to the practice of veterinary medicine in the United States and Canada. Site coordinators should take precautions to ensure that potential ECFVG applicants are not utilized to deliver the examination.

In order to assure adequate personnel, the following minimum standards are required:

- Personnel must be provided as specified in the CPE *Manual of Administration*.

- Four levels of personnel are identified.  Each level must meet the minimum standards listed:

  - *Site Coordinator or equivalent*—This person coordinates and manages the activities of the examination site. They must have a DVM degree (or equivalent) with a minimum of five (5) years clinical experience in a discipline representing one of the examination sections that make up the CPE. Site Coordinators must also consistently attend CPE Site Coordinators Meetings facilitated by the ECFVG and NEB.

  - *Section Coordinator or equivalent*—This person organizes and sets up the specific section of the examination and is responsible for the overall quality control and administration of that section (see CPE Manual of Administration). Section Coordinators must have a DVM degree (or equivalent) and been practicing in the section/discipline within the last 10 years, with a minimum of five (5) years' experience in the section/discipline.

  - *Examiner*—This person coordinates and sets up the station with the Section Coordinator, administers the station, and is directly responsible for evaluating the candidates. The examiner also signs off as the primary examiner on all assessment sheets, even when a secondary examiner or technician takes part in assessing a candidate's performance. Examiners must have a DVM degree (or equivalent) and been practicing in the section/discipline within the last 10 years, with a minimum of two (2) years clinical experience in the section/discipline. In addition,

EX 4

beginning in 2014, every examiner must participate in ECFVG (and/or NEB)-approved CPE examiners' web or video-based conference training sessions at least every two years, including modules on basic examination administration, section-specific training, and diversity training.

- *Technical Assistant*—This person assists the examiner(s) in monitoring the examination and may assist in evaluating the candidates. He/She must possess training and expertise in the species/procedure for which he/she is assisting. If the technical assistant is responsible for assisting the examiner(s) in candidate evaluation, he/she must be under the direct supervision of the examiner and have licensing, certification, or other documentation of expertise in that section/discipline.

**FACILITIES AND EQUIPMENT**

The facilities and equipment used in the CPE should meet contemporary practice standards for the US and/or Canada.  Facilities refer to structures and equipment refers to movable items used to practice clinical veterinary medicine.  CPE sites are expected to comply with the following:

- Facilities and equipment used for the CPE should meet the requirements outlined in the CPE Manual of Administration.
- The facilities should assure the safety of personnel and candidates, and provide for the safety and welfare of the animals.
- The facilities and equipment should be adequate to examine multiple candidates simultaneously.
- The facilities and equipment may vary slightly between sites in order to comply with all relevant local, state, provincial and United States or Canadian Federal regulations.  These requirements include, but are not limited to zoning, radiation safety, personnel and animal safety, animal care and use, and potentially toxic or dangerous substances (anesthetic gases).
- Because candidates are being evaluated on their ability to practice veterinary medicine at the entry level of competence, physical facilities and equipment should be equivalent to those used in a United States or Canadian contemporary veterinary clinical facility.
- Candidates for the examination must be provided with an adequate staging area for orientation, storage, and rest.
- All sites must provide timers, visible to all candidates, for each station or section. Whenever possible, timers should be of the "count-down" variety to allow candidates and examiners alike to clearly see time remaining in station or section.

# Appendix 2—Quality Assurance for the CPE Site

All CPE sites (existing or new) must agree to be monitored by the Educational Commission for Foreign Veterinary Graduates (ECFVG) or the National Examining Board (NEB) of the Canadian Veterinary Medical Association.

**TO ESTABLISH AN EXAMINATION SITE**

All those interested in establishing a CPE site must provide the ECFVG or the NEB with a comprehensive proposal outlining how the site meets the requirements set forth in the CPE *Manual of Administration*, and address all items in the *Requirements for Sites Providing the Clinical Proficiency Examination (CPE)*.

The chair of the ECFVG or NEB appoints a three-member committee as noted below, to assess the proposal:

1. A CPE site consultant (current or previous CPE site or section coordinator with a minimum of two years experience providing the CPE or a current or previous ECFVG member).
2. A current ECFVG or NEB member (the chair of the Commission may appoint himself/herself as the ECFVG member).
3. An American Veterinary Medical Association (AVMA) or Canadian Veterinary Medical Association (CVMA) professional staff member who provides support to the ECFVG or NEB.

Based on the criteria contained in the *Requirements for Sites Providing the Clinical Proficiency Examination (CPE)*, the committee analyzes the proposal and makes a recommendation to the ECFVG or NEB to approve or disapprove the proposal. If the proposal is approved, the ECFVG or NEB authorizes a "pre-exam" site visit. If the proposal is disapproved, the vendor is notified of the rejection in writing and given the reasons for the disapproval. The vendor is informed that another proposal is welcome if the deficiencies are addressed. The vendor may appeal, through the original process, the decision to disapprove the proposal to the ECFVG or NEB.

**SITE QUALITY ASSURANCE**

The CPE *Manual of Administration* provides a detailed outline of the CPE and the requirements for administering the examination. However, the sites require standardization, particularly related to administration of the examination and evaluation of the candidates. Therefore, the following steps have been designed to assist sites in establishing a quality assurance program.

*Pre-Exam Site Visit*
A site visit must be conducted before administration of the first examination to ensure that the resources described in the proposal are present and meet the expected standards.

The site visit is conducted by a CPE site consultant (preferably the same individual who evaluated the original proposal) who shall be appointed by the ECFVG or NEB.

All facilities and equipment must be in place. The animal resources plan must be established, although animals may not be on the premise at the time of the site visit. The site coordinator must meet with the site consultant to assure the qualification of all

11

CPE personnel concerning knowledge of entry-level veterinary practice, communication skills, level of understanding of the CPE *Manual of Administration*, conveyance of professionalism, comprehension of the evaluation process, and understanding of the resources necessary to provide the CPE.

The pre-examination site consultant provides a written report of findings to the ECFVG or NEB.

*Possible Outcomes of the Site Visit*

1. The site is approved and may administer its first CPE.
2. Approval of the proposed site may be delayed based upon deficiencies. The site is notified, in writing, of the deficiencies and asked if it wishes to correct the deficiencies to meet the minimum standards to become a site or to withdraw the bid.
3. Approval of the site is denied because the proposed site is unable to demonstrate that appropriate animal resources can be provided, personnel are insufficient or inadequately trained or experienced, and/or the facility and equipment do not meet the standards of a contemporary clinical veterinary practice.

Final approval or denial of the site is made by the ECFVG or NEB.

The proposed site may not administer the CPE without final approval of the ECFVG or NEB and may schedule only one examination after approval is granted.

*Oversight of the First Examination*

A site consultant must be present during administration of the first CPE to assist the site in understanding all factors involved in the examination.

The site consultant ensures that:

1. The format in the CPE *Manual of Administration* is followed, as published.
2. All examination resources are in place and are consistent with those described in the original proposal for that specific site.
3. Standards of evaluation are being applied consistently and fairly.
4. The site is examining for entry-level clinical practice skills.
5. The clinical cases and examination resources (slides, radiographs, etc.) are of good quality.
6. The flow of the examination is appropriate (candidate activity is stopped if an animal is in danger or a human is placed at risk, candidates are not subjected to long inactive periods, etc.).

*Decision Process Resulting from the First Administration of the CPE*

The site consultant will complete an evaluation list for that site and the results will be reported in writing to the ECFVG or NEB. Based upon the analysis of the report, the ECFVG or NEB may:

1. Notify the site in writing that it has met the standards and may continue to provide the CPE with customary periodic monitoring.
2. Provide written feedback to the site for correction of deficiencies. If the site agrees to correct the deficiencies, it may continue to provide the CPE with close periodic monitoring.
3. Close the site as being unacceptable in providing the CPE, as notified in writing.

*Periodic Monitoring*

All existing and new CPE sites are monitored on an ongoing basis. Monitoring consists of providing the ECFVG or NEB with a written report regarding each examination and the outcomes and periodic site visits. The ECFVG will give 2 months' notice for a site evaluation, but reserves the right to do an unannounced visit.

No more than thirty (30) days following the last day of each examination, ECFVG-approved CPE sites are required to report specific information for each section of the CPE on an Excel spreadsheet provided by the ECFVG office. These "after-exam reports" must be submitted to the ECFVG office in an electronic format. The use of the after-exam reports will allow the ECFVG to monitor at least three consecutive examinations at each site to ensure all sites are complying with clinical case and other requirements specified in the Manual of Administration.

Each ECFVG member will be assigned a CPE site and will serve as the reviewer of that site during his/her tenure on the ECFVG. The ECFVG will accept, reject for cause, or receive reports of CPEs administered at each of its meetings, and will communicate with the sites immediately following each meeting. The NEB will monitor its approved CPE sites in a manner determined by the NEB.

Every two years, or every 120 full-exam candidates, or as determined by monitoring of the after-exam reports, a site consultant, appointed by the ECFVG Chair, will visit ECFVG-approved sites during a CPE and evaluate the examination process. A written report will be submitted by the site consultant to the ECFVG, which will evaluate the report in relationship to the CPE Manual of Administration. The ECFVG will make a decision on ongoing approval of the site to continue administering the CPE and will provide its decision, in writing, to the site, together with required or recommended actions for improvements. The NEB will conduct on-site evaluations of its approved CPE sites in a manner determined by the NEB.

Travel expenses and a consultant fee for the periodic monitoring is funded by the CPE or ECFVG Quality Assurance Program (QAP) for ECFVG-approved sites and the NEB for NEB-approved sites.

# Appendix 3—ECFVG Policy on Testing Accommodations

*Introduction*—The AVMA/ Educational Commission for Foreign Veterinary Graduates (ECFVG) provides equal access to programs and services for individuals with documented disabilities by providing reasonable accommodations. The ECFVG Policy on Testing Accommodations provides individuals, schools, professional diagnosticians, and service providers with information regarding how to document a disability and a related need for accommodations for candidates for the ECFVG Clinical Proficiency Examination (CPE). The candidate is still required to have and demonstrate the skills and knowledge of veterinary medicine. Reasonable accommodations do not alter or change the skills and knowledge that must be demonstrated or examination as a fundamental method of assessing the requisite skill and knowledge.

The Americans with Disabilities Act of 1990 (ADA)  define a person with a disability as someone with a physical or mental impairment that substantially limits one or more major life activities such as walking, seeing, hearing, or learning. The candidate has the responsibility to demonstrate a qualifying disability.  The more comprehensive the information provided especially regarding the disability and related functional limitation as supported by qualified professionals, the better ECFVG with its consultants can make a decision regarding the need for and appropriate accommodation to be provided. Accommodations "match up" with the identified functional limitation so that the area of impairment is mitigated by an auxiliary aid or adjustment to the testing procedure. For example, a functional limitation might be an inability to hear within normal limits. An appropriate accommodation might be use of an amplified stethoscope. It is essential that the documentation submitted with an accommodations request provide a clear explanation of the functional impairment and a rationale for the requested accommodation.

The determination of a disability by ECFVG is an individualized inquiry and will be made on a case-by-case basis, per individual and per examination administration.  ECFVG reserves the right to make final judgment regarding testing accommodations.  If your request for testing accommodation is denied you will be entitled to take the examination at the time originally scheduled or at another test date acceptable to you and ECFVG.

As noted in the CPE Manual of Administration, the Clinical Proficiency Examination (CPE) is a hands-on examination of entry-level educational clinical skills and judgments designed for graduates of non-AVMA/Council on Education (COE)-accredited veterinary colleges. The CPE is intended to assess the practical clinical veterinary skills of an "entry-level" veterinarian (ie, a new graduate of an AVMA/COE-accredited school). The CPE Manual of Administration lists the specific clinical proficiency skills measured by each section of the examination.

The reasonable accommodations that may be provided for the CPE will be considered on a section-by-section basis.  Because of the different clinical skills measured by the different sections, accommodations may be provided for some sections but not for others. In no case will accommodations be provided that would compromise any examination section's ability to test accurately the skills and knowledge it purports to measure. Similarly, no auxiliary aid or service will be provided that will fundamentally alter any section of the examination.

As part of the measurement of clinical "efficiency," candidates are assessed on their timely and effective use of resources to complete a procedure. Efficiency is a component of competency. Therefore, an accommodation of additional testing time will not be provided for those sections that assess efficiency. Similarly, no accommodations, including additional testing time, will be provided where the safety and welfare of an animal may be compromised.

*Confidentiality*—Except where necessary to make a determination of appropriate accommodations, the ECFVG does not disclose names of applicants with disabilities or information concerning the application or accompanying documentation. In that event, such information shall be disclosed only to outside experts and other consultants, who are required to maintain confidentiality. Entities receiving verification of certification are not advised of any accommodations provided to the subject candidate.

*When to Request Test Accommodations for the CPE*—After being notified of eligibility and submission of the on line CPE application the completed **CPE Test Accommodation Request Form** (available on line) must immediately be submitted to the ECFVG office. Appropriate documentation of the disabling condition and need for accommodations must accompany the CPE Test Accommodation Request Form. In order to facilitate processing and to avoid delay, the ECFVG encourages applicants to provide detailed and complete responses to the request for test accommodations and accompanying documentation.

*How to Request Test Accommodations for the CPE*—All requests for ADA accommodations must be **in writing** for each accommodation. Accommodation requests by a third party (such as an evaluator or veterinary school) cannot be honored. Candidates should read and comply with the following seven steps to request accommodations:

1. Read the General Guidelines for Documenting Disabilities, Guidelines for Documenting Learning Disabilities, and Guidelines for Documenting Attention-deficit/Hyperactivity Disorder (hereinafter "GUIDELINES") provided below and share them with the professional who will be preparing your documentation. Your treating professional must provide the necessary supporting documentation as described in these guidelines.

2. Complete and sign the **CPE Test Accommodation Request Form** application. Alternatively, if you are applying to retake one, two, or three failed sections of the CPE, complete and sign the ECFVG Request for Subsequent (Retake) Test Accommodations for the Clinical Proficiency Examination (CPE), which may also be obtained on written request from the ECFVG office.

3. Attach documentation of the disability and your need for accommodation.
    1. Compare your documentation with the information listed in the GUIDELINES  to ensure a complete submission.

EX.4

2. **Untimely, incomplete or inadequate documentation will delay processing of your request.**

4. Attach a personal statement describing your disability and its impact on your ability to function in a clinical setting and in your daily life. If you are currently a practicing veterinarian, also describe any current workplace accommodations.

5. Submit all documentation as outlined in the GUIDELINES, including the following:

    1. Typed or printed letters and reports from evaluators on official letterhead.

    2. All documents in English. You are responsible for providing certified English translations of foreign-language documentation.

    3. Records from childhood if you are requesting accommodations based on a developmental disorder such as learning disorders (LD) or attention deficit/hyperactivity disorder (ADHD).

    4. Documentation of your functional impairment in activities beyond test-taking.

    5. Verification of your functional impairment by impartial third-party individuals who have observed you in day-to-day functioning or in clinical situations.

6. Retain a photocopy of all Request Forms and documentation submitted.

7. Send your completed ECFVG Test Accommodation Request Form for the CPE and documentation via a traceable or return-receipt method with your CPE application to:

    AVMA/ECFVG

    Attn: Testing Coordinator

    1931 N. Meacham Rd. Suite 100

    Schaumburg, IL 60173

*General Guidelines for Documenting Disabilities*—When requesting a testing accommodation based on an impairment that substantially limits one or more major life activities submit the following documentation from your testing professional:

1. A detailed, comprehensive written report describing the candidate's disability and its severity and justifying the need for the requested accommodations. Documentation in support of requests for accommodations on the basis of a learning disability or attention-deficit/hyperactivity disorder must also comply with the Guidelines for Documenting Learning Disabilities or Guidelines for Documenting Attention-Deficit/Hyperactivity Disorder, respectively.

2. The following characteristics are expected of all documentation submitted in support of a request for accommodations. Documentation must:

    1. State a specific diagnosis of the disability. A professionally recognized diagnosis for the particular category of disability is expected (eg, the DSM-IV diagnostic categories for learning disabilities).

    2. Be current. Because the provision of reasonable accommodations is based on assessment of the current impact of the examinee's disability on the testing activity, it is in the individual's best interest to provide recent documentation. As the manifestations of a disability may vary over time and in different settings, in most cases an evaluation should have been conducted within the past three years. For example, low vision or neuromuscular conditions are often subject to change and should be updated for current functioning.

    3. Describe the specific diagnostic criteria and name the diagnostic tests used, including date(s) of evaluation, specific test results, and a detailed interpretation of the test results. This description should include the results of diagnostic procedures and tests utilized and should include relevant educational, developmental, and medical history. Specific test results should be reported to support the diagnosis. For example, documentation for an examinee with multiple sclerosis should include specific findings on the neurological examination including functional limitations and MRI or other studies, if relevant. Diagnostic methods used should be appropriate to the disability and current professional practices within the field. Informal or non-standardized evaluations should be described in enough detail that other professionals could understand their role and significance in the diagnostic process.

    4. Describe in detail the individual's limitations due to the diagnosed disability (ie, a demonstrated impact on functioning on the CPE) and explain the relationship of the test results to the identified limitations resulting from the disability. The current functional impact on physical, perceptual, and cognitive abilities should be fully described (eg, the extent to which an examinee with macular degeneration and resulting reduced central vision is limited in the ability to read).

    5. Recommend specific accommodations and/or assistive devices including a detailed explanation of why these accommodations or devices are needed and how they will reduce the impact of the identified functional limitations. Accommodation requests for the CPE and their justification must be section specific. For example, a request for special lighting might be appropriate for the Surgery section, but not for the Small Animal Practice section. Extra time might be appropriate for the written stations in such sections as Small Animal Practice and Radiology but not for sections requiring demonstration of competencies required in Anesthesia or Surgery.

    6. Establish the professional credentials of the evaluator that qualify him or her to make the particular diagnosis, including information about licensure or certification and specialization in the area of the diagnosis. The evaluator should present evidence of comprehensive training and direct experience in the diagnosis and treatment of adults in the specific area of disability.

3. If no prior accommodations have been provided, the qualified professional expert should include a detailed explanation as to why no accommodations were given in the past and why accommodations are needed now.

*Guidelines for Documenting Learning Disabilities*—When  submitting a request for accommodations based specifically on a learning disability or cognitive impairment the following documentation is needed.

EX. 4

1. The evaluation must be conducted by a qualified professional. The qualified professional (diagnostician) must have comprehensive training in the field of learning disabilities and must have comprehensive training and direct experience in working with an adult population.

2. Testing/assessment must be current. The determination of whether an individual is significantly limited in functioning according to ADA criteria is based on assessment of the current impact of the impairment. (See General Guidelines for Documenting Disabilities). A developmental disorder such as a learning disability originates in childhood and, therefore, information which demonstrates a history of impaired functioning should also be provided.

3. Documentation must be comprehensive. Objective evidence of a substantial limitation in cognition or learning must be provided. At a minimum, the comprehensive evaluation should include the following:

   1. A diagnostic interview and history taking. Because learning disabilities are commonly manifested during childhood, though not always formally diagnosed, relevant historical information regarding the individual's academic history and learning processes in elementary, secondary and postsecondary education should be investigated and documented. The report of assessment should include a summary of a comprehensive diagnostic interview that includes relevant background information to support the diagnosis. In addition to the candidate's self-report, the report of assessment should include:

      - A description of the presenting problem(s);

      - A developmental history;

      - Relevant academic history including results of prior standardized testing, reports of classroom performance and behaviors including transcripts, study habits and attitudes and notable trends in academic performance;

      - Relevant family history, including primary language of the home and current level of fluency in English;

      - Relevant psychosocial history;

      - Relevant medical history including the absence of a medical basis for the present symptoms;

      - Relevant employment history;

      - A discussion of dual diagnosis, alternative or co-existing mood, behavioral, neurological and/or personality disorders along with any history of relevant medication and current use that may impact the individual's learning; and

      - Exploration of possible alternatives that may mimic a learning disability when, in fact, one is not present.

   2. A psychoeducational or neuropsychological evaluation. The psychoeducational or neuropsychological evaluation must be submitted on the letterhead of a qualified professional, and it must provide clear and specific evidence that a learning or cognitive disability does or does not exist. It must also have the following characteristics:

      - The assessment must consist of a comprehensive battery of tests.

      - A diagnosis must be based on the aggregate of test results, history and level of current functioning. It is not acceptable to base a diagnosis on only one or two subtests.

      - Objective evidence of a substantial limitation to learning must be presented.

      - Tests must be appropriately normed for the age of the patient and must be administered in the designated standardized manner.

      - Minimally, the domains to be addressed in the psychoeducational or neuropsychological evaluation should include assessment of:

        1. Cognitive Functioning: A complete cognitive assessment is essential with all subtests and standard scores reported. Acceptable measures include but are not limited to: Wechsler Adult Intelligence Scale-III (WAIS-III); Woodcock Johnson Psychoeducational Battery-III (WJ-III): Tests of Cognitive Ability; Kaufman Adolescent and Adult Intelligence Test.

        2. Achievement: A comprehensive achievement battery with all subtests and standard scores is essential. The battery must include current levels of academic functioning in relevant areas such as reading (decoding and comprehension) and mathematics. Acceptable instruments include, but are not limited to, the Woodcock-Johnson Psychoeducational Battery - Revised: Tests of Achievement (WJ-III); The Scholastic Abilities Test for Adults (SATA); Woodcock Reading Mastery Tests-III. Specific achievement tests are useful instruments when administered under standardized conditions and when interpreted within the context of other diagnostic information. The Wide Range Achievement Test-3 (WRAT-3) and the Nelson-Denny Reading Test are not comprehensive diagnostic measures of achievement and therefore neither is acceptable if used as the sole measure of achievement.

        3. Information Processing: Specific areas of information processing (e.g., short- and long-term memory, sequential memory, auditory and visual perception/processing, auditory and phonological awareness, processing speed, executive functioning, motor ability) must be assessed. Acceptable measures include, but are not limited to, the Detroit Tests of Learning Aptitude - Adult (DTLA-A), Wechsler Memory Scale-III (WMS-III), information from the Woodcock Johnson Psychoeducational Battery-III Tests of Cognitive Ability, as well as other relevant instruments that may be used to address these areas.

        4. Other Assessment Measures: Other formal assessment measures or nonstandard measures and informal assessment procedures or observations may be integrated with the above instruments to help support a differential diagnosis or to disentangle the learning disability from co-existing neurological and/or psychiatric issues. In addition to standardized test batteries, nonstandardized

EX 4

measures and informal assessment procedures may be helpful in determining performance across a variety of domains.

4. Actual test scores must be provided (age-based standard scores where available) as well as identification of norms used to interpret the data. Evaluators should use the most recent form of tests and should identify the specific test form as well as the norms used to compute scores. It is helpful to list all test data in a score summary sheet appended to the evaluation.

5. Records of academic history should be provided. Because learning disabilities are most commonly manifested during childhood, relevant records detailing learning processes and difficulties in elementary, secondary and postsecondary education should be included. Such records as grade reports, transcripts, teachers' comments and the like will serve to substantiate self-reported academic difficulties in the past and present.

6. A differential diagnosis must be reviewed and various possible alternative causes for the identified problems in academic achievement should be ruled out. The evaluation should address key constructs underlying the concept of learning disabilities and provide clear and specific evidence of the information processing deficit(s) and how these deficits currently impair the individual's ability to learn. No single test or subtest is a sufficient basis for a diagnosis. The differential diagnosis must demonstrate that:

    1. Significant difficulties persist in the acquisition and use of listening, speaking, reading, writing or reasoning skills.

    2. The problems being experienced are not primarily due to lack of exposure to the behaviors needed for academic learning or to an inadequate match between the individual's ability and the instructional demands.

7. A clinical summary must be provided. A well-written diagnostic summary based on a comprehensive evaluative process is a necessary component of the report. Assessment instruments and the data they provide do not diagnose; rather, they provide important data that must be integrated with background information, historical information and current functioning. It is essential then that the evaluator integrates all information gathered in a well-developed clinical summary. The following elements must be included in the clinical summary:

    1. Demonstration of the evaluators having ruled out alternative explanations for the identified academic problems as a result of poor education, poor motivation and/or study skills, emotional problems, attentional problems and cultural or language differences;

    2. Indication of how patterns in cognitive ability, achievement and information processing are used to determine the presence of a learning disability;

    3. Indication of the substantial limitation to learning presented by the learning disability and the degree to which it impacts the individual in the context of the CPE; and

    4. Indication as to why specific accommodations are needed and how the effects of the specific disability are mediated by the recommended accommodation(s).

8. Each accommodation recommended by the evaluator must include a rationale. The evaluator must describe the impact the diagnosed learning disability has on a specific major life activity as well as the degree of significance of this impact on the individual. The diagnostic report must include specific recommendations for accommodations and a detailed explanation as to why each accommodation is recommended. Recommendations must be tied to specific diagnostic test results or clinical observations. The documentation should include any record of prior accommodation or auxiliary aids, including any information about specific conditions under which the accommodations were used and whether or not they were effective. However, a prior history of accommodation, without demonstration of a current need, does not in and of itself warrant the provision of a like accommodation. **If no prior accommodation(s) has been provided, the qualified professional expert should include a detailed explanation as to why no accommodation(s) was used in the past and why accommodation(s) is needed at this time.**

9. Problems such as test anxiety, English as a second language in and of itself, slow reading without an identified underlying cognitive deficit or failure to achieve a desired academic outcome are not learning disabilities and, therefore, are not covered under the ADA.

*Guidelines for Documenting Attention-Deficit/Hyperactivity Disorder (ADHD)*—When submitting a request for accommodations based specifically on Attention-Deficit/Hyperactivity Disorder (ADHD), provide the following additional information:

1. Submit an evaluation conducted by a qualified diagnostician. Professionals conducting assessments and rendering diagnoses of ADHD must be qualified to do so. Comprehensive training in the differential diagnosis of ADHD and other psychiatric disorders and direct experience in diagnosis and treatment of adults is necessary. The evaluator's name, title and professional credentials, including information about license or certification as well as the area of specialization, employment and state in which the individual practices should be clearly provided.

2. Testing/assessment must be current. The determination of whether an individual is "significantly limited" in functioning is based on assessment of the current impact of the impairment on the CPE (see General Guidelines for Documenting Disabilities).

3. Documentation necessary to substantiate the ADHD must be comprehensive. Because ADHD is, by definition, first exhibited in childhood (although it may not have been formally diagnosed) and in more than one setting, objective, relevant, historical information is essential. Information verifying a chronic course of ADHD symptoms from childhood through adolescence to adulthood, such as educational transcripts, report cards, teacher comments, tutoring evaluations, job assessments, and the like are necessary.

    1. The evaluator is expected to review and discuss DSM-IV diagnostic criteria for ADHD and describe the extent to which the patient meets these criteria. The report must include information about the specific symptoms exhibited and document that the patient meets criteria for long-standing history, impairment, and pervasiveness.

EX.4

2. A history of the individual's presenting symptoms must be provided, including evidence of ongoing impulsive/hyperactive or inattentive behaviors (as specified in DSM-IV) that significantly impair functioning in two or more settings.

3. The information collected by the evaluator must consist of more than a self-report. Information from third party sources is critical in the diagnosis of adult ADHD. Information gathered in the diagnostic interview and reported in the evaluation should include, but not necessarily be limited to, the following:

   ▪ History of presenting attentional symptoms, including evidence of ongoing impulsive/inattentive or inattentive behavior that has significantly impaired functioning over time;

   ▪ Developmental history;

   ▪ Family history for presence of ADHD and other educational, learning, physical, or psychological difficulties deemed relevant by the examiner;

   ▪ Relevant medical and medication history, including the absence of a medical basis for the symptoms being evaluated;

   ▪ Relevant psychosocial history and any relevant interventions;

   ▪ A thorough academic history of elementary, secondary, and postsecondary education;

   ▪ Review of psychoeducational test reports to determine if a pattern of strengths or weaknesses is supportive of attention or learning problems;

   ▪ Evidence of impairment in several life settings (home, school, work, etc) and evidence that the disorder significantly restricts one or more major life activities.

   ▪ Relevant employment history;

   ▪ Description of current functional limitations relative to a clinical practice setting and to the CPE in particular that are presumably a direct result of the described problems with attention;

   ▪ A discussion of the differential diagnosis, including alternative or co-existing mood, behavioral, neurological, or personality disorders that may confound the diagnosis of ADHD; and

   ▪ Exploration of possible alternative diagnoses that may mimic ADHD.

4. Relevant assessment batteries must be described. A neuropsychological or psychoeducational assessment may be necessary in order to determine the individual's pattern of strengths or weaknesses and to determine whether there are patterns supportive of attention problems. Test scores or subtest scores alone should not be used as the sole basis for the diagnostic decision. Scores from subtests on the Wechsler Adult Intelligence Scale - III (WAIS - III), measures of memory function, or attention or tracking tests or continuous performance tests do not in and of themselves establish the presence or absence of ADHD. They may, however, be useful as one part of the process in developing clinical hypotheses. Checklists or surveys can serve to supplement the diagnostic profile but by themselves are not adequate for the diagnosis of ADHD. When testing is used, age-based standard scores must be provided for all normed measures.

5. Identification of DSM-IV criteria. A diagnostic report must include a review of the DSM-IV criteria for ADHD both currently and retrospectively and specify which symptoms are present (see DSM-IV for specific criteria). According to DSM-IV, "the essential feature of ADHD is a persistent pattern of inattention and/or hyperactivity-impulsivity that is more frequent and severe than is typically observed in individuals at a comparable level of development." Other criteria include:

   1. Symptoms of hyperactivity-impulsivity or inattention that cause impairment that were present in childhood.

   2. Current symptoms that have been present for at least the past six months.

   3. Impairment from the symptoms present in two or more settings (school, work, home, etc).

6. Documentation must include a specific diagnosis. The report must include a specific diagnosis of ADHD based on the DSM-IV diagnostic criteria. Individuals who report problems with organization, test anxiety, memory, and concentration only on a situational basis do not fit the prescribed diagnostic criteria for ADHD. Given that many individuals benefit from prescribed medications and therapies, a positive response to medication by itself is not supportive of a diagnosis, nor does the use of medication in and of itself either support or negate the need for accommodation.

7. A clinical summary must be provided. A well-written diagnostic summary based on a comprehensive evaluative process is a necessary component of the assessment. The clinical summary must include:

   1. Demonstration of the evaluators having ruled out alternative explanations for inattentiveness, impulsivity, and/or hyperactivity as a result of psychological or medical disorders or non-cognitive factors;

   2. Indication of how patterns of inattentiveness, impulsivity, and/or hyperactivity across the life span and across settings are used to determine the presence of ADHD;

   3. Indication of the substantial limitation to learning presented by ADHD and the degree to which it impacts the individual in the context for which accommodations are being requested (eg, impact on the CPE); and

   4. Indication as to why specific accommodations are needed for the CPE and how the effects of ADHD symptoms, as designated by the DSM-IV, are mediated by the accommodation(s).

8. Each accommodation recommended by the evaluator must include a rationale. The evaluator must describe the impact of ADHD (if one exists) on a specific major life activity as well as the degree of significance of this impact on the individual. The diagnostic report must include specific recommendations for accommodations. A detailed explanation must be provided as to why each accommodation is recommended and should be correlated with specific identified functional limitations. Prior documentation may have been useful in determining appropriate services in the past. However, documentation should validate the need for accommodation based on the individual's *current* level of functioning. The documentation should include any record of prior accommodation or auxiliary aid, including information about specific conditions under which the accommodation was used (eg, standardized testing, final exams, etc). However, a prior history

17

EX 4

of accommodation without demonstration of a current need does not in itself warrant the provision of a similar accommodation. **If no prior accommodation has been provided, the qualified professional and/or individual being evaluated should include a detailed explanation as to why no accommodation was used in the past and why accommodation is needed at this time.**

9. Because of the challenge of distinguishing ADHD from normal developmental patterns and behaviors of adults, including procrastination, disorganization, distractibility, restlessness, boredom, academic underachievement or failure, low self-esteem, and chronic tardiness or absence, a multifaceted evaluation must address the intensity and frequency of the symptoms and whether these behaviors constitute impairment in a major life activity.

*Appeal:*

*Adverse Decision_*A candidate dissatisfied with a decision not to provide an accommodation or with the accommodation approved may appeal the decision pursuant to the following ECFVG appeal process:

1. Appeals must be filed in writing within 10 business days of the denial of the request for accommodation. The written appeal must state why the adverse determination is incorrect.

2. Appeals must be submitted to the Chair of the ECFVG at the AVMA ECFVG office as follows: via US or Express Mail to 1931 N. Meacham Rd, Suite 100, Schaumburg, IL, 60173-4360, USA; via E-mail to **ECFVG@avma.org**; or via fax 847-285-5732.

3. ECFVG in addition to reviewing the file materials and written appeal may present the candidate an opportunity to be heard to present additional information and arguments.  ECFVG may engage the services of disability experts in hearing the appeal and making the final determination of eligibility.

4. Based on the information provided in the appeal, a decision will be made by the Chair of the ECFVG. The candidate will be provided with written notification of the decision and the reasons for it.

## OTHER AVMA SITES



The charitable arm of the AVMA
**American Veterinary Medical Foundation**

Externs on the Hill
National Pet Week

Animal Health SmartBrief
WebMD® Pet Health Community



ENSURING [
RECEIVE THE PR
HEALTHCA
THEY DES

Contact | AVMA Careers | Help | Site Map | Privacy | Terms of Use

Copyright © 2018 American Veterinary Medical Association

I was a candidate in a professional certification exam administered by the AVMA, the Clinical Proficiency Exam (CPE) for foreign veterinary graduates. CPE consists of seven sections of hands-on practical skills testing. In October 2016 I was scheduled to re-take 3 sections of CPE: Surgery, Anesthesia, and Equine Medicine. Each section requires rigorous use of hands.

Following sudden debilitating pain in my right hand and wrist, on 10/10/2016 I was diagnosed with osteoarthritis of the 1st carpometacarpal joint. Any activity with this hand would cause a flare-up of pain, and could potentially compromise my performance at the exam.

As soon as I received the diagnosis and medical record, I wrote to the CPE administrator and made an accommodation request. The request was denied, per the AVMA policy that all accommodation requests should be received at least 90 days prior to the exam date. (Correspondence attached in pages 2 & 3). Since this policy excludes all disabilities that may occur within 90 days of the exam, I believe it violates the ADA.

Due to lack of accommodation, I was in severe pain by the time I started the last section of the exam, Anesthesia. Due to the pain in my hand I could not complete a specific task in time, and received a failing grade for that section. Immediately after the exam I wrote to the site and exam administrators explaining this situation, and received no relief. (Correspondence in pages 4 &5).

**PLAINTIFF'S EXHIBIT 5**

Mail - subhadra.gunawardana@wustl.edu

EX.5

# Urgent: Accomodation request for temporary disability

## Gunawardana, Subhadra

Tue 10/11/2016 5:14 PM

To: Robert Cook (RCook@avma.org) <RCook@avma.org>; Dr. Don Waldron <d.waldron@wvc.org>; Marsha Moon <M.Moon@wvc.org>;

Cc: Crystal Vaquera <c.vaquera@wvc.org>;

📎  1 attachments (237 KB)

BarnesCare Report-10-10-16.pdf;

I am a CPE candidate scheduled to re-take 3 sections next week, starting Oct 17.  My candidate number is 273624.

Following sudden debilitating pain in my right wrist, yesterday I was diagnosed with osteoarthritis of the 1st carpometacarpal  joint. Medical record attached. I am wearing a brace and taking NSAIDs, which control the pain to some extent. However, any activity with this hand can still cause a flare-up of pain. Since the exam involves many activities that require the use of both hands, this disability can easily compromise my performance.

I am requesting the following accommodations if possible.

For Surgery: To have a sterile assistant available to help me in the event it becomes too painful for me to perform certain tasks that put pressure on the affected joint. For example, clamping/unclamping Carmalt forceps could trigger severe pain in my wrist.

For Equine and Anesthesia sections: Permission to wear my hand-brace at all times (if any task requires a sterile hand scrub, I can do that and put the brace back on after finishing the task).

For All sections: Permission to keep my pain medications close by; and to stop between tasks to take a pain pill if it becomes necessary.

I appreciate your consideration.  Thank you.


*Subhadra Gunawardana, Ph.D.*
Associate Professor, Cell Biology and Physiology
Washington University School of Medicine
660 S Euclid Ave, Campus Box 8228
St Louis, MO 63110.
subhadra.gunawardana@wustl.edu

10/7/2018   Case 3:19-cv-00096-NJR   Document 63-1   Filed 01/12/20   Page 61 of 92   Page ID #512
Mail - subhadra.gunawardana@wustl.edu
EX.5

# RE: Urgent: Accomodation request for temporary disability

## Robert Cook <RCook@avma.org>

Wed 10/12/2016 8:03 AM

Inbox

To: Gunawardana, Subhadra <subhadra.gunawardana@wustl.edu>; Dr. Don Waldron <d.waldron@wvc.org>; Marsha Moon <M.Moon@wvc.org>;

Cc: Crystal Vaquera <c.vaquera@wvc.org>; Dr. Ed Murphey <EMurphey@avma.org>;


Hello Dr. Gunawardana,

Sorry to hear of your hardship. Please see the excerpt from our CPE Testing Accommodations section of the CPE Candidate Bulletin:

Completed accommodation requests with all necessary documentation **must** be submitted immediately following the completion of the CPE application and must provide the ECFVG with sufficient time (at least 90 days before the first day of the preferred CPE administration) to review the accommodation request and reach a decision. *CPE Accommodations Request Form*

https://www.avma.org/professionaldevelopment/education/foreign/pages/ecfvg-cpe-bulletin.aspx#cpe-testing-accommodations

Our policy requires we receive these requests at least 90 days in advance. This allows the ECFVG to receive and review the materials properly before rendering a decision. For that reason your request is not accepted because it was not submitted per our policy and it is now 5 days from the CPE exam.

Sincerely,

Bob Cook

---

**From:** Gunawardana, Subhadra [mailto:subhadra.gunawardana@wustl.edu]
**Sent:** Tuesday, October 11, 2016 5:14 PM
**To:** Robert Cook; Dr. Don Waldron; Marsha Moon
**Cc:** Crystal Vaquera
**Subject:** Urgent: Accomodation request for temporary disability

I am a CPE candidate scheduled to re-take 3 sections next week, starting Oct 17.  My candidate number is 273624.

Following sudden debilitating pain in my right wrist, yesterday I was diagnosed with osteoarthritis of the 1st carpometacarpal  joint. Medical record attached. I am wearing a brace and taking NSAIDs, which control the pain to some extent. However, any activity with this hand can still cause a flare-up of pain. Since the exam involves many activities that require the use of both hands, this disability can easily compromise my performance.

3

10/7/2018    Case 3:19-cv-00096-NJR    Document 63-1    Filed 01/12/20    Page 62 of 92    Page ID #513
Mail - Subhadra Gunawardana@wustl.edu

EX.5

# Reporting a concern regarding CPE Oct 19

### Gunawardana, Subhadra

Thu 10/20/2016 11:15 AM

To: Dr. Don Waldron <d.waldron@wvc.org>;

Dr. Waldren,

Yesterday I was dismissed from the Anesthesia section due to leaving the pop-off valve closed too long while bagging the patient. While I realize that this is a serious error, I request you to consider the following:

I had made every attempt to open the pop-off valve, just couldn't get it open in time due to the pain in my hand from arthritis. If the session is videotaped it would show me struggling with the valve for a few seconds. (As I had used my hand a lot during the preceding surgery section, I was in considerable pain during the anesthesia section).

In other words, the error was not due my negligence but a physical disability. I request you to consider this in making a final decision.

Thank you,
Subhadra Gunawardana
Candidate ID 273634
615-674-8461

*Subhadra Gunawardana, Ph.D.*
Associate Professor, Cell Biology and Physiology
Washington University School of Medicine
660 S Euclid Ave, Campus Box 8228
St Louis, MO 63110.
subhadra.gunawardana@wustl.edu

EX.5

# Re: Reporting a concern regarding CPE Oct 19

## Dr. Don Waldron <d.waldron@wvc.org>

Thu 10/20/2016 11:39 AM

Inbox

To: Gunawardana, Subhadra <subhadra.gunawardana@wustl.edu>;

Cc: Ed Murphey <EMurphey@avma.org>;

Dr. Gunawardana,

Thank you for your note and your concern regarding your painful hand and the pop-off valve incident in Anesthesia yesterday.  As CPE site coordinator, I do not have the authority to change any section evaluation assigned by a CPE examiner.  I believe you had earlier communication with the AVMA office regarding accommodations so you are aware there were no accommodations permitted for you during the examination.  We also do not video any portion of the examination currently.

I'm aware you are disappointed and I wish you the best for the future.

Thank you,

Don Waldron


**Don Waldron**
**Chief Veterinary Medical Officer | WVC**
**O:** 866.800.7326 | **D:** 702.675.7812 | **E:** Don@wvc.org
**A:** 2425 E. Oquendo Rd., Las Vegas, NV 89120
wvc.org | oquendocenter.org | Facebook | Twitter


**WVC CONFIDENTIAL NOTICE:** This message is intended only for the use of the individual or entity to which it is addressed, and may contain information that is PRIVILEGED, CONFIDENTIAL and exempt from disclosure under applicable law. If the reader of this message is not the intended recipient, or the employee or agent responsible for delivering the message to the intended recipient, you are hereby notified that any dissemination, distribution or copying of this communication is strictly prohibited. If you have received this communication in error, please notify us immediately by telephone, and return the original to us by mail without making a copy.

---

**From:** "Gunawardana, Subhadra" <subhadra.gunawardana@wustl.edu>
**Date:** Thursday, October 20, 2016 at 12:15 PM
**To:** "Dr . Don Waldron" <d.waldron@wvc.org>
**Subject:** Reporting a concern regarding CPE Oct 19

Dr. Waldren,

Yesterday I was dismissed from the Anesthesia section due to leaving the pop-off valve closed too long while bagging the patient. While I realize that this is a serious error, I request you to consider the

**PLAINTIFF'S EXHIBIT**

**6**

| From: | ECFVG@avma.org |
|---|---|
| To: | subhadra.gunawardana@vanderbilt.edu |
| Subject: | ECFVG Full CPE Confirmation |
| Date: | Tuesday, September 30, 2014 1:59:56 PM |



**FULL CPE CONFIRMATION**

Candidate Name: Dr.Subhadra Gunawardana

Candidate ID:       273624

Order Number:     1465572

Payment Made:    $1000.00

Amount Due:        $5400.00

Dear Dr.Subhadra Gunawardana:

You have been scheduled to take the Clinical Proficiency Examination (CPE) at the Mississippi State University College of Veterinary Medicine (Starkville, MS) CPE site on Sep 15, 2015 - Sep 17, 2015. Final payment of $5400 is due to the ECFVG office by close of business on Jul 17, 2015. Failure to submit final payment by this date will result in forfeiture of your assigned position and all fees submitted.

*Note: Your $1000 initial payment must be submitted once your application has been entered.*

Travel information and site specific information for the Mississippi State University College of Veterinary Medicine (Starkville, MS) CPE site can be found here or online on your status page. Please use this information to make your travel plans for your CPE. The examination site will be contacting you directly with further information regarding your examination as well. Please note that you will need to bring your own lab coat and scrub suit for the examination, as well as all other material indicated in the Manual of Administration as being the candidate's responsibility. The current Manual of Administration can be downloaded here. If you would like a hard copy of the Manual of Administration sent to you, please contact the ECFVG office at ECFVG@avma.org.

Because the ECFVG office may communicate with you via E-mail, phone, and/or US mail, it is very important that your contact information is current. If your contact information changes, please update your contact information here.

Sincerely,

Testing Coordinator, Education and Research Division
American Veterinary Medical Association
1931 N. Meacham Rd., Suite 100
Schaumburg, IL 60173
800-248-2862 ext. 6682 Fax: 847-285-5732

EX.6

# ECFVG Retake CPE Confirmation

ECFVG@avma.org

Thu 3/3/2016 3:10 PM

To: Gunawardana, Subhadra <subhadra.gunawardana@wustl.edu>;



Building a bridge to your future in veterinary medicine

Educational Commission for
Foreign Veterinary Graduates

**ECFVG**

RETAKE CPE CONFIRMATION

Candidate Name: Dr.Subhadra Gunawardana
Candidate ID:        273624
Order Number:      1692318
Payment Made:     $4200.00
Amount Due:         $0.00

Dear Dr.Subhadra Gunawardana:

You have been scheduled to retake sections of the Clinical Proficiency Examination.

Further information about your retake examinations including travel information and site specific information for the CPE site can be found online on your profile page. Please use this information to make your travel plans for your CPE. The examination site will be contacting you directly with further information regarding your examination as well. Please note that you will need to bring your own lab coat and scrub suit for the examination, as well as all other material indicated in the Manual of Administration as being the candidate's responsibility. The current Manual of Administration can be downloaded here.

Because the ECFVG office may communicate with you via E-mail, phone, and/or US mail, it is very important that your contact information is current. If your contact information changes, please update your contact information here.

Sincerely,

*Malathi Raghavan*

Malathi Raghavan, DVM, MS, PhD
Assistant Director, Education and Research Division
Staff Consultant to the ECFVG

MR/mb

EX.6

# ECFVG Retake CPE Confirmation

ECFVG@avma.org

Wed 2/8/2017 10:13 AM

To: Gunawardana, Subhadra <subhadra.gunawardana@wustl.edu>;



**Building a bridge** to your future in veterinary medicine

Educational Commission for
Foreign Veterinary Graduates

**ECFVG**

RETAKE CPE CONFIRMATION

Candidate Name: Dr.Subhadra Gunawardana
Candidate ID:      273624
Order Number:    1817404
Payment Made:   $1450.00
Amount Due:       $0.00

Dear Dr.Subhadra Gunawardana:

You have been scheduled to retake sections of the Clinical Proficiency Examination.

Further information about your retake examinations including travel information and site specific information for the CPE site can be found online on your profile page. Please use this information to make your travel plans for your CPE. The examination site will be contacting you directly with further information regarding your examination as well. Please note that you will need to bring your own lab coat and scrub suit for the examination, as well as all other material indicated in the Manual of Administration as being the candidate's responsibility. The current Manual of Administration can be downloaded here.

Because the ECFVG office may communicate with you via E-mail, phone, and/or US mail, it is very important that your contact information is current. If your contact information changes, please update your contact information here.

Sincerely,

E.D. Murphey, DVM, PhD, DACVS
Assistant Director, Education and Research Division
American Veterinary Medical Association





PLAINTIFF'S
EXHIBIT
7

# Market Research Statistics: U.S. Veterinarians 2018

|  | Total (No.)[1] | Male | Female | Unknown |
|---|---|---|---|---|
| **Total** | **113,394** | **43,345** | **69,908** | **141** |

## U.S. Veterinary Positions (among employed veterinarians)

*Definitions of categories below*

|  | Total as of December 31, 2018[1,2] | Percent of Total | Male % | Female % |
|---|---|---|---|---|
| **Private Clinical Practice** |  |  |  |  |
| Food animal exclusive | 1,286 | 1.8% | 77.1% | 22.9% |
| Food animal predominant | 3,105 | 8.7% | 74.3% | 25.7% |
| Mixed animal | 4,182 | 5.7% | 56.0% | 44.0% |
| Companion animal predominant | 6,372 | 8.7% | 49.0% | 51.0% |
| Companion animal exclusive | 48,898 | 66.6% | 35.9% | 64.0% |
| Equine | 4,125 | 5.6% | 45.8% | 54.2% |
| Other | 309 | 0.4% | 35.3% | 64.7% |
| Species Unspecified | 5,096 | 6.9% | 21.8% | 78.1% |
| **Total Private Practice** | **73,373** | **100%** | **40.1%** | **59.9%** |
| **Public & Corporate Employment** |  |  |  |  |
| College or university | 6,889 | 40.8% | 41.2% | 58.8% |
| Federal government | 1,869 | 11.1% | 51.0% | 49.0% |
| State or local government | 1,122 | 6.6% | 45.3% | 54.7% |
| Uniformed services | 760 | 4.5% | 48.2% | 51.7% |
| Industry | 3,555 | 21.0% | 53.1% | 46.9% |
| Other Public & Corporate | 2,702 | 16.0% | 30.1% | 69.9% |
| **Total Public & Corporate** | **16,897** | **100%** | **43.3%** | **56.7%** |
| **Employment Unknown** | **28,375** |  |  |  |
| **Not Listed Above** | **2,007** |  |  |  |
| **Total # of Positions held by U.S. Veterinarians** | **120,652** |  |  |  |

Ex7

[1] Includes active AVMA members (Regular, Recent Graduates, and Educational) and Non-members (Excludes non-members born prior to 1948 and non-members who received their veterinary degree prior to 1974)

**[2] Veterinarians may hold more than one position.**

Updated 1/19.

**View 2017 statistics**
**View 2016 statistics**
**View 2015 statistics**
**View 2014 statistics**
**View 2013 statistics**
**View 2012 statistics**

**The species categories listed under Private Clinical Practice can be defined by the following calculations.**

**Species categories**

- Food animal exclusive: Sum of (Bovine, Porcine, Ovine/Caprine, Camelid, Cervid and Poultry) is at least 90% of the contact.

- Food animal predominant: Sum of (Bovine, Porcine, Ovine/Caprine, Camelid, Cervid and Poultry) is at least 50% of the contact.

- Mixed animal: Varied species with at least 25% from companion animal and 25% from either food animal or equine.

- Companion animal predominant: Sum of (Canine, Feline, Avian (non-poultry) and Exotics) is at least 50% of the contact.

- Companion animal exclusive: Sum of (Canine, Feline, Avian (non-poultry) and Exotics) is at least 90% of the contact.

- Equine: Combination of equine predominant and exclusive where there's at least 50% contact with equines.

Copyright © 2019  American Veterinary Medical Association

EX.8



Join |     Store | Career Center | Public Resources | Sign In

Membership    News & Publications    Professional Development    Economics & Practice    Advocacy    Meetings & Events    About AVMA    Policy

**You are here:** Home | Professional Development | Education | **Foreign**          PRINT    SHA

**About Us**

News

FAQs

Contacts

**Program Steps**

Enrollment Application/Online Status

English Language Requirement

BCSE Candidate Bulletin

CPE Candidate Bulletin

**Policies & Procedures**

AVMA-Listed Veterinary Colleges

Veterinary Medical Degrees Granted Throughout the World

Processing Times

Appeals

Complaints

Release of Information

Canadian NEB

**Related resources**

Directory of AVMA-Listed Veterinary Colleges of the World

Classification of Colleges

Colleges Accredited by the AVMA

Directory of State Veterinary Regulatory Boards

Info for Foreign Veterinary Graduates Working in the U.S.

# ECFVG - About Us

The educational prerequisite for veterinary licensure in most states and for certain federal positions includes graduation from a veterinary school accredited by the American Veterinary Medical Association (AVMA) Council on Education. For graduates of foreign, non-accredited schools, most states require successful completion of an educational equivalency assessment certification program—the ECFVG.

ECFVG helps bridge the gap between the dream for some veterinarians of licensure in the United States, and the reality of achieving the American Dream.



For over 40 years, the Educational Commission for Foreign Veterinary Graduates (ECFVG) has helped state veterinary boards and other entities nationwide assess the educational readiness of graduates of non-accredited veterinary schools for licensure or employment.



ECVFG certificate holders enrich the US veterinary profession by increasing diversity. In 2018, more than 154 ECFVG certificates will be awarded to graduates of more than 75 different veterinary schools in approximately 40 different countries. Since the inception of the current certification program (January 1, 1973) through December 31, 2018, the ECFVG has awarded more than 6,535 certificates.



**Four Steps to ECFVG Certification**

**STEP 1: Register and provide proof of graduation**

- Completed online application and registration fees
- Signed and notarized confirmation pages with 2 photos.
- Certified or official notarized photocopy of veterinary college diploma and final transcript.
- Final year students may register by including a letter from an official at the non-accredited veterinary college indicating the expected graduation date; however, copies of diploma and final transcript are required for completion of Step 1.

**STEP 2: Pass English language ability assessment**

- ECFVG candidates must pass one of three standard English-as-a-foreign-language examinations.
- ECFVG candidates who completed secondary school in the United States, United Kingdom (England, Wales, Scotland, and Northern Ireland), Australia, New Zealand, or Canada (except Quebec) must provide acceptable documentation of successful completion of at least three years of secondary (high) school at which the complete language of instruction was English.

**STEP 3: Pass basic & clinical veterinary sciences knowledge assessment**

- Attain a passing score on the computer-based, multiple-choice examination assessing basic and clinical veterinary sciences knowledge.

**STEP 4: Pass hands-on clinical skills assessment**

- Successfully complete a postgraduate, rigorous, standardized, and multi-day hands-on assessment of clinical veterinary skills.





## Certification

A candidate is awarded an ECFVG certification once all four steps are completed. Each of the four steps is to be completed in order. Students in their final year at non-accredited veterinary colleges may register and proceed through ECFVG Steps 2 and 3 prior to graduation.

Once earned, an ECFVG certificate, like the veterinary diploma itself, is valid for life.

ECFVG certificates are recognized in all 50 states as meeting, either in full or in part, the educational prerequisite for licensure and by the federal government as meeting the educational prerequisite for certain federal positions.

To obtain a state license to practice veterinary medicine or to successfully compete for certain federal veterinary positions, ECFVG certificate holders need to comply with all other state-specific licensure or federal employment requirements. Such licensure or employment requirements might include completion of national and state licensure examinations.

## Cost of Certification for New Candidates as of January 2019

**STEP 1**

Registration: $1,400 for two full years of active registration in the program.
Re-registration: $120 for each additional 2-year period.

**STEP 2**

Prices vary depending on examination taken; 2015 approximate range: $150-$200 (USD).

**STEP 3**

See **BCSE Candidate Bulletin** for current Basic and Clinical Sciences Examination fee.

EX.8

**STEP 4**

See **CPE Candidate Bulletin** for current Clinical Proficiency Examination fee.



## More About the ECFVG

- Certificate holders can seek licensure in any jurisdiction, because the ECFVG is the only veterinary educational equivalency certificate that is recognized in all 50 states, the District of Columbia, Puerto Rico, and the Virgin Islands.

- The ECFVG program provides EVERY graduate of ALL recognized non-accredited foreign veterinary schools the SAME opportunity to meet the state-mandated educational prerequisite for licensure in the US.

- Since its inception, the ECFVG has awarded more than 6,535 certificates to qualified candidates.

- Oversight of the ECFVG certification program is the responsibility of the ECFVG, an AVMA committee. Staff in the AVMA Education and Research Division assist the Commission and are responsible for the day-to-day operations of the certification program.

- See **Certification Program** for a quick introduction to the steps of the ECFVG certification process, or consult the **Program Steps** or the **Policies and Procedures** for detailed information.

- Because each state has specific prerequisites and requirements for licensure, the ECFVG strongly encourages candidates to contact the **veterinary regulatory board** in the state or U.S. territory in which licensing is desired to obtain up-to-date and complete licensure information.



### OTHER AVMA SITES

National Pet Week                 Animal Health SmartBrief





Contact | AVMA Careers | Help | Site Map | Privacy | Terms of Use

Copyright © 2019 American Veterinary Medical Association

Case 3:19-cv-00006-NJR   Document 63-1   Filed 01/13/20   Page 72 of 92   Page ID #523



(https://www.americanimmigrationcouncil.org)

Home (/) » Research (/topics)

SPECIAL REPORT

# Foreign-Trained Doctors are Critical to Serving Many U.S. Communities

January 17, 2018

416

There are more than 247,000 doctors with medical degrees from foreign countries practicing in the United States, making up slightly more than one-quarter of all doctors. Although the data used in this report does not contain information on country of birth or citizenship, evidence from other sources indicates that most foreign-trained doctors are not U.S. citizens—meaning that the majority are foreign-born. These doctors play a key role in providing healthcare for millions of Americans.

This report builds upon other studies that have looked at the critical role foreign-trained doctors play regionally, in underserved communities, in rural areas, and in providing primary health care. It finds that foreign-trained physicians are more likely than U.S.-trained doctors to practice in lower-income and disadvantaged communities and, as a result, their presence is critically important.

More precisely, this report examines foreign-trained doctors in Primary Care Service Areas (PCSAs) and analyzes the socio-demographic characteristics of the populations they serve (see Methodology). For instance, it finds that:

- In areas with the highest poverty rates—where more than 30 percent of the population lives below the federal poverty rate—nearly one-third of all doctors are foreign-trained.
- Where per-capita income is below $15,000 per year, 42.5 percent of all doctors are foreign-trained.
- Where 75 percent or more of the population is non-white, 36.2 percent of the doctors are foreign-trained.

- Where 10 percent or less of the population has a college degree, nearly one-third of all doctors are foreign-trained.

Foreign-trained doctors play such an important role in filling medical shortfalls in disadvantaged communities because of the large disparities in access to healthcare that exist in the United States. Research has found that minorities and the poor are less likely to have health insurance and less likely to have a regular source of medical care. African Americans and low-income Hispanics are more likely than Caucasians and Asians to live in "healthcare deserts"—areas with few or no primary-care physicians. African Americans and Hispanics may be up to twice as likely as whites to live in zip codes with few or no primary-care physicians.

The demand for foreign-trained doctors will only increase as the need for doctors and accessible, affordable healthcare in the United States continues to grow. The Association of American Medical Colleges found that the demand for doctors will continue to outpace supply, leading to a projected shortfall of between 46,100 and 90,400 doctors by 2025, many in primary care. These shortages are compounded by the fact that large numbers of doctors will be retiring in the next few years.

Yet U.S. immigration policies significantly limit the ability of these doctors to immigrate to and practice in the United States. As policy-makers debate what immigration reforms would best serve the national interest, they should keep in mind that foreign-trained doctors are already taking the lead on providing care to many communities across the United States.

## One-quarter of All Doctors in the United States are Foreign-trained

Just over one-quarter of doctors in the United States were "foreign-trained" as of 2017, meaning that they received their medical degrees from schools outside of the United States (Table 1). Some of these doctors are U.S. citizens who went abroad for medical school. However, most are not.  From 1992 through 2016, 81.3 percent of the 234,850 certifications issued by the Educational Commission for Foreign Medical Graduates (ECFMG) were non-U.S. citizens. (ECFMG issues certifications to International Medical Graduates (IMGs) who have passed the first three components of the United States Medical Licensing Examination, and whose final medical diploma and transcript have been directly verified.)

### Table 1: U.S. Physicians by Training Location, 2017

|  | Number of Practicing U.S. Physicians | Percentage of Total |
|---|---|---|
| U.S.-Trained | 727,000 | 74.6 |
| Trained Abroad | 247,449 | 25.4 |
| Total U.S. Physicians | 974,449 | 100 |

# Gender Composition

## 49,958
**FEMALE WORKFORCE**
± 4,182

## 26,911
**MALE WORKFORCE**
± 3,027

65% of Veterinarians are Female, making them the more common gender in the occupation. This chart shows the gender breakdown of Veterinarians.

Dataset: ACS PUMS 1-year Estimate
Source: Census Bureau







GENDER

2014 | 2015 | **2016**

# Race & Ethnicity

**MOST COMMON RACE OR ETHNICITY OF VETERINARIANS**

1. White
2. Asian
3. Two or more races

93.2% of Veterinarians are White, making that the most common race or ethnicity in the occupation. Representing 2.45% of Veterinarians, Asian is the second most common race or ethnicity in this occupation. This chart shows the racial and ethnic breakdown of Veterinarians.

Dataset: ACS PUMS 1-year Estimate
Source: Census Bureau



RACE OR ETHNICIT

2014 | 2015 | **2016**



PLAINTIFF'S EXHIBIT
11

Ex.11





Share: ✉    Like 0    Share

## Veterinarians challenge AVMA status quo

USDE taps COE to evaluate foreign schools amid calls to upend how the accrediting body operates

July 3, 2015
By Jennifer Fiala

With the American Veterinary Medical Association's annual gathering of policymakers on the horizon, opposing stakeholders are posturing ahead of next week's House of Delegates meeting in Boston.

Accreditation and what role, if any, the AVMA should have in that process are topics of several resolutions on the House's agenda, even as the U.S. Department of Education (USDE) grants the AVMA new authority to accredit foreign programs — a duty separate from agency's recognition process for accrediting domestic veterinary education.

The AVMA's accreditation arm, the Council on Education (COE), is a 20-member volunteer body that has operated under the association's umbrella since the 1950s, when USDE named it the nation's sole programmatic accreditor of domestic veterinary education. Programmatic accreditors provide schools, including foreign programs that cater to U.S. citizens, the ability to offer students access to professional loans under Title VII of the U.S. Public Health Act.

For years, a growing faction of veterinarians have challenged how the COE operates, so much so that its status as a programmatic accreditor is in question.

In a twist, however, USDE tapped the COE for a bigger role — ensuring that foreign veterinary schools are qualified to participate in Title IV federal student aid, which includes programs such as Pell Grants, Direct Loans and Perkins Loans. The COE's new authority began July 1, per federal regulations that ordered USDE to find an accrediting body to do the job previously held by the National Committee on Foreign Medical Education and Accreditation (NCFMEA)

The irony: Turmoil still surrounds how the COE operates domestically and its self-imposed mission to accredit foreign programs, a role the USDE now has mandated. How delegates, particularly those calling for change, will respond is unknown.

For nearly half a century, the COE attracted little controversy. That's no longer the case.

As the AVMA's primary policymaking body, the House comprises delegates from every state and 18 allied groups who are elected or assigned to represent constituent association members. Up for consideration are two resolutions to reform the COE, either by enacting a yearlong moratorium on accreditation or creating an independent review board to restructure the evaluating body. A third resolution, submitted by six veterinary medical associations, moves to cut AVMA ties by establishing a new accrediting body with its own bylaws, budget and staff

Voting will take place July 10 in Boston as the AVMA kicks off its annual convention. Already, there's been lobbying to sway delegates, including a grassroots initiative to foster member-delegate communication and a letter by AVMA top brass, both owing to the topic's contentious nature.

### Drug and Food Recall Center
‹ CLICK HERE ›

### Search VIN News Service

[ Enter search term(s) ] [ GO ]

### Follow us

   

### About us

Mission

Reprint policy

Letters policy

FAQ

Meet the news team

Add VIN News Service logo to your site

### Recent stories

Zoetis buys veterinary diagnostics company ZNLabs - 11/22/2019

Inside veterinary education at Long Island University - 11/21/2019

Has the no-kill movement increased animal suffering? - 11/18/2019

British veterinary practice chain CVS shuffles management - 11/12/2019

Lawmakers, DVMs expand care for pets of homeless people - 11/12/2019

Veterinarians resist Utah's plan to tax care - 11/8/2019

See more stories »

### Search archives by category

Academia & Education

Associations & Organizations

Business & Economics

Clinical Practice

Disease Outbreaks & Information

Emergencies & Disasters

Employee & Professional Support

Industry

Legal Issues

Opinion

Pharmaceuticals

Regulations & Legislation

Research

Scope of Practice

Ex.11
State of the Profession
Work & Life

**Blogs worth reading**

Vetzinsight

The Veterinary Idealist

Worms & Germs blog

During the past few years, not a single House meeting has concluded without debate about accreditation. The battle between veterinarians seeking to change the COE and AVMA officials fighting to maintain the status quo has resulted in the creation of a task force, reports, letters, videos, meetings and two highly publicized reprimands from a USDE oversight panel regarding COE shortcomings that include lacking consistency, conflicts of interest and a strained relationship with the profession.

Critics have expressed concerns that the evaluating body has bowed to an AVMA mission to accredit foreign schools, stripping U.S. veterinary programs of needed attention. Proponents for change contend that the AVMA maintains too much influence over the COE, which is supposed to operate autonomously, spurring allegations of cronyism and political jockeying.

To alleviate scrutiny and comply with USDE demands, AVMA and COE officials recently made several changes to better ensure that a firewall exists between the two groups. Advocates for spreading U.S. accreditation overseas believe it's needed to elevate veterinary medicine internationally and suggest other accrediting bodies will do the job if America doesn't step in. The hubub over how the AVMA and COE operate is rooted in a lack of knowledge about accreditation processes, they contend.

Dr. Chip Price, chair of the AVMA Board of Directors, echoed as much in a June 25 letter to delegates asking on behalf of board that they vote against all three resolutions to alter COE operations. Accompanying the letter was a eight-page chart comparing the accreditation practices of several other health professions.

There's no "substantive evidence" to justify the call for change, he said.

"Simply put, it is not clear to the board what problem the resolutions are attempting to resolve," Price concluded. "Further, the reasoning behind the resolutions reveals a fundamental lack of understanding of programmatic accreditation and the role of the (USDE) in the process."

## Multiple narratives

How, what and where veterinary programs are evaluated provide overview and context for the accreditation saga, yet the smaller moving parts — the fight for and against accrediting foreign and nontraditional schools, a lack of transparency regarding accreditation processes and fears that agenda-driven leaders pull strings for their own benefit —  have captivated many in the profession.

The firing of Dr. Mary Beth Leininger and her fight to regain a seat on the COE is one such event.

Leininger, a former AVMA president, was kicked off the COE last spring after publicly suggesting that the body might be stretched thin between its responsibility to evaluate a growing number of domestic programs and mounting requests to assess schools overseas.

The COE has accredited 14 programs outside the United States and Canada, eight of which were recognized during the past decade. Thirty veterinary colleges have been evaluated on U.S. soil and five are based in Canada.

Leininger was accused of expressing opinions that conflicted with her role as a COE member, an accusation she rejects. The AVMA Board of Governors will hear her appeal on July 7 in Boston, two days before the House is scheduled to convene. It's unclear when a decision might be rendered; the meeting is closed to the public despite Leininger's request to keep it open, at least to AVMA members.

Transparency is a theme that goes beyond Leininger's push for an open hearing. Apart from accreditation, other resolutions before the House include a call for pharmacists to receive more education in veterinary pharmacology and an edited policy on how dogs and cats are used in research, testing and education. There's also a new draft on veterinary ethics and several

proposed bylaws changes involving term limits for volunteers in governance.

Lastly, an attempt to make House voting records transparent — an idea delegates have shunned in the past due to fears that disclosing voting records would invite public scrutiny — could incite debate.

Submitted by veterinary medical associations in New Hampshire and Vermont, the resolution postulates that "trust is a necessary part of any successful organization and the (House) needs to trust its members and to be trusted to help lead the AVMA."

Veterinarians such as Dr. Bonnie Bragdon, an AVMA member who does not belong to a state association, say they feel disenfranchised by the AVMA's governance structure. A lack of transparency, she stated, compounds the problem.

"Are we the Freemasons?" she quipped about the secrecy surrounding voting records. Given that she's not a member of a state group that selects delegates, she added, "I feel like I have no access to my national association."

In an effort to be heard, Bragdon and others launched "Under the microscope," a website that opines on the state of veterinary accreditation and other controversies in the profession. Last month, a means for AVMA members to identify and email their delegate representatives was added to the site. Users plug in their state of residence or allied association and names of their House representatives appear, prompting them to email a form letter or erase the text to create a unique message.

"The AVMA's House of Delegates will review a number of resolutions this summer at the annual conference in July. Here are three resolutions we think you should know about," the website stated, listing those involving accreditation.

Some 130 veterinarians have participated. Another 1,000 are members of the website's closed group on Facebook. Bragdon, an industry consultant and the site's moderator, is hoping those numbers will climb. She struggles to get people's attention but doesn't want to be inflammatory, something the site's been accused of in the past.

"I really do want to be a positive constructive person who changes the world, but unfortunately, I feel like people aren't listening," Bragdon said. "I don't know whether it's apathy or the AVMA. The AVMA does seem to shut out dissenters."

She later observed, "It seems to me that sometimes, if we don't put pressure on, they don't take us seriously."

**Federal expectations**

If AVMA officials aren't feeling pressure, the federal government could change that.

Last December, the National Advisory Committee on Institutional Quality and Integrity (NACIQI), an 18-member oversight committee within USDE, ordered the AVMA and COE to make several fixes such as reaching out to critics and demonstrating wide acceptance among practitioners. If that doesn't happen within a year, the COE could lose its status as a programmatic accreditor.

Critics surmise that student-loan access — not the prestige associated with U.S. accreditation — is driving overseas institutions to seek the COE's approval. U.S. accreditation helps foreign programs attract American students who pay a premium for tuition due to their international status.

Now that the COE is a gatekeeper for Title VII *and* Title IV eligibility, U.S. veterinary accreditation is even more attractive. Two other accrediting bodies also received USDE's approval to be a Title IV evaluator, including the Royal College for Veterinary Surgeons and the Australasian Veterinary Boards Council.

In a letter dated June 30, USDE officials notified the AVMA-COE Director Dr. Karen Brandt that the COE was selected. According to AVMA officials, this foreign accreditation duty runs separately from recognition process for domestic accrediting agencies.

"I am writing to inform you of my decision ...," wrote Gail McLarnon, senior director of USDE's Policy Coordination Group. "Department staff reviewed the processes and accreditation standards the AVMA-COE uses to accredit veterinary schools and has determined that the AVMA-COE has an acceptable quality assurance system for evaluating the educational quality of veterinary schools ...

"I concur ..." McLarnon continued. "Please convey my appreciation to the members of the AVMA-COE. Your organization's willingness to participate in this process is greatly appreciated and will give U.S. students access to U.S. federal student aid while attending veterinary schools accredited by the AVMA-COE."

*Editor's note: This article was amended to include news that in addition to the COE, the Royal College of Veterinary Surgeons and Australasian Veterinary Boards Council also received the USDE's nod to act as a Title IV gatekeeper.*

URL: //news.vin.com/doc/?id=6854258

---

**Related resources**

- COE seeks to retain authority over U.S. veterinary schools - *July 29, 2019* 🖾

- Another review of AVMA COE nears - *March 31, 2016* 🖾

- Leininger wins appeal - *August 5, 2015* 🖾

- Leininger appeal culminates without resolution - *July 8, 2015* 🖾

- Stakeholders urge veterinary accreditation overhaul - *June 9, 2015* 🖾

- Veterinarians urge AVMA to spin off accrediting body - *January 26, 2015* 🖾

- Government orders COE to mend rift with veterinarians - *December 16, 2014* 🖾

- USDE staff heeds 800-plus complaints against AVMA COE - *December 4, 2014* 🖾

- Government review of veterinary accreditation nears - *September 22, 2014* 🖾

- 'Call to action' sounded in long battle over veterinary accreditation - *July 21, 2014* 🖾

- Bid to end foreign veterinary accreditation dies at AVMA meeting - *January 16, 2014*

- Overseas opinion dulls repute of AVMA accreditation as 'gold standard' - *September 16, 2013*

- AVMA leaders mull organization's future in international accreditation - *June 4, 2013*

- Government orders veterinary-school accreditor to correct problems - *December 14, 2012*

- AVMA's role as education accreditor scrutinized - *December 11, 2012*

- AVMA task force to review merits of foreign accreditation - *July 20, 2011*

- Resolutions ask AVMA to explore foreign accreditation, globalization efforts - *May 20, 2011*

- AVMA seeks third-party audit of accreditation program - *December 10, 2010*

- Foreign-school accreditation clash continues in JAVMA - *July 21, 2010*

- Veterinarians question AVMA's role in international accreditation - *July 13, 2010*

- What's happening with accreditation of foreign health professional schools? - *July 13, 2010*

- Accreditation under fire in veterinary medicine - *February 26, 2010*

Share:    ✉    Tweet    Like    Share   Sign Up to see what your friends like.

Send us feedback about this article

800.700.4636   | news@vin.com |   VIN Policies 🔒 |   530.756.4881 |   Fax: 530.756.6035
From the UK:   01 45 222 6154   | From Australia:   02 6145 2357
777 W. Covell Blvd, Davis, CA 95616
*Copyright* 1991-2019 Veterinary Information Network, Inc.




PLAINTIFF'S
EXHIBIT
**12**



**July 15, 2014**

# Antitrust caution clashes with workforce concerns

## FTC says it's watching associations' activities

**By Malinda Larkin**

**Posted July 1, 2014**

When talk of the veterinary job market has arisen, some have said the AVMA should take action to limit the number of veterinary graduates. Or that the AVMA Council on Education should no longer accredit foreign veterinary schools as a result of perceived workforce issues associated with students graduating from these institutions who come to the U.S. to practice. But recent remarks from the Federal Trade Commission indicate those ideas may be a nonstarter.

Concerns about the effects of veterinary college accreditation on the veterinary workforce here in the United States gained momentum around the time the AVMA COE accredited the National Autonomous University of Mexico School of Veterinary Medicine and Animal Husbandry in Mexico City in 2011. Since then, these issues have been debated endlessly on message boards, at professional meetings, and even among members of the AVMA House of Delegates and Executive Board.



Most recently, Dr. Robert R. Marshak, dean emeritus of the University of Pennsylvania School of Veterinary Medicine, sent a letter this spring to state VMAs asking them to support him in his efforts to persuade the Department of

1/30/2019 Case 3:19-cv-00096-NJR Document 63-1 Filed 01/13/20 Page 81 of 92 Page ID #532
Antitrust caution: Trade associations shouldn't attempt to limit competition in the workforce or elsewhere

EX.12

Education's National Advisory Committee for Institutional Quality and Integrity to recommend that the USDE withhold recognition of the COE as the accrediting body for veterinary medicine until reforms are made to its composition—not mentioning the fact that most of these reforms had already taken place (*see JAVMA*, Sept. 1, 2013).

In the letter, Dr. Marshak wrote as one of his arguments against the COE: "This proliferation of accredited vocational and foreign schools, and the increase in student numbers to make up for severe cut backs in funding for our traditional state supported schools, are adding significantly to the number of new graduates, many marginally trained, at a time when there is already a surplus of veterinarians and the applicant pool as a whole appears to be diminishing. ... *The negative financial impact of the growing workforce surplus on private veterinary practices, especially in an economy that may take decades to recover, cannot be overestimated.*" (emphasis in original)

## A little friendly competition

According to the FTC, it's not for the AVMA to decide how many veterinarians are in the marketplace. The FTC issued a release May 1 (available here) stating it continues to focus on trade associations' compliance with antitrust laws and it is watching their activities.

"It is a fundamental principle of antitrust law that competitors—whether businesses or individuals—cannot join together to limit the way that they offer products or services to potential customers, especially where there is no legitimate business purpose other than avoiding competition. Strictly speaking, competitors are expected to compete," according to the press release.

The FTC went on to relate how it obtained settlement agreements with two trade associations at the end of 2013 for unreasonable trade association rules. In one case, an association of legal support professionals not only banned comparative advertisements but also prevented members from offering discounted rates to another member's clients or recruiting another member's employees without giving prior notice.

In the other case, an association of music teachers' code of ethics prevented members from soliciting clients from a rival, in effect preventing them from offering services to students who were already taking lessons from another member.

Each association agreed to settle the FTC charges and to change its rules.

"These cases serve as a reminder that the commission, as it was a century ago, remains vigilant about trade association activity that restrains competition among the members without a legitimate business justification. If you are a member of a trade association or provide counsel to one, remember that there are no special antitrust rules for trade associations. Trade association rules, codes, or bylaws that seek to override the normal give-and-take among competing members may interfere with the competitive process and risk antitrust review. When in doubt, trade associations may apply for a staff advisory opinion regarding proposed rules that potentially raise antitrust concerns," the FTC wrote.

## Keeping an eye out

Isham Jones, the AVMA's general counsel, says there are two important things to note about the FTC's press release. First, the two associations mentioned were small players, not larger corporations such as Google or IBM that are more likely to make headlines when it comes to antitrust activities, the point being that the FTC does not focus only on big companies but also goes after small nonprofit entities.

Second, Jones noted it was "somewhat odd" that the FTC would issue a press release solely to tell associations that it's watching their activities.

"It's more common to say we just did this or will do this initiative. They did issue a press release with the settlements, but this went further. I take this as a lesson that they're watching what associations do," Jones said.

He continued, "Associations, unfortunately, are inherently suspect because they're groups of competitors coming together to better their businesses. For the AVMA, part of what we do is to ask, 'How can we make veterinary medicine a more profitable endeavor?' When that is part of the goal, antitrust regulators will watch to see how groups are going to do that without violating the law. There are thousands of ways to do it but equally as many traps they can fall into that raise scrutiny."

1/30/2019　Case 3:19-cv-00096-NJR　Document 63-1　Filed 01/13/20　Page 82 of 92　Page ID #533
Antitrust caution reaches individual workforce as well

EX.12

> "Associations, unfortunately, are inherently suspect because they're groups of competitors coming together to better their businesses. For the AVMA, it's 'How can we make veterinary medicine a more profitable endeavor?' When that is part of the goal, antitrust regulators will watch to see how groups are going to do that without violating the law. There are thousands of ways to do it but equally as many traps associations can fall into that raise scrutiny."

*-Isham Jones, AVMA's general counsel*

## Applies to practices as well

Individual veterinarians, too, need to watch for violating antitrust rules, which aren't always intuitive or obvious, Jones said.

"Practitioners shouldn't be banding together with other practices to say, 'We're going to charge a certain amount for a spay or neuter.' Or say they're not going to buy (a company's) products because they're selling to big-box stores. That's likely to be viewed as unlawful. Same with dividing up markets; 'You take everything north of here, and I'll take everything south of here,'" he said.

Prior to the Veterinary Economics Strategy Committee's meeting in May, Michael Dicks, PhD, director of the AVMA Veterinary Economics Division, advised committee members to be vigilant that their actions do not restrain competition among AVMA members or prevent new Association members from being able to compete.

"Providing information about supply, demand, and prices is not a problem, but the suggestion by even a single member to constrain supply or set prices is likely to be viewed as attempting to use the power of the association to restrain competition. Thus, we need to be ever vigilant about our comments as VESC members both at the meeting and in public. As an example, discussing workforce issues is not a problem nor is discussing accreditation a problem. However, when the two are talked about together this is a problem," Dr. Dicks wrote.

He says that veterinarians need to keep in mind the value of the market in its ability to efficiently allocate resources.

"If the resources are not being allocated correctly, it is not our job to fix the market but to remove the factors that prevent it from working efficiently," he said. "I believe the job of AVMA is to provide the best unbiased information to all market participants so that they can make informed resource allocation decisions. This will reduce the long periods between excessive excess capacity and insufficient capacity, in essence, improving market efficiency."

The economics division and the Veterinary Economics Strategy Committee have been working on three economic studies. They are as follows:

- An elasticity study that will determine the effects of the price of veterinary services and customer disposable income on the demand for veterinary services.
- An employment study that will look at how many veterinarians have been unemployed or underemployed and for how long, in addition to whether their status is temporary or permanent and why.
- A capacity study that will determine the difference in characteristics between veterinary practices operating at excess capacity and those operating at full capacity.

The results will be announced during the AVMA Veterinary Workforce Summit on Oct. 28. In the meantime, the economics division along with the AVMA Membership and Field Services Division and the Early Career Development Committee is developing a budgeting tool that will help veterinary students and early-career veterinarians develop personal budgets. The goal is to help them understand the effect of various degrees of debt, debt repayment, and income on their budget.

These actions likely won't satisfy every Association member, but the AVMA recognizes members aren't the only ones watching what it does.

## Related *JAVMA* content:

**Statistics shed light on international education** (June 15, 2013)

**Speaking different languages** (May 15, 2010)

**'Philisophical differences of opinion**" (Feb. 15, 2013)

**Board keeps course on foreign veterinary school accreditation** (Aug. 1, 2013)

Copyright © 2019  American Veterinary Medical Association







# USDE staff heeds 800-plus complaints against AVMA COE

Report calls for significant change for accrediting agency

December 4, 2014
By: Jennifer Fiala
For The VIN News Service

Six months to a year, tops.

That's all the time staffers at the U.S. Department of Education (USDE) want to give the American Veterinary Medical Association to fix a myriad of alleged deficiencies within its accrediting body, the Council on Education (COE).

USDE staff outlined their grievances in a report, released Monday. The fact that USDE received more than 900 letters, most from veterinarians critical of the COE's performance, was referenced throughout the analysis.

On the table is the COE's re-recognition as the sole accreditor of veterinary education in America. The harsh critique from USDE staff is remarkable for the AVMA COE, which has evaluated veterinary academia since the early 1950s.

AVMA and COE officials did not respond to VIN News Service requests for their perspective.

The USDE staff report is intended to guide the agency's National Advisory Committee on Institutional Quality and Integrity (NACIQI), an 18-member panel of auditors that advises the Secretary of Education on the recognition of higher education accreditors.

The AVMA COE will appear before NACIQI on Dec. 11 in Arlington, Virginia, in response to a 2012 edict by auditors to become more consistent, transparent, inclusive and, among other things, weed out conflicts of interest.

While NACIQI reconsiders the COE's appointment every five years, the auditors' tough look in 2012 was encouraged by veterinarians who testified before the panel, accusing the accrediting body of being overly influenced by AVMA politics and operating outside of federal guidelines and directives.

During the past two years, AVMA officials say they've modified how the COE functions by inviting the Association of American Veterinary Medical Colleges (AAVMC) to get more involved with accreditation. They've also tweaked standards that weren't uniformly applied to foreign programs and schools without teaching hospitals. Volunteers who go on site visits are no longer COE members with a voting stake in a program's accreditation. As for transparency, more information about COE actions is being provided online, AVMA officials say.

That's not enough, many veterinarians say. Some assert that the COE operates in a vacuum, steered by the deep-seated influence of AVMA politics. Others point to the sudden firing of Dr. Mary Beth Leininger. The former AVMA president was kicked off the COE last spring after questioning the use of resources to accredit foreign programs, an undertaking that for years has generated heated debate among veterinarians.

USDE staff reference this discontent in their report, calling the widespread negative perception of the COE a violation of the Code of Federal Regulations, section 602.13: acceptance of the agency by others.

"...The department has received over 900 comments from educators, educational institutions and practitioners against the agency's continued recognition, which allege inconsistent application of agency standards, undue political influence from the (AVMA), and non-acceptance of the agency's standards and processes," the staff report says.

Ninety-eight comments were received in support of the COE, and deans at 26 of the country's 30 veterinary programs advocated for continued recognition of the accrediting body.

EX.13

Nevertheless, USDE staff gave weight to the volume of those critical of the accrediting body.

"Due to the outstanding sections of non-compliance and the overwhelming number of negative comments received from educators, the agency remains non-compliant under this section as it has not demonstrated wide acceptance among educators," the report said.

"Given that the vast majority of negative comments received were from practitioners," the report continued, "the agency has further not demonstrated wide acceptance among practitioners."

USDE staff summarized the negative comments this way:

• Non-acceptance of current COE standards and processes, with accusations that standards are vague, inconsistently enforced and weakened to justify the accreditation of substandard schools.
• The commingling of the AVMA and AAVMC and allegations that these groups' close oversight of the COE breeds conflicts of interest. The COE acts at the whim of AVMA leaders whose interests might conflict with the good of the profession and public.
• The profession's progress as a science-based medical profession is compromised due to the accreditation of substandard schools that lack robust research programs and the inadequate training of graduates.
• The decision to accredit foreign veterinary schools was made unjustly by the AVMA Executive Board and not the COE. The decision is strongly opposed by many in the veterinary community.

USDE staff also had complaints of their own, chiefly the validity of using pass/fail rates of the North American Veterinary Licensing Examination (NAVLE) to assess the educational performance of programs.

In 2012, NACIQI pointed out that requiring an 80 percent NAVLE pass rate worked for domestic programs where the vast majority of graduates take the examination. However, it less accurately assesses foreign programs due to low numbers taking the test.

The AVMA has since tweaked the standard to better reflect the smaller pool of NAVLE test takers at overseas institutions. Even so, USDE staff remained unsatisfied with the changes.

Another standard that isn't uniformly applied is the research requirement, the staff report said. "... This would be yet another example of a problem in applying the same standard for foreign and domestic schools, which further underscores third-party commenters concerns."

USDE previously wasn't focused on the AVMA's overseas accreditation efforts, but that's changed given a new federal mandate. By June 2015, foreign programs will need to be accredited in order to offer American students access to federal student aid.

The USDE has not yet named the evaluating bodies charged with accrediting those foreign programs.

"Although they are outside the scope of the recognition process, such allegations raise concerns regarding the agency's operations and consideration of input of its communities of interest," the report said. "Further notable is that American students attending foreign veterinary schools may be eligible for direct loans based on AVMA or other accreditation, and it therefore is of concern to the department."

As long as the AVMA COE is accrediting foreign programs, "it will use an established, evidenced-based evaluation process subjected to independent, third-party review..." the report continued.

In a response published in the USDE staff report, AVMA officials stated that its foreign accreditation activities are outside of the USDE's purview. "As such, we believe this is a professional dispute that should be resolved within the profession," the AVMA stated.

The AVMA attributed much of the criticism to a vocal faction of the profession that aims to protect the American workforce from oversaturation by slowing the entry of new graduates into the marketplace.

That's an objective the AVMA must ignore, association leaders stated. "As a private accrediting agency subject to federal antitrust laws, we cannot make a determination about the number of types of veterinary schools based on concerns regarding the number of veterinarians in the United States."

The AVMA also took issue with how the federal government tallied the critical feedback it received, but in the end, USDE staff insisted that their numbers were correct.

ADDITIONAL TABLE-300 plus comments against Agency COE - VIN.ai

"The department has received approximately 935 comments; 98 in support of the agency (AVMA) and 837 against the agency," the report said.

URL: //news.vin.com/doc/?id=6542142

## Related resources

- [Another review of AVMA COE nears](#) - *March 31, 2016* 🗎

- [Leininger wins appeal](#) - *August 5, 2015* 🗎

- [Leininger appeal culminates without resolution](#) - *July 8, 2015* 🗎

- [Veterinarians challenge AVMA status quo](#) - *July 3, 2015* 🗎

- [Stakeholders urge veterinary accreditation overhaul](#) - *June 9, 2015* 🗎

- [Veterinarians urge AVMA to spin off accrediting body](#) - *January 26, 2015* 🗎

- [Government orders COE to mend rift with veterinarians](#) - *December 16, 2014* 🗎

- [Government review of veterinary accreditation nears](#) - *September 22, 2014* 🗎

- ['Call to action' sounded in long battle over veterinary accreditation](#) - *July 21, 2014* 🗎

- [Bid to end foreign veterinary accreditation dies at AVMA meeting](#) - *January 16, 2014* 🗎

- [Overseas opinion dulls repute of AVMA accreditation as 'gold standard'](#) - *September 16, 2013* 🗎

- [Lincoln Memorial's veterinary college receives accreditation go-ahead](#) - *July 17, 2013* 🗎

- [Midwestern veterinary college earns nod toward accreditation](#) - *June 20, 2013* 🗎

- [AVMA leaders mull organization's future in international accreditation](#) - *June 4, 2013* 🗎

- [Government orders veterinary-school accreditor to correct problems](#) - *December 14, 2012* 🗎

- [AVMA's role as education accreditor scrutinized](#) - *December 11, 2012* 🗎

- [St. George's veterinary school receives U.S. accreditation](#) - *September 23, 2011* 🗎

EX.13

- AVMA task force to review merits of foreign accreditation - *July 20, 2011*

- Resolutions ask AVMA to explore foreign accreditation, globalization efforts - *May 20, 2011*

- Ross' veterinary medical school earns U.S. accreditation - *March 9, 2011*

- AVMA seeks third-party audit of accreditation program - *December 10, 2010*

- Texas veterinarians mull reviving bid to examine AVMA's role in global accreditation - *August 19, 2010*

- Foreign-school accreditation clash continues in JAVMA - *July 21, 2010*

- Veterinarians question AVMA's role in international accreditation - *July 13, 2010*

- What's happening with accreditation of foreign health professional schools? - *July 13, 2010*

- St. George's shuns rumors of closing, seeks U.S. accreditation - *May 14, 2010*

- UNAM appeals failed bid for U.S. accreditation - *April 22, 2010*

- Prospect of accreditation for Mexican program fuels concern from U.S. veterinarians - *March 12, 2010*

- Western U receives full accreditation - *March 5, 2010*

- Accreditation under fire in veterinary medicine - *February 26, 2010*

- Osburn resigns from Banfield board of directors - *February 13, 2010*

View all articles

Send us feedback about this article

Advertise     Contact     Subscribe     E-mail Signup     View the Canadian version of the site

Login / Register

Subscribe

E-mail Sign-up

# Veterinary
# Practice News



PLAINTIFF'S EXHIBIT
**14**

WHAT ARE STEROIDS COSTING YOUR CLIENTS AND PRACTICE?     ZOETIS PETCARE     ⌄ EXPAND

## Open Letter to AVMA Board Chairman Chip Price and Responses, March 2015 Letters

Print full article  ☆

**The March 2015 issue of Veterinary Practice News presented an open letter from four noted veterinary professionals to AVMA board of directors chairman Chip Price along with responses from Dr. Price and from Western and Lincoln Memorial universities, which the open letter references.**

March 2, 2015



LDPROD/ISTOCK/THINKSTOCK

**By Veterinary Practice News Editors**

*Should the Council on Education remain the accrediting body for U.S. veterinary colleges? Should the council still accredit foreign schools? What role should the American Veterinary Medical Association continue to play in the council's work? Do conflicts of interest exist? These are some of the questions at the root of a raging debate in the veterinary community. Veterinary Practice News presents an open letter from four noted veterinary professionals to AVMA board of directors chairman Chip Price along with responses from Dr. Price and from Western and Lincoln Memorial universities, which the open letter references.*

### Open letter to AVMA board chairman Chip Price

Dear Dr. Price,

Our profession, concerned about the proliferation and accreditation of veterinary schools that fail to meet Council on Education (COE) standards, has turned a critical eye on the AVMA's leadership, its culture, judgment, vision for the future and capacity to lead. Membership approval of AVMA policies, procedures, decisions and philosophy can no longer be taken for granted.

We hope, therefore, that you will consider using the precious commodity of time left in your tenure as AVMA board chairman to begin a process that will result in a more transparent, responsive, inclusive and accountable organization, an organization that welcomes, rather than scorns, dissenting views.

Suggested Veterinary Products

SOFTWARE & APPS
**VetTools Buddy**
From VINx

BUSINESS & FINANCIAL, OTHER MEDICAL EQUIPMENT & SUPPLIES, PHARMACY
**CUBEX Mini**
From CUBEX

Get Our Free Newsletter

Comprehensive and timely coverage industry news delivered right to you

Click here to sign-up!

Editor's Picks

**The Flip Side**

**Products Help In Equine Oral Exams**

**Why Heartworm Preventive Sales Sh Go Over The Counter**

**Vet Blood Banking Endures Growing**

**How Class IV Lasers Evolved**

It is also past time to consider seriously whether the AVMA's top officers and executive staff, whose response to criticism is to circle the wagons, deny the obvious and bend the truth, should be replaced by new blood. Such board action is normal practice by companies, corporations and organizations that have lost the confidence of their investors or membership.

The U.S. Department of Education's "wide acceptance" requirement (Criteria for Recognition 602.13) was a topic of great concern at the recent meeting of the National Advisory Committee for Institutional Quality and Integrity (NACIQI). Preliminary to the meeting, NACIQI had received letters supporting COE autonomy and independence, i.e., separation of the COE from the AVMA, from six state veterinary medical associations: California, Nebraska, New Jersey, New York, Pennsylvania and Texas. These six VMAs represent tens of thousands of veterinarians, an estimated quarter to half of the AVMA's total membership.

NACIQI also had received an avalanche of letters opposing continuing recognition of the COE as the accrediting agency for American veterinary schools from individual practitioners and educators, former COE members, AVMA past presidents, the past executive director of the North American Veterinary Licensing Examination (NAVLE) and the president of Cornell University. Veterinarian-scientists and administrators opposed to continuing recognition included, among many, six members of the National Academies Institute of Medicine, the discoverer of the Ebola and Marburg viruses, a recipient of the National Medal of Science and member of the National Academy of Sciences, two sitting veterinary deans, and former deans and associate deans.

During decades of AVMA membership we have witnessed a gradual, now accelerated, disillusionment with the organization, its self-aggrandizement (such as the COE's "gold standard" refrain), aversion to criticism, narrow vision, conflicts of interest, revolving-door politics and the executive board's pusillanimous surrender when threatened with a lawsuit by Western University of Health Sciences. The board's disastrous interference in the Western case has resulted in permanent inestimable harm to the fabric of American veterinary medical education, devaluing the DVM/VMD degree, and encouraging the proliferation of additional substandard for-profit type schools.

Although the USDE Criteria for Recognition 602.18 requires that an accrediting agency must consistently enforce its standards, the COE regularly ignores this requirement based on the false premise that veterinary schools have different missions; this, despite the fact that the primary mission of every school is, and remains, the education of competent entry-level practitioners, and that the 11 standards—all of them—were designed to ensure society that this is in fact the case.

Even as the COE has steadily weakened its standards, some recently accredited schools still fail to comply with the letter and spirit of standards 3, 4, 6, 8, 9, 10 and 11. It is evident to us that schools recently granted full accreditation, e.g., Western, or provisional status, e.g., Lincoln Memorial, are essentially for-profit trade schools that mistakenly believe there will always be an applicant pool willing to pay very high tuition fees for an inferior education. A striking parallel can be found in Paul Campos' "The Law-School Scam," published in the September 2014 issue of The Atlantic, where he wrote that "for-profit schools are a capitalist dream of privatized profits and socialized losses," i.e., when students default on federally guaranteed loans American taxpayers must bear the burden.

Finding itself under increasing pressure, the COE has introduced some cosmetic reforms, e.g., AAVMC participation in the selection of COE membership, and has allowed the COE chair, rather than Drs. Ron DeHaven and David Granstrom, to speak for or respond to criticism of COE policies, procedures and decisions.

Perhaps eventually the COE will also consider disallowing the current practice of permitting board members to sit in on COE deliberations and ceasing the practice of expelling COE members whose conscience compels them to speak out in opposition to what they believe are wrongful AVMA-COE actions or policies. NACIQI members were visibly shocked to learn that this is what happened to Drs. William Kay and Mary Beth Leininger.

With reference to transparency issues, it was disturbing to hear Drs. Granstrom's and COE chairman Fred Derksen's responses to a question posed by a NACIQI member. When asked "Why do foreign schools seek AVMA accreditation?" they gave many reasons—globalization, desire for "gold standard" recognition, incentive to improve programs, etc.—while artfully dodging the main reason: the desire to attract American students who are eligible for U.S.-backed loans and willing to pay exorbitant tuitions.

No matter how many reforms are implemented, they likely will be rendered meaningless unless the COE is granted full autonomy and independence with its own budget, staff, working space and legal counsel, and unless the selection process for COE membership is freed of real and apparent conflicts of interest. The statements by Drs. DeHaven and Granstrom that a "firewall" separates the COE from the AVMA are false and disingenuous. Consider, for example, the board's insistence that the COE must continue to accredit foreign veterinary schools. Regardless of House of Delegates' approval, this is an outrageous example of the board's interference with the COE's autonomy and independence.

Among the most egregious conflicts is the fact that the AVMA-COE selection committee consists of AVMA board members, past AVMA presidents and other AVMA insiders. Such a committee, without a single educator, is ill-equipped to identify and choose individuals qualified to evaluate institutions as complex as schools of veterinary medicine. Moreover, they are unlikely to choose individuals who question COE standards, policies, procedures and decisions, or the AVMA's agenda or philosophy. It may be wise to consider the Liaison Committee for Medical Education's selection process by allowing the COE, with appropriate guidelines, to select its own replacements.

**You May Also Like  Toronto veterinarian honoured with OVMA award**

Unfortunately, the AAVMC's COE member selection process is also rife with real or apparent conflicts of interest, e.g., deans in a position to select fellow deans or members of their own faculties. Some deans serve or have served on the Banfield Pet Hospital board, a major proponent and supporter of schools like Western. And because our 30 veterinary school deans are likely to know each other well, they should be ineligible for COE membership.

Dr. Andrew Maccabe, AAVMC's executive director, and Dr. DeHaven assure the profession that the accreditation process is "standards and evidence driven" and that the COE has taken action to assure it remains in "strategic alignment with the changing needs of the profession and the society it serves." We find it hard to believe that the changing needs of the profession and society are well-served by encouraging and accrediting veterinary schools whose sole contribution to society is the mass production of marginally educated entry-level graduates.

We believe that most veterinarians would agree that the "changing needs" of the profession and society call for more, rather than less, top-quality science in the veterinary curriculum. Because we live in an age when biomedical science is advancing at a pace beyond anything previously witnessed in human history, veterinary school graduates without a solid platform in contemporary science and technology will be poorly prepared to understand and incorporate into their practices the remarkable developments in translational research, molecular medicine, genomics, stem cell biology and so forth. Moreover, at a time when the AVMA and AAVMC, faced with a rapidly growing surplus of entry-level practitioners, are urging veterinary school graduates to consider nonpractice careers, e.g., in research, academia, epidemiology, food safety and security, and industry, the COE is accrediting schools that do not prepare students to be able to consider seriously these exciting and important alternative careers.

Also, in advocating the distributive model as practiced by Western as an acceptable substitute for the traditional teaching hospital, Dr. Maccabe and his AVMA-COE colleagues fail to understand that outsourcing students for most or all of their clinical training to private practices has serious shortcomings. In such a distributive model, who is there to continually challenge and encourage students to question deeply, to cross boundaries between clinical disciplines, to make connections that produce deeper insights, to learn appropriate lessons from failure, to be consistent in doing their SOAPs, to experience the thrill of discovery and the potential for careers in research, and to appreciate that much of what they learn will be proven wrong a decade later?

For a distributive model to deliver a quality education requires a substantial investment in electronic equipment and faculty personnel to continually train, monitor and evaluate partner practices, excellent on-campus infrastructure for in-house clinical training, a strong basic science faculty, and state-of-the-art laboratories for veterinary student, graduate student and faculty teaching and research. In other words, it requires an environment appropriate for the intensely intellectual nature of veterinary medical education.

Located on the campus of a research university, only the Calgary Faculty of Veterinary Medicine, with its small class size (about 32 veterinary students), provincial funding and intimate medical school connections meets these requirements.

In sum, we must conclude that Dr. Maccabe's and the AVMA-COE's views are dangerously disconnected from and in extreme misalignment with the obvious changing needs of the profession and society. Indeed, rather than "evolving to meet the changing needs of the veterinary medical profession," as Dr. Maccabe asserts, the COE's decisions have slammed the brakes on the profession's progress, moving us back towards an earlier, less science-based era in veterinary medical education and practice.

Dr. Maccabe's assertion that Dr. Marshak believes it is "appropriate to use the accreditation process as a means to regulate or limit the number of veterinary graduates entering the work force" is a gross misreading of what he has written on several occasions, i.e., that while the COE cannot refuse a school's request to be considered for reasonable assurance, and eventually for full accreditation, it is not obligated to grant either if it is determined that the school clearly cannot now or in the future meet the required standards.

Indeed, it is imperative that the COE, despite the threat of lawsuits, refuse to accredit substandard schools, not to limit the number of graduates entering the work force but to ensure that each graduate has been properly trained and educated to begin the practice of veterinary medicine. Unfortunately, NAVLE, in its present iteration—specifically designed for the minimally competent entry-level graduate and with a universal pass rate in the 90s on first try—has little, if any, relationship to a veterinary school's educational quality. Entirely clinical, and with only 5 percent of new questions each year, the exam fails to test a graduate's knowledge and understanding of the increasingly complex basic science disciplines that underpin the practice of clinical medicine.

In closing, we hope you will consider acting boldly by introducing ideas and initiatives for study and action aimed at making the AVMA a more transparent, responsive, inclusive and accountable organization that welcomes constructive dissent. We believe that refreshing the AVMA's leadership team, moving as quickly as possible to give the COE complete autonomy and independence—its own budget, staff, working space and legal counsel—and remedying the COE's unacceptable membership selection process deserve particular attention.

Noting your long association with Louisiana State University, it is hard to resist mentioning that LSU's veterinary dean emeritus Mike Groves is one of Dr. Marshak's heroes. To the best of our knowledge, his brilliant letter, written in 2006, to the U.S. Department of Education was the first to question the USDE's continuing recognition of the COE as the accrediting agency for schools of veterinary medicine. Further, in a joint letter to NASIQI written in 2014, LSU Dean Joel Baines and Cornell Dean Michael Kotlikoff endorsed separating the COE from the AVMA.

Sincerely,

*Ralph Brinster, VMD, Ph.D. Richard King Mellon Professor of Reproductive Physiology, University of Pennsylvania  School of Veterinary Medicine, Recipient of 2011 National Medal of Science*

*William D. Hardy Jr., VMD, Director, National Veterinary Laboratory Inc.*

*Robert R. Marshak,  DVM, Dipl. ACVIM Professor emeritus of medicine and dean emeritus, University of Pennsylvania School of Veterinary Medicine*

*Robert D. Phemister, DVM, Ph.D., Dipl. ACVP Professor emeritus of pathology and dean emeritus, Cornell University College of Veterinary Medicine*

## Dr. Price responds:

I appreciate the opportunity to address the concerns presented by Drs. Brinster, Hardy, Marshak and Phemister.

**You May Also Like  Beyond the new year's resolution**

Many of their concerns are answered in detail in the professional development section of the AVMA website. Open to all are specific explanations of the rigorous and comprehensive peer review process that every veterinary school undergoes when seeking accreditation. There you will find:

• Detailed information about your colleagues serving on the Council on Education, including the Code of Conduct they must follow.

• Policies and procedures adhered to by site teams when evaluating whether a college is in compliance with the 11 Standards of Accreditation.

• Specific COE site team scoring rubrics, grids and schedules.

• Examples of how COE findings are used by the schools to continually improve veterinary education.

This information provides insight into the gravity with which site visits are conducted. It also helps clarify how veterinary schools that utilize the distributive clinical education model are evaluated to ensure graduates are fully prepared to practice veterinary medicine.

While we know the answers to many of the questions raised by the authors are available and transparent, they are not easily found or explained. There is always room for improvement.

For that reason, a listening session with COE representatives was held during the North American Veterinary Community conference and the Western Veterinary Conference. The comments and opinions gathered through these and other information-gathering processes will be considered by the full council at its next meeting in March.

Plans are underway for the COE to provide an update of proposed actions at the AVMA convention in July. All AVMA members, whether dissenting or not, are invited to share their thoughts on the AVMA@work blog or to send specific thoughts to *coe@avma.org*.

AVMA volunteer leaders and staff understand that the challenges the COE is facing are part of a larger issue, involving concerns about transparency and the value of  AVMA membership. We're taking strong action to better address member needs and ask for patience as these improvements continue to unfold. We are depending on constructive feedback from our members throughout this process, however repeated condemnation for perceived or even real missteps in the past are not helpful. It is difficult to move forward if you are mired in the past.

We are listening and taking action. The AVMA Economics Division was established three years ago to study the veterinary workforce and to provide the information and analysis needed to build programs to ensure the financial well-being of our members. The Early Career Development Committee was formed to build programs that help recent graduates reach their full potential. The new Personal Financial Planning Tool is an example of the type of products the Career Development Committee is developing.

The AVMA Veterinary Career Center was expanded to help veterinarians and employers find each other more readily. The AVMA helped initiate and continues to lead the Partners for Healthy Pets program to ensure pets receive the preventive health care they need through regular visits to the veterinarian.

When the use of controlled drugs off veterinary premises was threatened, the AVMA advocacy team led a successful campaign to pass the Veterinary Medicine Mobility Act. AVMA volunteers and staff work continuously at the state and national level to keep the profession informed and protected.

These are not the activities of people who wish the profession ill or would consider compromising their integrity for personal gain. No, these are the actions of people who have an unwavering commitment to the profession they hold dear and the members they have chosen to serve. These are the actions of those who possess an enduring desire to see that the profession flourishes for all who call it their own.

*Your colleague,*

*Chip Price, DVM*

*Chairman, AVMA board of directors*

## WesternU responds

The open letter to Dr. Price from Dr. Robert Marshak and others is filled with misstatements, inaccuracies and questionable assertions, starting with the misrepresentation of our university's tax status (WesternU is a nonprofit, 501(c) (3), graduate university of the health professions), which appears to be an unsubtle attempt to characterize the college as nothing more than a money-making enterprise. We take strong issue with such aspersions.

WesternU is in the middle of this firestorm because of an inability by some to understand how the COE determined that our CVM met accreditation standards. "The COE must have weakened the standards" is the simplest answer for those who have never taken time to read the standards, the college's self-study or the COE's Report of Evaluation. These same forces now question whether the Department of Education should continue to certify the COE as the profession's accrediting body.

Between the time the Letter of Assurance was issued and full accreditation was granted, WesternU CVM generated and submitted:

• 10 semiannual reports.

• Six annual reports.

• 11 progress updates and clarifications of our plans to meet the standards.

• Four comprehensive self-studies.

• At least 20 in-depth pieces of correspondence between WesternU and the COE, addressing nearly 700 questions, concerns, recommendations, requests for documentation and/or commendations.

Once the charter class arrived in 2004, the COE was a nearly constant presence on our campus. The liaison committee (or a subcommittee) visited the campus every year from 2004 to 2008 for comprehensive (two) or focused (three) evaluations. Since 2008, the COE has completed two additional comprehensive evaluations. During each comprehensive site visit, every facility we use to deliver our core curriculum—except for those facilities that belong to other COE-accredited institutions—was visited.

Several words could be used to describe the degree of scrutiny this process entailed. "Permissive" is not among them. Ceaseless assertions that the COE has steadily weakened its standards, or has failed to apply them consistently, come from those with the least knowledge and narrowest interpretation of those standards, and little to no knowledge of how we deliver our program.

Dr. Marshak asserts that he is familiar with our program. But he has not visited our campus since 2004—more than a decade ago—when our charter class was in its second year of the professional program and the clinical program had yet to be implemented. To our knowledge, none of the other distinguished signatories has ever visited our campus or sought information from us regarding concerns about our program.

**You May Also Like  A tale of four paws, two veterinary practices**

Repeated requests by members of NACIQI (and others) that Dr. Marshak provide evidence justifying his concerns has not been met by such evidence, but rather the incessant refrain that the COE—and everyone who accepts its assessment—is simply wrong. Refuting vague, evidence-free assertions of compliance failure is virtually impossible.

The quality of our program is best reflected in the performance of our graduates in the full breadth and scope of the profession, including their performance on the NAVLE. Dr. Marshak's argument about the NAVLE is troubling at best. He suggests that an

instrument designed to protect the public by assuring minimal competencies should have a relatively high first-time failure rate across all accrediting colleges before he will accept its validity. The implications of actually implementing such a tool are unthinkable and provide further evidence of the lengths being taken to discredit facts that contradict Dr. Marshak's opinion.

My concerns regarding the representations of our college's interaction with the COE are probably best phrased by Dr. Keiser, a member of NACIQI, in an exchange with Dr. Marshak during the NACIQI hearing held in December 2013:

*Dr. Keiser: "… My understanding (is) the school was under evaluation for 10 years, had multiple visits by multiple qualified, you know, veterinarians and folks who are part of veterinary science, and then 20 members of an accrediting commission all missed all of these things that you talked about?*

*"… Why do you have a better understanding of the process than probably 50 other people who have been involved in evaluating this institution?"*

Our graduates continue to prove their worth alongside graduates of other institutions every day. They are broadly dispersed throughout the profession, continue to meet the demands of our society and are as prepared for future challenges as any other graduate. The distribution of our graduates between practice (private and public), government, academic, internships, residencies and graduate education is comparable to that of any other accredited institution.

We are proud of the graduates we produce and the curriculum that produced them. As far as we know, every institution has had the liberty to develop their respective mission statement. We reserve the right to do so as well. Our motivation for providing these educational opportunities is the same as any other institution—to serve society. Contrary to the assertion made by Dr. Marshak in his open letter, we did not, nor do we, seek his opinion about what our mission should be.

Respectfully,

*Phillip D. Nelson, DVM, Ph.D., Dean, Western University  of Health Sciences College of Veterinary Medicine*

### Lincoln Memorial Responds

Former University of Pennsylvania Dean Marshak and three colleagues co-authored a letter repeating Dr. Marshak's chronic complaints about the AVMA's Council on Education and its accreditation of three domestic schools of veterinary medicine since 1981.

I am writing this letter on behalf of my client, Lincoln Memorial University, which received provisional accreditation from the COE and welcomed its first class of veterinary students in August of 2014. I serve as consultant and counsel for Lincoln Memorial University.

I have commented on Dr. Marshak's theories in other venues, including before the Department of Education both in December 2012 and 2014. However, this letter addresses a more egregious error by Dr. Marshak and his colleagues, for which an apology is owed to Lincoln Memorial University.

In the haste or zeal to make his point, Dr. Marshak makes a blatantly false and mean-spirited comment about my client, Lincoln Memorial University, and it reveals unfortunately a wanton lack of respect for the facts and history of a unique institution.

Addressing the AVMA's Dr. Price, they write: "It is evident to us that schools recently granted full accreditation, e.g., Western, or provisional status, e.g., Lincoln Memorial, *are essentially for-profit trade schools that mistakenly believe there will always be an applicant pool willing to pay very high tuition fees for an inferior education." (emphasis added)*

Lincoln Memorial was founded in 1897 at the direction of Gen. O.O. Howard, who was urged by President Abraham Lincoln during the Civil War in 1863 to found two institutions of higher learning: (1) a university in Washington, D.C., to serve the needs of African-Americans, which became known as Howard University and proudly exists to this day; and (2) a university near the Cumberland Gap where Kentucky, Virginia and Tennessee meet to serve the needs of the people of Appalachia who aided the Union cause during the Civil War.

Lincoln Memorial University is a nonprofit institution, like Dr. Marshak's former employer, the University of Pennsylvania, and has maintained this status for 117 years. Hardly a "trade school," Lincoln Memorial University has earned the highest level of accreditation available by its Department of Education-recognized regional accrediting body and has awarded degrees in the liberal arts and sciences for its entire history.

More importantly, Lincoln Memorial University embraced its mission to serve the needs of Appalachia, the poorest region in the United States, and in the past few decades has developed robust health and other professional programs as follows: nursing, nurse practitioners, osteopathic medicine, physician assistants, education, business administration, law, veterinary medicine, veterinary technology.

Not all graduates return to Appalachia, but a significant number of Lincoln Memorial professionals are on the front lines of struggling rural communities throughout the 13-state Appalachian region, providing services needed at all levels.

Lincoln Memorial University respects the eminent status and academic contribution of the University of Pennsylvania and understands that this institution does not endorse the views of its former veterinary school dean, in particular his false assertions about Lincoln Memorial's status, mission and ethics. But the lack of respect for the facts and character of an institution with which Dr. Marshak and his colleagues have no familiarity or firsthand knowledge demands some accountability. And the proud graduates and current students of this fine institution named for President Lincoln, who called for its birth, deserve an apology.

Whatever Dr. Marshak thinks about accreditation, he and his colleagues went too far.

*Mark L. Cushing, Tonkon Torp LLP,  Animal Policy Group*

---

Leave a Comment